## IN THE U.S. DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **SMART PROFITABILITY SOLUTIONS. LLC d/b/a SMART SAFETY GULF COAST,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| | ) | **Civil Action No. 1:18-cv-00706-MHC** |
| **vs.** | ) | |
| | ) | |
| **DOUBLE CHECK RISK SOLUTIONS, LLC AND JOHN MARSHA, II,** | ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

### PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Fed. R. Civ. P. 65, Plaintiff Smart Profitability Solutions, LLC d/b/a SMART Safety Gulf Coast ("Plaintiff" or "SMART") seeks the entry of a temporary restraining order enjoining Defendants Double Check Risk Solutions, LLC ("Double Check") and John Marsha, II ("Marsha"), including their representatives, employees, agents, and assigns, from: (1) using and possessing Plaintiff's confidential information and/or trade secrets; (2) doing business with or soliciting for business Plaintiff's actual and potential customers, with which SMART has done business or solicited for business within the past two years; (3)

1

using any marketing and/or operational materials copied, sourced or otherwise derived, in full or in part, from SMART information; and (4) breaching (or aiding the breach of) Marsha's employment agreement with Plaintiff, in particular its non-disclosure and non-recruitment provisions. SMART also seeks expedited discovery as outlined in its Proposed Order submitted with this Motion. Without such injunctive relief, Plaintiff has and will continue to suffer substantial and irreparable harm to its business operations.

## I.      FACTUAL BACKGROUND

Plaintiff SMART provides safety management, OSHA training, and professional safety staffing solutions to companies throughout the United States. (Verified Complaint ("Compl."), at ¶ 8). By utilizing SMART's services rather than maintaining an in-house safety department, SMART's clients enjoy substantial cost savings while maintaining a high-quality safety program. (Declaration of Robert L. Turner, III ("Turner Dec."), attached as **Exhibit A,** at ¶ 3). SMART primarily provides such services to companies in the construction and manufacturing industries, but it also serves those in distribution and similar industries. (*Id.*).

Defendant Marsha began his relationship with SMART as an independent contractor on or about May 30, 2014. (*Id.* at ¶ 9). In conjunction with the

2

commencement of his engagement, Marsha executed a Confidentiality, Non-Solicitation, and Non-Competition Agreement (the "NDA"). (*Id.* at ¶ 10; NDA, attached as **Exhibit B**). The NDA contains a confidentiality provision, which provides:

> Confidential Information.[1]  I recognize that during my employment I will receive, develop, or otherwise acquire information which is of a secret or confidential nature,   including Confidential Information regarding Smart and its Clients.  Except as authorized   by Smart, I will not disclose, directly or indirectly, any Confidential Information of Smart or its Clients to any third party including, without limitation, other customers or suppliers.   Further, I will only use such Confidential Information in the faithful performance of my duties for

---

[1] "Confidential Information" is defined as:

> any and all trade secrets and other confidential information relating to the disclosing party's business or the business of its customers, suppliers, equipment manufacturers   and/or consultants with whom it conducts business ("Clients") including, but not limited to information concerning management, engineering, finances, human resources, information services, legal, manufacturing, marketing, project management, research and development, business forms, sales, products and product plans; computer software; processes; procedures; pricing; business costs; business plans; ideas, drawings and technical data; financial data and plans; identity of actual and potential customers; identity, capability, responsibilities, and/or compensation of its employees; recruiting plans; customer specifications and job requirements; and proposals and bidding information.

> (Exhibit A, Definitions, p. 1).

3

Smart.  The confidentiality provisions of this Agreement shall survive the termination of my employment at Smart. I also acknowledge that all files, records, documents, drawings, specifications, equipment, and similar items (regardless of media) relating to Smart's business, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of Smart.  Upon the conclusion of my employment, I agree to return to or leave with Smart all of such written or other records and all copies thereof.

(Exhibit A, ¶ A). The NDA also contains a non-recruitment provision, which provides: "I agree that, during the Prohibited Term, I will not directly or indirectly, solicit, recruit or induce any Smart employee to leave employment with Smart or to work for any other person or business."[2] (Ex. A, ¶ C).

On or about September 4, 2014, SMART hired Marsha as its Business Development Officer. (Compl., ¶ 15). Upon accepting SMART's offer of employment, Marsha signed an offer letter acknowledging and agreeing to the terms of his employment (the "Employment Agreement"). (*Id.*; Employment Agreement, attached as **Exhibit C**).  The Employment Agreement explicitly incorporates the terms of Marsha's NDA as a condition of Marsha's employment. (Exhibit B, p. 5).  Accordingly, by signing the Employment Agreement, Marsha re-

---

[2] "Prohibited Term" is defined as "during employment, and the two year period immediately following the termination of my employment with Smart (regardless of the reason for such termination."). (Exhibit A, Definitions, p. 1).

4

affirmed his contractual obligations outlined in the NDA, including those outlined above. (Compl., ¶ 16).  Upon hire, Marsha also signed a Patent and Confidential Information Agreement, agreeing not to disclose any of SMART's confidential information during and subsequent to his employment with the company.  (Turner Dec., ¶ 13 and its Ex. C).

As SMART's Business Development Officer, Marsha reported directly to the company's CEO, Robert L. Turner, III, and was one of SMART's top four executives. (*Id.* at ¶ 17).   In this role, Marsha was responsible for directing SMART's sales efforts across all regions, services, and industry segments serviced by SMART; overseeing SMART's marketing functions; and managing SMART employees engaged in sales and field safety activities. (*Id.* at ¶ 18). He had the authority to submit proposals to SMART's customers and potential customers, to negotiate pricing, and to modify service terms necessary to secure sales. (*Id.* at ¶ 19). Marsha was likewise entrusted with SMART's most valuable proprietary information, including but not limited to its strategic planning data, actual and prospective customer data, sales proposals and contracts, confidential marketing and business development materials, and proprietary pricing and sales methodologies. (*Id.* at ¶ 20).

5

In or around July 2017, while still employed as SMART's Business Development Officer, Marsha approached Brandon Chapman, SMART's Vice President of the Gulf Coast Region, and asked him if he would be interested in leaving SMART with him to start a new, competing company. (Declaration of Brandon Chapman, attached as **Exhibit D**, at ¶ 5). Marsha told Chapman that he believed they could do a "better job" than SMART, and thus should go out on their own. (*Id.*). Marsha raised this topic at least 4-5 times with Chapman between July - November 2017. (*Id.*). Similarly, in or around September/October 2017, while still employed as SMART's Business Development Officer, Marsha encouraged Ted Low, SMART's Vice President of National Operations, to leave SMART and start a competing safety services company with him. (Declaration of Ted Low, attached as **Exhibit E**, at ¶ 11).

On or about November 16, 2017, Defendant Double Check filed its Articles of Organization with the Georgia Secretary of State. (Compl., ¶ 23; Double Check Articles of Organization, attached as **Exhibit F**). Upon information and belief, Marsha, as the President of Double Check, authorized Double Check's creation. (Compl., ¶ 23). On December 18, 2017, Marsha voluntarily and unexpectedly resigned from SMART, with his last official day of employment being January 2,

6

2018.  (Compl., ¶ 24). During Marsha's exit interview with Turner, Marsha told Turner that he was leaving SMART to become the president of an entity which resold auto insurance warranties. (*Id.* at ¶ 25).  Marsha explicitly represented to Turner that this company was not a competitor to SMART. (*Id.*).

Following Marsha's voluntary resignation, Marsha updated his LinkedIn profile to include his new role as President of Double Check.  (*Id.* at ¶ 27; *see also* Marsha LinkedIn Profile, attached as **Exhibit G**, *available at* https://www.linkedin.com/in/johnmarsha/).  Double Check's website states that it offers a variety of services, including: "Program Management"; "Audits/Inspections"; "Training"; "Reporting" and; "Incident Investigation", with particular expertise in "verifying regulatory compliance." (*See* "Double Check Risk Solutions, LLC", *available at* https://www.doublecheckrs.com/ (2017), *last accessed* February 19, 2018, attached as **Exhibit H**). It further states that Double Check "manages customized programs for auto dealers, manufacturers, and distribution companies." (*Id.*).  SMART provides each and every one of these services. (Turner Dec., ¶ 8). Accordingly, based on Marsha's and Double Check's own representations about the nature and scope of their services, they are directly competitive with SMART. (*Id.*).

4830-4251-5805 v2
2904860-000002 02/20/2018

In light of this discovery, SMART began investigating Marsha's departure from the Company, including undertaking a third-party forensic examination of Marsha's SMART computer, which he returned to SMART on December 21, 2017. (Compl., ¶¶ 26, 29).  This examination revealed that Marsha saved numerous files containing SMART's highly proprietary and trade secret information to external storage devices, and that he downloaded some of the most sensitive of them mere days before he turned in his computer to SMART. (Turner Dec., ¶ 9; Declaration of Chase Ritchey ("Ritchey Dec."), attached as **Exhibit I**, at ¶¶ 7-10 and its Exs. F-H).  However, Marsha did not return any external storage devices to SMART following his resignation. (Compl., ¶ 31).

The examination also revealed that Marsha regularly worked on Double Check-related files, including services agreements, independent contractor agreements, and PowerPoint presentations, between mid-November 2017 and December 21, 2017.  (Ritchey Dec., ¶¶ 11-12).  Specifically, the third-party forensic vendor discovered a draft services contract between Russell Landscaping, Inc. ("Russell") and Double Check saved on Marsha's SMART-issued computer. (Ritchey Dec., ¶ 5 and its Ex. B). As written, the agreement provides that Double Check "shall provide services, training and advice relating to safety, risk and

8

health" to Russell.  (*Id.* at Ex. B).   Russell is one of SMART's active sales prospects. (Compl., ¶ 35). Indeed, SMART submitted a proposal to perform services to Russell during Marsha's SMART employment, and followed up on that proposal numerous times, with Marsha's active participation. (*Id.*).

The forensic vendor also discovered an unexecuted independent contractor agreement between Marcial Marquez and Double Check dated December 20, 2017, prior to Marsha's departure from the Company. (Ritchey Dec., ¶ 6 and its Ex. C). This file was discovered in the Recycle Bin of Marsha's computer, indicating that Marsha attempted to delete it before returning his computer to SMART.  (*Id.* at ¶ 6). Marquez was an independent contractor with SMART who completed a project for SMART in late November 2017. (Compl., ¶ 41). Following the conclusion of that assignment, Turner met with Marquez in December 2017 to discuss future opportunities for employment with SMART, and had him meet one of SMART's clients to discuss opportunities with it.  (*Id.*).  Marquez stopped communicating with Turner shortly thereafter.  (Turner Dec., ¶ 15).

On February 5, 2018, SMART's counsel sent a letter to Defendants, notifying them that SMART suspected that they were unlawfully competing with it and advising that it was initiating an investigation into Marsha's departure from the

9

Company.  Therein, SMART demanded that Marsha immediately return any and all SMART property in his possession. (Compl., ¶ 42 and its Ex. G). Neither Defendant responded. (*Id.*).   Thereafter, on February 13, 2018, SMART sent Defendants a second letter, this time asserting that SMART had evidence that Marsha had its confidential and trade secret information in his possession. Again, SMART demanded that Defendants return this information immediately.  (Compl., ¶ 43 and its Ex. H).  Again, Defendants refused to respond. (*Id.*).

## II.   LEGAL ARGUMENT AND CITATION TO AUTHORITY

### A.   Standard of Law.

In order to obtain a temporary restraining order, a plaintiff must show:

(1) a substantial likelihood of ultimate success on the merits; (2) that the temporary restraining order is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the temporary restraining order would inflict on the non-movant; and (4) that the temporary restraining order would serve the public interest.

*Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).

### B.   SMART Will Succeed on the Merits.

SMART has alleged three substantive claims for relief against one or both of the Defendants of relevance here: (1) a breach of fiduciary duty claim against Marsha, as well as an associated conspiracy claim against Double Check; (2) a

misappropriation of trade secrets claim against both Defendants; and (3) a breach of contract claim against Marsha.  SMART is likely to succeed on the merits of each.

### 1.    Marsha Breached His Fiduciary Duty to SMART.

To establish a claim for breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.  *Wright v. Apt. Inv. and Mgmt. Co*., 315 Ga. App. 587, 594 (2012).  Under Georgia law:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

 O.C.G.A. § 23-2-58.

As SMART's Business Development Officer, Marsha held a key position on Plaintiff's executive team.  He reported directly to SMART CEO Robert Turner and was responsible for securing and growing SMART's customer and referral relationships. As such, Marsha had the authority to offer pricing and other contract terms to customers and to make changes to proposals on behalf of SMART.  In addition, Marsha enjoyed access to all of Plaintiff's most proprietary information

11

and trade secrets, including its actual and prospective customer lists and information, strategic plans, pricing and terms of service, and similar data. Accordingly, Marsha owed a fiduciary duty to Plaintiff. *See Wright*, 315 Ga. App. at 594 (employee who solicited and reviewed bids and had authority to approve changes to scope of work on employer's behalf owed it a fiduciary duty); *Nilan's Alley, Inc. v. Ginsburg*, 208 Ga. App. 145, 145 (1993) (employee had fiduciary obligation to employer where he was employer's agent for soliciting offers to purchase employer's products).

Additionally, it is undisputable that Marsha violated his fiduciary duty to SMART. While "[a]n employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed … [h]e is not [] entitled to solicit customers for a rival business before the end of his employment[,] nor can he properly do other similar acts in direct competition with the employer's business." *Professional Energy Mgmt., Inc. v. Necaise*, 300 Ga. App. 223, 225 (2009). Not only did Marsha misappropriate SMART's confidential information and trade secrets on behalf of a competitor, he also diverted at least one potential customer away from SMART for the benefit of himself and Double Check. Additionally, Marsha actively solicited two of SMART's high-level

employees to leave SMART and start a competitive venture.  Upon information and belief, he also successfully recruited one of its independent contractors for Double Check.  All of this conduct constitutes competitive activity that violates his fiduciary duty to SMART.[3] *See id.* (misappropriation of employer's confidential information and solicitation of employer's existing and prospective clients constitute breaches of fiduciary obligations); *Pinnacle Agriculture Dist., Inc. v. Mayo Fertilizer, Inc*., No. 1:17-CV-29 (LJA), 2017 WL 889542, at *4 (M.D. Ga. Mar. 6, 2017) (plaintiff showed likelihood of success on merits of fiduciary duty claim where evidence showed former employee shared its confidential information with competitor and misled customers into doing business with competitor); *Wright*, 315 Ga. App. at 594 ("When a fiduciary relationship exists, the agent may not make a profit for himself out of the relationship to the injury of the principal.").

Moreover, substantial evidence exists to establish that Double Check conspired in Marsha's fiduciary duty breach.  "To recover damages for a civil conspiracy claim, a plaintiff must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort." *Wright*, 315 Ga. App. at 595. "It is not

---

[3] Indeed, a review of Marsha's sales performance during this time reveals that he was exerting little effort on behalf of SMART.  His sales were down 65% in Q4 2017 from the prior quarter, and down 133% from his average performance across the four quarters prior to Q4 2017.  (Turner Dec., ¶ 16).

necessary to prove an express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances." *Id.* Further, "[o]nce a conspiracy is proven, any actionable deed by one of the conspirators is chargeable to all." *Id.*

The actions Marsha took to compete with SMART were done on behalf of and for the benefit of Double Check.  As Marsha is Double Check's President, it is inconceivable that Double Check was unaware of Marsha's fiduciary obligations to SMART.  This constitutes sufficient evidence to establish a likelihood of success on the merits for SMART's conspiracy claim.  *See White v. Shamrock Bldg. Sys., Inc.*, 294 Ga. App. 340, 347-48 (2008) (sufficient evidence of conspiracy between defendants existed where defendant-employee created defendant-company while still employed with plaintiff  "for the purpose of creating a vehicle by which [defendant-employee] could solicit customers in breach of his fiduciary duties").

### 2.    SMART Will Succeed on Its GTSA Claim.

The GTSA authorizes injunctive relief for an actual or threatened misappropriation of a "trade secret," which means:

4830-4251-5805 v2
2904860-000002 02/20/2018

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).  "Even in the absence of an express agreement, it is an implied term of an employment contract that an employee will not divulge a trade secret learned by virtue of his employment to a competitor of his former employer." *Am. Bldgs. Co. v. Pascoe Bldg. Sys., Inc.*, 260 Ga. 346, 349 (1990).

The GTSA specifically cites to "a list of actual or potential customers" as an example of a trade secret.  Here, SMART's forensic examination of Marsha's computer revealed that Marsha has accessed and retained SMART's "ATL Ops Audit Tracker," which contains detailed information regarding each of SMART's customers in the Atlanta Region, including specific services provided, operational planning details, and contact information for each customer's key executives. (Compl., ¶ 32; Turner Dec., ¶ 9).  He has also accessed and retained information pertaining to SMART's prospective customers.  (Compl., ¶ 31).

15

"Financial data,"  as well as "techniques," "methods," "technical data," and similar information are also explicitly identified as examples of trade secrets in the statute.   In addition to SMART's customer information, Marsha accessed and retained SMART's proprietary training materials, which it sells to customers for a fee; customer proposals and contracts, which contain SMART's proprietary pricing structure and service terms; SMART's Strategic Plan Starter, which contains the company's 2018 strategic planning framework; and SMART's Budgeting and Revenue Forecast Tracker, which outlines SMART's plans for acquiring new business and contains detailed financial performance data, including profit and loss data for the past several years. (Compl., ¶¶ 31-32; Turner Dec., ¶ 9). All of this information is entitled to trade secret protection under the GTSA.  *See Wright v. Power Ind. Consultants, Inc*., 234 Ga. App. 833, 838 (1998) (company's "customer lists, its list of craftsmen, and its internal company files," including files which revealed the company's pricing structure, constituted trade secrets), *overruled on other grounds by Advance Tech. Cons., Inc. v. Roadtrac, LLC*, 250 Ga. App. 317 (2001).

All of this information has significant value to SMART. Further, as it provides a roadmap to developing a successful safety services business, it is

16

extremely detrimental to SMART in the hands of a competitor.  (Turner Dec., ¶¶ 10-11).  Accordingly, SMART keeps all of this information confidential, and it limits its disclosure to only its most trusted high-level employees who have executed non-disclosure agreements with the Company.  (*Id.* at ¶11).  Moreover, SMART maintains extensive policies regarding the use and disclosure of its confidential information, and requires the use of passwords to access its computer network and internal document management system. (Compl., ¶ 33; Turner Dec., ¶¶ 11-12).  Accordingly, these materials constitute trade secrets subject to the protections of the GTSA. *See Paramount Tax & Acct'g, LLC v. H&R Block East. Enters., Inc.*, 299 Ga. App. 596, 603 (2009) (defendant made "reasonable efforts" to protect its information where it did not disclose it to the public, established company-wide policies to protect it, and limited access to certain employees such that it constituted a trade secret).

### 3.    SMART Will Succeed on Its Breach of Contract Claims.

SMART alleges that Marsha breached two provisions of the NDA: (1) the non-disclosure provision, and (2) the non-recruitment of employees provision. These claims arise under Louisiana law in light of the NDA's choice-of-law provision. (NDA, ¶ E(5)).  Under Louisiana law, "[t]he central elements of a

17

breach of contract action are the existence of a contract, a party's breach thereof, and damages." *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. App. 4 Cir. 2011) (quoting *Hercules Machinery Corp. v. McElwee Bros., Inc.,* 2002 WL 31015598, at *9 (E.D.La. Sept. 2, 2002)).  SMART will succeed on the merits of both claims.

Pursuant to the NDA, Marsha agreed not to disclose SMART's confidential and trade secret information to any third parties, nor to use it for any reason other than the "faithful performance of [his] duties for SMART." (NDA, ¶ A). Additionally, he agreed to return all information related to SMART upon the termination of his employment. (*Id*.).  Such agreements are routinely held enforceable under Louisiana law, and they do not have to comply with the stringent requirements of Louisiana's restrictive covenants statute (LA R.S. § 23:921) because they are not considered restraints on trade. *See NovelAire Techns., L.L.C. v. Harrison*, 50 So.3d 913, 918-19 (La. App. 4 Cir. 2010) ("An employer may require an employee not to disclose confidential information."); *Engineered Mech.Servs., Inc. v. Langlois*, 464 So.2d 329, 334, n. 15 (La. App. 1st Cir. 1984) ("Confidentiality agreements have been held enforceable and not subject to the prohibition (and requirements) of La. R.S. 23:921.").

4830-4251-5805 v2
2904860-000002 02/20/2018

The same is true of employee non-solicitation provisions like the one contained in the NDA. *See CDI Corp. v. Hough*, 9 So. 3d 282 (La. App. 1 Cir. 2009); (finding LA R.S. § 23:921 inapplicable to a similar non-solicitation of employees provision because it did not restrict performance of trade); *Smith, Barney, Harris, Upham & Co. v. Robinson*, 12 F.3d 515 (5th Cir. 1994 (same); *O'Sullivan v. Gupta*, No. 17-609,  2017 WL 3438349, at *6 (E.D. La., May 1, 2017) (upholding non-solicitation of employees provision despite striking down employer's non-compete provision in same agreement).

Notwithstanding the existence of these contractual obligations, Marsha downloaded and retained significant amounts of SMART's confidential information and trade secrets. He then refused to return any of it upon his departure and after having twice been instructed to do so.  Moreover, SMART reasonably suspects that Marsha disclosed this information to Double Check and used it for the benefit of Double Check, including but not limited to in the solicitation of SMART's prospective customers.  Further, while still employed by SMART, Marsha actively solicited two of SMART's high-level employees to leave SMART and compete against it.  Such acts constitute clear violations of the NDA's non-disclosure and non-recruitment provisions.  Finally, as demonstrated below,

4830-4251-5805 v2
2904860-000002 02/20/2018

SMART will undoubtedly suffer immediate and irreparable harm as a result of these breaches if the requested injunctive relief is not entered.   Accordingly, SMART has established a reasonable likelihood of success on the merits of its breach of contract claims.

### C.   SMART Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

"[T]he loss of customers and goodwill is an irreparable injury." *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).  Should Defendants be allowed to continue to retain and use SMART's confidential information and trade secrets to compete with SMART, and/or to continue to do business with or solicit business from SMART's actual and prospective customers appropriated in violation of Marsha's fiduciary duty, SMART will inevitably lose customers to Double Check.  Such a loss is an irreparable injury.  *See Variable Annuity Life Ins. Co. v. Joiner*, 454 F. Supp. 2d 1297, 1304 (S.D. Ga. 2006) (plaintiff "will suffer irreparable injury if [defendants] are allowed to continue to use [plaintiff's] client identity and account information to solicit [plaintiff's] customers because [plaintiff] will be deprived of the value of the trade secret and confidential information in which it has invested significant time and money"); *Amedisys Holding, LLC v. Interim Healthcare of Atl., Inc.*, 793 F. Supp. 2d 1302, 1313-14 (N.D. Ga. 2011)

(plaintiff would suffer irreparable harm if defendant was "allowed to solicit patients from the same doctors and facilities that were referenced in the misappropriated Referral Logs" because it would give defendant an "unearned advantage in the marketplace and will likely cause [plaintiff] to lose patients and referral sources") (Duffey, J.).  Moreover, should Marsha be allowed continue violating his non-recruitment covenant, SMART risks the loss of its employees, also an irreparable harm. *See Caliber Home Loans, Inc. v. Bales*, No. 3:16-cv-1167-J-32JRK, 2016 WL 4810287, at *1 (M.D. Fla. Sept. 14, 2016) (granting TRO and finding that plaintiff would suffer "irreparable injury and loss" if defendants were permitted to improperly solicit plaintiff's employees).

### D.    The Balance of Harms Favors SMART.

The balance of harms weighs heavily in SMART's favor.  Imposing the injunctive relief SMART seeks will merely prohibit Defendants from using information they unlawfully obtained and from otherwise profiting from their unlawful conduct. Without this relief, SMART risks irreparable harm in the form of lost customers, lost goodwill, and the significant if not complete diminution in value of its confidential information and trade secrets. *See Pinnacle*, 2017 WL 889542, at *6 (balance of harms weighed in favor of plaintiff; without injunction,

plaintiff faced loss of customers and goodwill, while with the injunction defendants "will only be prevented from using information obtained unlawfully" and thus would not be harmed); *Specialty Chems & Servs., Inc. v. Chandler*, 1988 WL 618583, at *4 (N.D. Ga. Sept. 29, 1988) ("Defendants cannot suffer compensable harm when enjoined from unlawful activity.") (Shoob, J.).  Further, SMART's actual and potential customers will not be harmed by enjoining Defendants from doing business with them, as SMART can continue to service them or they can obtain similar services from other providers.  (Turner Dec., ¶ 8).

###        E.        The Public Interest Supports the Imposition of Injunctive Relief.

Federal and Georgia courts have long recognized that upholding valid non-disclosure agreements, prohibiting the misappropriation of trade secrets, and protecting customer relationships from unlawful interference by former employees support the public interest.  *See Variable Annuity*, 454  F. Supp. 2d at 1305 ("A cognizable public interest exists in upholding an agreement pursuant to which an employer sought to protect itself from post-termination piracy of the most valuable information it owns, as well as discouraging employees from breaching their employer's trust and misappropriating trade secret and confidential information for their own gain."); *Pinnacle*, 2017 WL 889542, at *7 ("There is a strong public

policy for protecting trade secrets from misappropriation and in promoting fair competition.") (quoting *Priority Payment Sys., LLC v. Signapay, LTD*, 161 F. Supp. 3d 1294, 1304 (N.D. Ga. 2016)); *Lee v. Envtl. Pest & Termite Ctrl., Inc.*, 271 Ga. 371, 373-74 (1999) ("When a duty has been imposed upon an employee pursuant to a contract not to disclose confidential business information upon termination of employment, public policy is swung in favor of protecting these commercial intangibles and of preventing unfair methods of exploiting them in breach of duty."); *Palmer & Cay of GA., Inc. v. Lockton Cos., Inc.*, 280 Ga. 479, 484 (2006) ("The employer has a protectable interest in the customer relationships its former employee established and/or nurtured while employed by the employer, and is entitled to protect itself from the risk that the former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer.").

Here, SMART seeks an injunction prohibiting Defendants from continued violation of Marsha's contractual obligations, and from using and profiting from its confidential information and trade secrets in violation of Marsha's non-disclosure agreement, his fiduciary duty of loyalty to SMART, and the GTSA. Such relief fully supports the public interests outlined above.

4830-4251-5805 v2
2904860-000002 02/20/2018

## III.  CONCLUSION

For the foregoing reasons, SMART respectfully requests that the Court enter a temporary restraining order enjoining Defendants from: (1) using and possessing Plaintiff's confidential and trade secret information; (2) doing business with Plaintiff's actual and potential customers with whom Plaintiff did business or solicited for business in the past two years; (3) using any marketing and/or operational materials copied, sourced or otherwise derived from SMART information; and (4) breaching (or aiding the breach of) Marsha's employment agreement with Plaintiff, in particular its non-disclosure and non-recruitment provisions.  Further, SMART seeks an order compelling Defendants to provide complete written responses to, as well as to produce all responsive documents, materials, and devices requested in, the discovery requests attached to Plaintiff's Motion for Expedited Discovery, which Plaintiff has filed contemporaneously with this Motion.[4]  Finally, SMART seeks an order compelling Defendant Marsha to sit for his deposition in anticipation of a preliminary injunction hearing.  For the

---

[4] Plaintiff includes this request for discovery here in an abundance of caution.  If the Court has already granted Plaintiff's Motion for Expedited Discovery, this request is moot.

4830-4251-5805 v2
2904860-000002 02/20/2018

Court's convenience, SMART has submitted a Proposed Order outlining its requested relief in detail.

Respectfully submitted this 20th day of February, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
David E. Gevertz
GA Bar No. 292430
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA  30326
Phone: 404-223-2216
Email:    khinton@bakerdonelson.com
          dgevertz@bakerdonelson.com

25

## CERTIFICATE OF SERVICE

I certify that on this date I caused to be served a true and correct copy of

*Plaintiff's Brief in Support of its Motion for Temporary Restraining Order* as

follows:

### Via hand-delivery & Federal Express

Double Check Risk Solutions, LLC
Ben Newton, Registered Agent
2800 Century Parkway, Suite 300
Atlanta, Georgia 30345

### Via hand-delivery, email & Federal Express

John C. Marsha, II
119 Foxdale Way
Dallas, GA 30132

Respectfully submitted this 20th day of February, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
*Attorney for Plaintiff*

4830-4251-5805 v2
2904860-000002 02/20/2018