**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **SMART PROFITABILITY SOLUTIONS, LLC d/b/a SMART SAFETY GULF COAST,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 1:18-cv-00706-MHC** |
| **vs.** | ) ) ) | |
| **DOUBLE CHECK RISK SOLUTIONS, LLC AND JOHN MARSHA II** | ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) ) | |

**FIRST AMENDED VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

COMES NOW Smart Profitability Solutions, LLC d/b/a SMART Safety Gulf Coast  ("SMART" or the "Company"), by and through Counsel, and files its First Amended Verified Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(A) against Defendants Double Check Risk Solutions, LLC ("Double Check") and John Marsha, II ("Marsha") (collectively, "Defendants"), stating as follows:

1

## PARTIES

1.

SMART is a corporation organized under the laws of the State of Delaware, with its principal place of business in Marietta, Georgia.

2.

Defendant Double Check is a Georgia limited liability company, with its principal place of business located in Atlanta, Georgia.  Double Check may be served with process through its registered agent, Ben Newton, at 2800 Century Parkway, Suite 300, Atlanta, Georgia 30345.

3.

Defendant John Marsha, II is an individual who resides in Paulding County, Georgia.  He may be served with a copy of this Complaint at his home address, 119 Foxdale Way, Dallas, Georgia 30132.

## JURISDICTION AND VENUE

4.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it involves federal questions arising under the Computer Fraud and Abuse Act of 1986, as amended, 18 U.S.C. § 1030 ("CFAA").  This

2

Court also has supplemental jurisdiction over all of the state law claims in this action because they arise out of the same facts and circumstances underlying the CFAA claim.

5.

This Court has personal jurisdiction over Double Check because the claims alleged against it arise from its transaction of business in the State of Georgia, and/or from Double Check's commission of tortious acts in the State of Georgia.

6.

This Court has personal jurisdiction over Defendant Marsha because, as a Georgia resident, he is subject to general personal jurisdiction in Georgia.

7.

This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and Division.[1]

---

[1]While the agreement upon which SMART's breach of contract claims are based contains an exclusive venue provision in Louisiana, SMART expressly waives that provision. This provision was included at SMART's direction for its convenience. All parties are located in this venue and all of the events giving rise to this action occurred in this venue, such that the interests behind the venue provision are moot with respect to this action.

3

4847-2176-4703 v2
2904860-000002 03/09/2018

## FACTS

8.

SMART provides safety management, OSHA training, and professional safety staffing solutions to companies in a variety of industries throughout the United States.  SMART primarily provides such services to companies in the construction industry, but also serves those in distribution, manufacturing, and similar industries.  Robert L. Turner, III ("Turner") is the Company's President and Chief Executive Officer.

9.

Marsha began his relationship with SMART as an independent contractor on or about May 30, 2014.

10.

In conjunction with the commencement of his engagement with SMART, Marsha executed a Confidentiality, Non-Solicitation, and Non-Competition Agreement (the "Non-Disclosure/Non-Solicitation Agreement"). A true and correct copy of the Non-Disclosure/Non-Solicitation Agreement is attached as **Exhibit A**.

4847-2176-4703 v2
2904860-000002 03/09/2018

11.

The Non-Disclosure/Non-Solicitation Agreement contains a confidentiality

provision, which provides:

Confidential Information.  I recognize that during my employment I will receive, develop, or otherwise acquire information which is of a secret or confidential nature,   including  Confidential  Information regarding Smart and its Clients.  Except as authorized   by  Smart,  I will not disclose, directly or indirectly, any Confidential Information of Smart or its Clients to any third party including, without limitation, other  customers  or  suppliers.   Further,  I  will  only  use  such Confidential Information in the faithful performance of my duties for Smart.  The confidentiality provisions of this Agreement shall survive the termination of my employment at Smart. I also acknowledge that all   files, records, documents, drawings, specifications, equipment, and similar items (regardless of media) relating to Smart's business, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of Smart.  Upon the conclusion of my employment, I agree to return to or leave with Smart all of such written or other records and all copies thereof.

(Exhibit A, ¶ A).

12.

"Confidential Information" is defined as:

any and all trade secrets and other confidential information relating to the  disclosing  party's  business  or  the  business  of  its  customers, suppliers, equipment manufacturers   and/or consultants with whom it  conducts  business  ("Clients")  including,  but  not  limited  to information  concerning  management,  engineering,  finances,  human resources,  information  services,  legal,  manufacturing,  marketing,

5

project management, research and development, business forms, sales, products and product plans; computer software; processes; procedures; pricing; business costs; business plans; ideas, drawings and technical data; financial data and plans; identity of actual and potential customers; identity, capability, responsibilities, and/or compensation of its employees; recruiting plans; customer specifications and job requirements; and proposals and bidding information.

(Exhibit A, ¶ 2).

13.

The Non-Disclosure/Non-Solicitation Agreement also contains a non-solicitation of employees provision, which provides: "I agree that, during the Prohibited Term, I will not directly or indirectly, solicit, recruit or induce any Smart employee to leave employment with Smart or to work for any other person or business." (Exhibit A, ¶ C).

14.

"Prohibited Term" is defined as "during employment, and the two year period immediately following the termination of my employment with Smart (regardless of the reason for such termination."). (Exhibit A, ¶ 3).

15.

On or about September 4, 2014, SMART hired Marsha as its Business Development Officer. Upon accepting SMART's offer of employment, Marsha

4847-2176-4703 v2
2904860-000002 03/09/2018

signed an offer letter acknowledging and agreeing to the terms of his employment (the "Employment Agreement").  A true and correct copy of the Employment Agreement is attached as **Exhibit B.**

16.

The Employment Agreement specifically incorporates Marsha's Non-Disclosure/Non-Solicitation Agreement as a condition of Marsha's employment. (Exhibit B, p. 5).  Accordingly, by signing the Employment Agreement, Marsha re-affirmed his contractual obligations outlined in the Non-Disclosure/Non-Solicitation Agreement, including those outlined above.

17.

As SMART's Business Development Officer, Marsha reported directly to CEO Turner, and was one of the top four executives in SMART's organization. During his employment, Marsha was one of only four employees who received grants of equity awards from the Company.

18.

In this role, Marsha was responsible for directing SMART's sales efforts across all regions, services, and industry segments serviced by SMART;

4847-2176-4703 v2
2904860-000002 03/09/2018

overseeing SMART's marketing functions; and managing the activities of SMART employees engaged in sales activities and SMART's field safety personnel.

19.

Marsha had the authority to submit proposals to SMART's customers and potential customers, to negotiate pricing, and to modify service terms as necessary to secure sales.

20.

Marsha was also entrusted with cultivating SMART's most valuable business relationships, including those with SMART referral sources/channel partners (insurance brokers, law firms, etc.) and SMART customers and potential customers.

21.

Marsha was likewise entrusted with SMART's most valuable proprietary information, including but not limited to its strategic planning data, actual and prospective customer data, sales proposals and contracts, confidential marketing and business development materials, and proprietary pricing and sales methodologies.

4847-2176-4703 v2
2904860-000002 03/09/2018

22.

In or around July 2017, while still employed as SMART's Business Development Officer, Marsha approached Brandon Chapman, Vice President of the Gulf Coast Region of SMART, and asked him if he would be interested in starting a competing safety services company with him. During this conversation, Marsha encouraged Chapman to leave SMART and join him in a competitive venture.

23.

Similarly, in or around September/October 2017, while still employed as SMART's Business Development Officer, Marsha asked Ted Low, Vice President of National Operations, to leave SMART and start a competing safety services company with him. Marsha also informed Low that he had already approached Chapman about the idea, and Marsha encouraged Low to join him. Marsha further told Low that although he knew he had agreed to certain restrictive covenants in the Non-Disclosure/Non-Solicitation Agreement, he did not think it would be an issue because SMART did not have the stomach to try to enforce it against him.

4847-2176-4703 v2
2904860-000002 03/09/2018

24.

On or about November 16, 2017, Defendant Double Check filed its Articles of Organization with the Georgia Secretary of State.  Upon information and belief, Defendant Marsha, as the President of Double Check, authorized Double Check's creation.

25.

On or about December 18, 2017, Marsha voluntarily and unexpectedly resigned from SMART, with his last official day of employment being January 2, 2018.

26.

During Marsha's exit interview with Turner, Marsha told Turner that he was leaving SMART to become President of an entity which resold auto insurance warranties.  Marsha explicitly represented to Turner that this company was not a competitor of SMART.

27.

Marsha turned in his company-issued computer to SMART on or about December 21, 2017.

10

28.

Following Marsha's voluntary resignation, Marsha updated his LinkedIn profile to include his new role as President of Double Check.  A true and correct copy of Marsha's LinkedIn profile is attached as **Exhibit C.**  Double Check's LinkedIn profile describes the company as one that "manages customized programs for auto dealers, manufacturers, and distribution companies."  It further lists Double Check's specialties as including "safety" and "OSHA." A true and correct copy of Double Check's LinkedIn profile is attached as **Exhibit D**.

29.

Based on its own publicized statements, Double Check is providing services competitive with SMART.

30.

In light of this discovery, SMART began investing Marsha's departure from the Company, including undertaking a third-party forensic examination of Marsha's SMART computer.

31.

This examination revealed that in the week before Marsha's return of his SMART computer, Marsha connected an external storage device(s) to the

11

computer.  He then accessed numerous files on that device, revealing that Marsha
had either just downloaded the files to the device or had done so previously.  These
files contained significant amounts of SMART's confidential information and trade
secrets, to which Marsha had been provided access over the last three years solely
by virtue of him serving as a key SMART executive, who had signed a non-
disclosure agreement.

32.

Specifically, SMART's investigation revealed that Marsha has SMART's
customer lists, referral source/channel partner information, prospective customer
information, pricing data, strategic planning materials, proprietary training
materials (which SMART sells to its customers), and similar highly confidential
and trade secret information in his possession.  Marsha did not return any of this
information to SMART following his voluntary resignation.  Accordingly, upon
information and belief, Marsha still has this information in his possession.

33.

In particular, some of the documents Marsha retained include: SMART's
"ATL Ops Audit Tracker," a detailed list of SMART's Atlanta-area customers
including services performed for these customers each month, operations planning,

12

and contact information of key customer executives; SMART's customer portfolio for the Baton Rouge/Houston region; SMART's proprietary training materials, which it provides to customers for a fee; SMART's prospective client list; SMART's customer proposals and contracts, which contain details of SMART's confidential pricing model and service terms; SMART's Strategic Plan Starter, which contains the Company's 2018 strategic planning framework; and SMART's Budgeting and Revenue Forecast Tracker, which outlines SMART's plans for acquiring new business and contains.

34.

SMART takes all reasonable steps to ensure that its proprietary information is protected from disclosure. It does not share any of this information publicly, and it limits access to this information internally to only its highest-level employees, such as Marsha. All of SMART's computers are password-protected, and employees must have a username and password to access SMART's email and document management system.

35.

SMART also discovered a draft services contract between Russell Landscaping, Inc. ("Russell Landscaping") and Double Check saved on Marsha's

4847-2176-4703 v2
2904860-000002 03/09/2018

SMART computer. As written, the agreement provides that Double Check "shall provide services, training and advice relating to safety, risk and health" to Russell Landscaping. A true and correct copy of the agreement between Russell Landscaping and Double Check is attached as **Exhibit E.**

36.

Russell Landscaping is one of SMART's active sales prospects. SMART submitted several proposals to perform services to Russell Landscaping during Marsha's SMART employment, with Marsha's knowledge and active participation.

37.

Upon information and belief, Marsha used SMART's proprietary information to appropriate this opportunity away from SMART on behalf of his new competing venture, Double Check.

38.

Upon information and belief, Marsha diverted and/or appropriated other sales prospects and opportunities away from SMART to Double Check while still employed with SMART.

14

39.

By way of example, upon information and belief, Marsha utilized the relationships he developed with SMART's referral sources/channel partners (including representatives of Yates Insurance Agency ("Yates")), using these contacts to identify and attract new business opportunities that would have otherwise gone to SMART.

40.

Further, on information and belief, Marsha used SMART's proprietary and trade secret information to secure referrals from referral sources/channel partners such as Yates.

41.

Marsha utilized his relationship with Yates representatives -- which he developed through his SMART employment -- to secure funding for Double Check and/or the services of Double Check's registered agent.

42.

Since his departure from SMART, Marsha, on behalf of Double Check, has solicited at least one of SMART's current customers, Manufacturing Resources, Inc. ("MRI"), to provide services competitive with SMART.  Upon information

15

and belief, Marsha and Double Check used SMART's proprietary information and trade secrets to aid in this solicitation.

43.

Marsha also used his position with SMART to recruit SMART's employees and independent contractors to leave SMART and work for Double Check.   In addition to his solicitation of Chapman and Low, Marsha also solicited and successfully recruited one of SMART's independent contractors, Marcial Marquez.

44.

In the course of its review of Marsha's computer, SMART's third-party forensics vendor also discovered an unexecuted independent contractor agreement between Marquez and Double Check dated December 20, 2017, prior to Marsha's departure from the Company.  A true and correct copy of this employment contract is attached as **Exhibit F**.

45.

Marquez was an independent contractor with SMART who had recently completed a project for SMART in late November 2017.  Following the conclusion of that assignment, Turner met with Marquez in December 2017 to discuss future opportunities for employment with SMART, and had him meet one of SMART's

16

clients to discuss specific opportunities with it. Upon information and belief, Marquez decided not to continue his relationship with SMART because Marsha solicited him to work for Double Check.

46.

On February 5, 2018, SMART's counsel sent a letter to Defendants, notifying them that SMART was aware that they were unlawfully competing with it and were initiating an investigation into Marsha's departure from the Company. Further, SMART's counsel demanded that Marsha return any and all SMART property in his possession immediately.   A true and correct copy of this correspondence is attached as **Exhibit G.**  Neither Defendant responded.

47.

Thereafter, on February 13, 2018, SMART's counsel sent a second letter to Defendants, notifying them that SMART had evidence that Marsha had its confidential and trade secret information in his possession. Again, SMART demanded that Defendants return this information immediately.  A true and correct copy of this letter is attached as **Exhibit H.**  Again, Defendants failed to respond.

4847-2176-4703 v2
2904860-000002 03/09/2018

48.

As a result of Defendants' unlawful actions, SMART has been damaged, including but not limited to by the loss of prospective customers such as Russell Landscaping, the loss of Marquez, and the loss and utilization of its proprietary information and trade secrets.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT AGAINST DEFENDANT MARSHA
*Breach of the Confidentiality and Non-Solicitation Provisions*

49.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

50.

Defendant Marsha executed valid agreements with Plaintiff in exchange for valuable consideration, through which he agreed to refrain from using any of SMART's confidential information for any purpose except to perform services for SMART, and to not directly or indirectly solicit, recruit or induce any SMART employee to leave employment with SMART.

4847-2176-4703 v2
2904860-000002 03/09/2018

51.

Notwithstanding his contractual obligations to the contrary, Defendant Marsha has materially breached his Employment and Non-Disclosure/Non-Solicitation Agreements by disclosing and using SMART's trade secret and/or confidential and proprietary information to and for the benefit of himself and Double Check.  Marsha's breach of the Employment and Non-Disclosure/Non-Solicitation Agreements is further evidenced by his failure to return SMART's information at the end of his employment with SMART.

52.

Defendant Marsha has also materially breached his Employment and Non-Disclosure/Non-Solicitation Agreements by directly soliciting, or participating in the solicitation of, SMART employees to leave SMART and come to work for competitor Double Check, including Ted Low, SMART's Vice President of National Operations and Brandon Chapman, SMART's Vice President of Gulf Coast Region.

53.

As a direct and proximate result of Defendant Marsha's breach of his Employment and Non-Disclosure/Non-Solicitation Agreements, SMART has

4847-2176-4703 v2
2904860-000002 03/09/2018

suffered, and will continue to suffer, immediate and irreparable injury, for which SMART has no adequate remedy at law, and for which SMART is entitled to preliminary and permanent injunctive relief.

54.

As a direct and proximate result of Defendant Marsha's breach of his Employment and Non-Disclosure/Non-Solicitation Agreements, SMART has suffered actual damages, including the loss of at least one sales opportunity and the loss of one of its independent contractors.

55.

SMART is also entitled to attorney's fees and costs of litigation pursuant to the terms of the Non-Disclosure/Non-Solicitation Agreement.

## COUNT II
## BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT MARSHA

56.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

57.

58.   As a SMART executive officer who was entrusted with SMART's confidential and proprietary information, who had the authority to offer pricing and

20

other contract terms to current and prospective clients, and to amend proposals with customers and other third parties, Marsha was an agent of SMART and owed it a fiduciary duty of loyalty.

Marsha breached his fiduciary duties to SMART by:

(a)      disclosing SMART's confidential and proprietary information and trade secrets to Double Check without the Company's consent, both before and after the termination of his SMART employment;

(b)      misappropriating SMART's confidential and proprietary information and trade secrets to benefit himself and Double Check, a direct competitor of SMART, both before and after the termination of his SMART employment;

(c)      soliciting SMART employees and/or contractors, including but not limited to, Brandon Chapman, Ted Low, and Marcial Marquez, to leave SMART and work for a competitor; and

(d)      appropriating SMART's corporate opportunities for his own benefit and the benefit of Double Check, including but not limited to SMART's prospective client Russell Landscaping and referrals from one of SMART's most important referral sources, Yates.

4847-2176-4703 v2
2904860-000002 03/09/2018

59.

Marsha breached his fiduciary duty to SMART in bad faith, such that SMART is entitled to an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

60.

As a result of the foregoing breaches of Marsha's fiduciary duty, SMART has been damaged in an amount to be proven at trial, and it additionally has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS

61.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

62.

The customer lists, referral source/channel partner information, sales prospect data, pricing data, marketing materials, strategic plans, and training materials which SMART sells to customers and other documents described above constitute "trade secrets" within the meaning of O.C.G.A. § 10-1-761.  They are

22

not commonly known by or available to the public; derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and are the subject of efforts by SMART that are reasonable under the circumstances to maintain their secrecy.

63.

Defendant Marsha disclosed and/or used the trade secrets described above without express or implied consent, and used improper means to acquire knowledge of such trade secrets because he acquired such knowledge by breaching his confidential fiduciary relationships with SMART and his contractual obligation to maintain their secrecy and/or limit their use.

64.

Upon information and belief, Double Check acquired the trade secrets described above from Defendant Marsha and knew or had reason to know that Defendant Marsha acquired such trade secrets by improper means.

65.

Upon information and belief, Double Check used the trade secrets described above without express or implied consent, and it used improper means to acquire

23

knowledge of such trade secrets because it acquired such knowledge by inducing breaches of confidential fiduciary relationships and duties to maintain secrecy and/or limit use.

66.

Upon information and belief, Double Check used the trade secrets described above without express or implied consent, and at the time of use, it knew or had reason to know that knowledge of such trade secrets was:   derived from John Marsha, who had utilized improper means to acquire it; acquired by John Marsha under circumstances giving rise to duties to maintain secrecy and/or limit use; and derived from John Marsha, who owed SMART duties to maintain secrecy and/or limit use.

67.

As a result of Defendants' misappropriation of its trade secrets, SMART has been damaged in an amount to be proven at trial, and it additionally has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

4847-2176-4703 v2
2904860-000002 03/09/2018

68.

Further, Defendants' misappropriation of SMART's trade secrets was willful and malicious, and SMART should be awarded exemplary damages and attorneys' fees under O.C.G.A. §§ 10-1-763 and 764.

## COUNT IV
## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

69.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

70.

Defendants have acted in concert to undertake the tortious conduct and other wrongs alleged herein, specifically Marsha's breach of fiduciary duty.

71.

At a minimum, its conspiracy is inferable from the profits they have shared and the concerted nature of their activities, *e.g.*, the distribution of information/items taken from SMART.

72.

Defendants' civil conspiracy is continuous and ongoing.

25

73.

Under the conspiracy, all tortious conduct and other wrongs by any one conspirator shall be chargeable to all Defendants.

### COUNT V
### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030(A)(2)(C)
### AGAINST DEFENDANT MARSHA

74.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

75.

As a SMART officer, Defendant Marsha had access to SMART's computer network and hardware.

76.

Defendant Marsha intentionally accessed SMART's protected network and computer without authorization or in such a way that exceeded his authorization by misappropriating SMART's confidential and proprietary information to benefit himself and Double Check, a direct competitor of SMART.

26

77.

Defendant Marsha's unauthorized access of SMART's protected computer and network resulted in a loss to SMART of at least or exceeding $5,000 in value. SMART was required to expend time, resources and money investigating the cause and scope of Marsha's computer intrusion and breaches of confidentiality, and has lost an amount to be determined at trial from Marsha's unlawful use of its confidential information he misappropriated by virtue of his unauthorized access.

## COUNT VI
## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

78.

Defendants Marsha and Double Check have been unjustly enriched by virtue of their misappropriation of SMART's confidential information and trade secrets, to the detriment of SMART.

79.

Additionally, to the extent SMART reimbursed Marsha for business-related expenses, or compensated him for time he spent engaging in competitive activities on behalf of himself or Double Check, Marsha has been unjustly enriched to the detriment of SMART.

4847-2176-4703 v2
2904860-000002 03/09/2018

80.

As Defendants have obtained benefits for which should be returned to SMART and/or for which SMART should be compensated under rules of equity, a claim for unjust enrichment is warranted and SMART should be made whole for its losses resulting in a benefit and/or windfall to Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, SMART prays for judgment as follows:

1.     That Defendants be temporarily, preliminarily, and permanently enjoined from disclosing or using any confidential information or trade secrets of SMART, and that Defendants be mandated to return all of SMART's property in their possession immediately;

2.     That Defendants be temporarily, preliminarily, and permanently enjoined from soliciting for business or continuing to do business with any referral source/channel partner or customer which they acquired either in violation of Marsha's fiduciary duty to SMART or with SMART's confidential information and/or trade secrets (which equates to all SMART referral sources/channel partners, actual and potential customers with whom SMART has solicited for business or done business with in the past two years);

28

3.     That the Court honor the choice-of-law provisions in the Non-Disclosure/Non-Solicitation Agreement and apply the substantive laws of the State of Louisiana as to the breach of contract claim in this action; however, the Court shall apply the laws of the State of Georgia as to the tort claims in this action;

4.     For an award of compensatory damages in an amount to be proven at trial;

5.     For an award of exemplary damages in an amount twice the compensatory damages awarded on the misappropriation claim;

6.     For an award of punitive damages in light of the willful, malicious, and intentional nature of Defendant's actions;

7.     For attorneys' fees as provided in O.G.C.A. § 10-1-764, O.G.C.A.§ 13-6-11, and the Non-Disclosure/Non-Solicitation Agreement;

8.     For an award of SMART's costs incurred in pursuing this action;

9.     For a disgorgement of any compensation and reimbursements paid by SMART to Defendant Marsha during the pendency of his breach of fiduciary duty, as well as any profits acquired by either Defendant by virtue of Marsha's breach of fiduciary duty;

10.    For any further or additional relief that justice requires; and

4847-2176-4703 v2
2904860-000002 03/09/2018

11.     Pursuant to Fed. R. Civ. P. 38, SMART demands a jury trial on all issues so triable.

Respectfully submitted this 9th day of March, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
David E. Gevertz
GA Bar No. 292430
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA  30326
Phone: 404-223-2216
Email:    khinton@bakerdonelson.com
              dgevertz@bakerdonelson.com

4847-2176-4703 v2
2904860-000002 03/09/2018

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date I caused to be served a true and correct copy of

*First Amended Verified Complaint for Damages and Injunctive Relief* via the

Court's ECF filing system as follows:

Eric Barton, Esq.
Seyfarth Shaw LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309-3958

Respectfully submitted this 9th day of March, 2018.

<u>s/ Kathryn Hinton</u>
Kathryn Hinton
GA Bar No. 542930
*Attorney for Plaintiff*

31