IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SMART PROFITABILITY
SOLUTIONS,
LLC d/b/a SMART SAFETY GULF
COAST,

        Plaintiff,

v.

DOUBLE CHECK RISK SOLUTIONS,
LLC, and JOHN MARSHA, II,

        Defendants.

Case No. 1:18-cv-00706-MHC

Honorable Judge Mark H. Cohen

**DEFENDANT DOUBLE CHECK RISK SOLUTIONS, LLC'S
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
TO MODIFY TEMPORARY RESTRAINING ORDER**

Defendant Double Check Risk Solutions, LLC ("Double Check") responds in

opposition to Plaintiff SMART Profitability Solutions, LLC's ("SMART") Motion

to Modify Temporary Restraining Order ("Motion to Amend"), showing the Court

as follows:

**INTRODUCTION**

SMART's Motion to Amend is an impermissible attempt to enjoin Double

Check from utilizing its independent business relationships and personal knowledge

to lawfully compete in the marketplace.  When SMART first sought injunctive relief

in this case, Double Check made the deliberate decision not to oppose SMART's request for a TRO because: (1) Double Check had already returned all of SMART's information, (2) had not utilized any of SMART's information, (3) did not perform any work for any of SMART's customers or prospective customers, (4) did not intend to immediately work for any of SMART's current or prospective customers, (5) Defendant John Marsha ("Marsha") had just filed for bankruptcy, and (6) because it knew that the TRO was of limited duration.[1]  Accordingly -- and in a genuine hope to expedite the resolution of this case -- Double Check chose to participate in limited expedited discovery so that it could prove to SMART that Double Check had not profited off any information belonging to SMART.  Despite the fact that Double Check has now returned all of SMART's information in its possession, turned over access to Marsha's personal e-mail account for SMART's review, and willingly abided by the terms of the TRO, SMART now seeks to ***expand*** the existing TRO by requesting that Double Check be prevented from communicating or doing business with its "referral sources," with a special focus on Yates Insurance Agency ("Yates"). As detailed below, there is no factual or legal

---

[1] *See*, e.g., *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 946 (7th Cir. 2006) (Even a TRO issued with notice to the parties is still subject to the 20 [now 28] automatic expiration period set forth in F.R.C.P. Rule 65(b)(2)).

basis for this request, which is nothing more than an improper attempt by SMART to inhibit a business rival from permissibly competing.

Incredibly, SMART acknowledges that employees of Yates were involved in the creation of Double Check, while simultaneously asserting that Double Check should not be able to seek referrals from Yates.  In other words, if this Court were to grant the Motion to Amend, it would mean that individuals who have an ownership interest in the Double Check could not do *any* work for the company, notwithstanding the fact that they are not subject to any applicable non-competition or non-solicitation agreement and all of SMART's property has already been returned.  SMART's attempt to thrust a non-compete and non-solicit upon Double Check is not supported by any applicable law.

SMART is also not entitled to the requested injunctive relief based upon its allegation that Double Check "conspired" with Marsha to breach his fiduciary duties to SMART.  Setting aside the fact that Double Check cannot "conspire" to do something it is legally entitled to do (i.e., compete against SMART without using SMART's information), any alleged damage, past or future, is fully compensable with money damages, and as such does not qualify SMART to receive injunctive

-3-

relief.  For all these reasons and the reasons set forth below, SMART's Motion to Amend should be denied.[2]

## BACKGROUND FACTS

**I.     The Court Entered a Temporary Restraining Order.**

On February 20, 2018, SMART filed its Motion for TRO, asking this Court, in part, to enter an injunction against Double Check to (1) prevent Double Check from using and possessing Plaintiff's confidential information and/or trade secrets; (2) compel Double Check to turn over any SMART information in its possession; (3) prevent Double Check from doing business with or soliciting business from any actual or potential customer of SMART; and (4) prevent Double Check from aiding the breach of Marsha's employment agreement. (*See* Dkt. No. 5).  As Double Check did not knowingly possess any SMART information, did no work for any SMART customer or prospective customer, did not intend to immediately work for any

---

[2] Because Double Check has now returned all of SMART's information in its possession, there is no longer a risk that Double Check will utilize the information moving forward.  As there is also no enforceable non-compete or non-solicit agreement in force between SMART and Marsha or Double Check, the alleged threat of Double Check misappropriating SMART information was the ***only*** basis to enjoin Double Check from soliciting SMART's current or prospective customers. As such, there is no longer a basis to prohibit Double Check from lawfully competing with SMART.  Thus, if the TRO is to be modified, the Court should remove the prohibition enjoining Double Check from doing business with or soliciting for business any actual or potential customer of SMART.

SMART current or prospective customer, and knowing that a TRO automatically expired at the most 28 days from entry, Double Check chose not to oppose SMART's Motion for entry of a TRO. Instead, Double Check chose to participate in limited expedited discovery so that it could prove to SMART that Double Check had not taken or used any of SMART's information in the hope of resolving this suit in a cost effective and expeditious matter.  As such, Double Check has complied with all Court orders, willingly turned over all documents and devices containing SMART information, and propounded responses to SMART's written Interrogatories.  Thus, to the extent that Double Check ever had access to SMART information, this is no longer the case and is no longer a basis for injunctive relief.

On March 14, 2018, SMART filed its Motion to Amend, seeking to prevent Double Check from communicating or doing business with its "referral sources," with a special focus on Yates, and seeking to prevent Double Check from utilizing its own long-standing, independent business relationships.   This is a massive overreach.

## II.     Yates Insurance Agency and Creation of Double Check.

As SMART stated in its Motion to Amend, between February 3, 2015 and December 1, 2017, Yates often referred clients to SMART, but as SMART's silence on the matter demonstrates, Yates and Yates' agents have ***never*** had any duty,

contractual or otherwise, to direct all potential referrals to SMART.  Instead, before and after the creation of Double Check, Yates *always* had the legal right to refer business wherever it chose.  In fact, in late 2017, SMART's primary referral source at Yates, Jeff Blanton, started to receive complaints from his referrals regarding the services received from SMART, and as such, was entitled to refer business to other providers, such as Double Check. (*See*, *e.g.*, Verified Responses to SMART's First Set of Interrogatories, attached hereto as **Exhibit A**, at 5).

### III.   Double Check Has Returned All of SMART's Information.

The SMART information discovered in Marsha's possession after his resignation from SMART was not downloaded by Marsha as part of a scheme to utilize such information in his new role at Double Check. In fact, it was downloaded during the course of Marsha's employment at SMART at the behest of SMART's CEO, Robert Turner ("Turner"), who recommended that his employees back up files to a personal flash drive.  (Declaration of John Marsha (hereinafter "Marsha Decl."), attached hereto as **Exhibit B**, at ¶ 8).  Thus, in order to comply with this policy, Marsha accessed and downloaded information from SMART networks and servers to conduct business on behalf of SMART at the direction of Turner.  (*Id.* at ¶ 9). Furthermore, in Marsha's role at SMART, he was granted access to some of

SMART's databases and information.  (*Id.* at ¶ 10).  Simply put, Marsha did not acquire SMART's alleged trade secrets through improper means.

When Marsha left SMART, he returned all his customer files and company car.  (*Id.* at ¶ 15).  He did not take anything from his work desk, leaving everything behind.  (*Id.*)  He also returned several flash drives and his company computer, which he believed to be all the electronically stored SMART information in his possession.  (*Id.*)  Marsha did not discover that he had additional electronically stored SMART information until he searched his house following receipt of SMART's first demand letter in February 2018.  (*Id.* at ¶ 16).  While Marsha did not believe he possessed SMART information, after receiving the demand letter, he searched his house.  (*Id.* at ¶ 18).  As a result, Marsha located three additional flash drives in an old work bag that contained a combination of personal information and SMART information.  (*Id.*)  After identifying such materials, Marsha tried to reach out to Turner to return the three additional flash drives.  (*Id.* at ¶ 19).  Marsha called Turner, who did not answer the phone call, instead responding to Marsha via text message requesting that any communication between the two of them should be through counsel.  (*Id.*)  As Marsha did not have counsel at that time, it took additional time for Marsha to retain counsel.  (*Id.* at ¶ 20).  As soon as counsel was retained, they immediately began working to return the flash drives to SMART's counsel.  (*Id.*)

Marsha did not make any copies of the SMART information on the flash drives or disseminate this information to any other entity or individual. (*Id.* at ¶ 22). Double Check never requested that Marsha provide it such information, obtain such information, or use such information. (*Id.* at ¶ 21). Marsha has now turned over all SMART information to counsel and has not used any such information in performing his duties at Double Check. (*Id.* at ¶ 23). Moreover, Marsha even agreed to give SMART total access to his personal Gmail account so SMART could review its contents and delete any SMART information that may have been downloaded during his tenure at SMART, under the explicit understanding that SMART would give Marsha access back to his Gmail account after the expiration of the TRO.[3] (*Id.* at ¶ 24). To the extent any SMART information was downloaded to Marsha's Gmail account, he did not disseminate this information to any other entity or individual. (*Id.*)

## **ARGUMENT AND CITATION TO AUTHORITY**

"[B]oth a temporary restraining order and a preliminary injunction are extraordinary remedies which are to be granted only by a showing of clear and

---

[3] SMART recently represented to Marsha that it will not give him access back to his Gmail account absent court order, in direct contravention to the parties' agreement, thereby exceeding the scope of their authorization and unlawfully converting Marsha's e-mails. (*Id.* at ¶ 25).

45376656v.2

convincing evidence of all of the elements of injunctive relief." *Brown Bark II, L.P. v. Dixie Mills, LLC*, No. 1:08-CV-1303-TWT, 2008 WL 11284843, at *1 (N.D. Ga. May 1, 2008). Accordingly, before SMART can obtain a modification of the TRO entered against Double Check to include a prohibition from Double Check utilizing independent referral sources, the law requires that it establish four elements with specific facts: "(1) it has a substantial likelihood of prevailing on the merits; (2) it would suffer irreparable harm if the injunctive relief is not granted; (3) the threatened injury to [SMART] outweighs the damage that [Double Check] would sustain if the relief is not granted; and (4) granting injunctive relief would not be adverse to the public interest." *Regions Bank v. First Ga. Banking Co.*, No. 4:05-CV-97(HL), 2005 WL 2099341, at *1 (M.D. Ga. Aug. 29, 2005).

Notably, while the Court entered an order finding SMART has a likelihood of success on the merits for its claims against Double Check, SMART still needs to establish that it is deserving of the specific relief requested, including that it has a legitimate protectable interest in limiting Double Check's utilization of independent referral sources, such as Yates. SMART cannot establish that it is entitled to such relief due to the fact that (1) the referral source information it alleges has been utilized by Double Check is not entitled to trade secret protections under the Georgia Trade Secrets Act ("GTSA"), and (2) SMART cannot show that it is entitled to relief

45376656v.2

against Double Check for the alleged conspiracy to divert referral sources away from SMART when Double Check has a legal right to utilize its independent relationships with Yates. Thus, because SMART's allegations underlying its claims against Double Check are conclusory and SMART has failed to present any evidence, let alone clear and convincing evidence, that it is deserving of additional injunctive relief against Double Check, the Court should deny SMART's Motion to Amend.

## I.   There Is No Substantial Likelihood That SMART Will Succeed On The Merits Of Its Claim For Additional Relief Against Double Check.

SMART has no legal basis to assert a protectable interest in publicly known referral sources and fails to provide any valid justification supporting its request for an order prohibiting Double Check from utilizing such referral sources.  First, SMART has not -- and in fact cannot -- show that the referral sources are eligible for trade secret protection or that Double Check misappropriated such information. Similarly, SMART presents no evidence supporting its assertion that Double Check conspired with Marsha to breach fiduciary duties owed to SMART by unlawfully diverting referral resources from SMART.

### A.   SMART Did Not And Cannot Show That Referral Sources Are Eligible for Trade Secret Protection.

A claim for misappropriation of trade secrets under the GTSA requires a plaintiff to prove that "(1) it had a trade secret and (2) the opposing party

-10-

misappropriated the trade secret." *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998). The party asserting the existence of a trade secret has the burden of proving that the information qualifies for trade secret protection and that the accused party violated the Act. *Id.* Because the information regarding SMART's referral sources is not the type that Georgia courts recognize as deserving trade secret protection, SMART cannot succeed on a claim for trade secret misappropriation under the GTSA against Double Check.

**1.    Trade Secret Protection Under the GTSA is Unavailable for Intangible Materials And Information Obtained Through Independent, Lawful Means.**

To recover for misappropriation one must establish a property right or protectable interest in the work product allegedly misappropriated. *Kitfield v. Henderson, Black & Greene*, 231 Ga. App. 130, 134 (1998). SMART asserts that Marsha's alleged misappropriation of SMART's trade secret information regarding its referral sources constitutes evidence supporting its claim against Double Check under the GTSA.  (Pl. Brief at 11).  SMART, however, cannot establish a protectable interest in such "referral resources."

First, the documents identified by SMART merely contain an "ordinary list" of customers and insurance brokers.  (Pl. Brief at 4).  SMART includes no allegations that it has manipulated or analyzed the identified materials in any way to transform

these lists into materials eligible for trade secret protection.  (*Id.*)  The fact that insurance brokers sometimes refer customers to safety regulation compliance companies such as SMART and Double Check is public information known to those in the industry, and such information is not protectable as a trade secret under Georgia law.  *See Wachovia Ins. Servs., Inc. v. Fallon*, 299 Ga. App. 440, 446 (2009) (former senior vice president of company, who maintained information relating to company's clients on wireless communication device, did not misappropriate trade secrets, where information was commonly known or available to public).

In fact, the only case SMART cites that found referral sources protectable under the GTSA supports this assertion.  In *Amedisys Holding, LLC v. Interim Healthcare of Atl., Inc.,* a former employee took a document containing the plaintiff company's Referral Logs, which included "detailed information" on over 1,200 potential patients. 793 F. Supp. 2d 1302, 1305-06 (N.D. Ga. 2011).  The court found the Referral Logs to be eligible for trade secret protections only because they were "more than a list of names of healthcare providers and facilities," "not simply a directory of healthcare providers," and "contain valuable, proprietary information uniquely known to Amedisys, and which is not publicly available."  *Id.* at 1310 (finding that Referral Logs were entitled to trade secret protection when Amedisys "collects, evaluates, analyzes, and arranges" such information to "enable[] Amedisys

employees to make informed, fact-based decisions on where to focus their business solicitation efforts," because it had "transform[ed] an ordinary list of doctors and healthcare providers to a trade secret"). In contrast, all that SMART speculates Double Check had access to were a list of customers and insurance brokers, Marsha's personal LinkedIn connections, and "proposals" for a handful of insurance companies (with no allegation that Double Check has actually used any of these proposals). Thus, the tangible "referral resources" SMART seeks to protect are entirely different from those in *Amedisys*, containing only publicly known information compiled into an ordinary list, and as such, not eligible for trade secret protection under the GTSA.

Notably, while SMART alleges that it discovered the identified tangible materials containing information on its "referral sources" on Marsha's devices, it never claims that Double Check has actually used such materials in seeking to do business with the only two referral sources SMART identifies: Yates or Brown & Brown.[4] ***Nowhere*** in SMART's submissions to this Court does SMART assert that Double Check could not obtain contact information for Yates or Brown & Brown

---

[4] To the extent that SMART seeks to prevent use of any of these SMART materials, Marsha and Double Check have already returned all such information to SMART and the current TRO in effect will prevent any use of such materials. (*See* Order granting TRO, Dkt. No. 17, at 4-5).

absent any access to this SMART information.  In fact, Double Check's registered agent works in the very same office building as Yates and has worked with them for years.  (Marsha Decl., at ¶ 7).  Thus, SMART is well aware that Double Check does not need to utilize any SMART information to contact these referral sources.

It should also be noted that SMART is not merely requesting Double Check be prohibited from using the tangible documents it has identified, but instead, seeks an order prohibiting Double Check from communicating or doing business with such referral sources.  (Pl. Brief at 15).  As this request makes clear, what SMART is truly seeking to enjoin is the use of intangible knowledge possessed by Double Check's other employees and agents.  Personal knowledge, however, is not protected under the GTSA, as only "handwritten, typed, printed or written information" regarding SMART's referral resources can conceivably be protected.  *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 536 (1997) (information which allegedly would allow franchisee to contact suppliers not generally known to competitors was not protectable as trade secret, as franchisor did not claim franchisee misappropriated tangible supplier list, and personal knowledge of suppliers was not a trade secret).  Any information Marsha retained by virtue of his memory, as well as any relationships he maintained, is conclusively not a trade secret under the GTSA.  *Id.* at 536  ("[U]tilization of personal knowledge may be forbidden through the use of

-14-

restrictive covenants, but not under the Trade Secrets Act."); *Wolff v. Protege Sys., Inc.*, 234 Ga. App. 251, 254 (1998), disapproved of on other grounds by 250 Ga. App. 317 (2001) ("Knowledge on the part of the employee concerning the names and addresses of customers is not the property of the employer.").  As such, SMART has failed to meet its burden in demonstrating that the "referral resources" it alleges Marsha took and utilized on behalf of Double Check were trade secrets, and will not succeed on its claim for misappropriation.

> **2.     SMART Fails To Proffer Any Evidence To Support Its Claim That Double Check Misappropriated SMART's Trade Secrets.**

The GTSA defines misappropriation in relevant part as the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade secret of another without express or implied consent by a person who: . . . (ii) At the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was: (I) Derived from or through a person who had utilized improper means to acquire it; . . . ."  Ga. Code Ann. § 10-1-761(2).  Notably, for SMART to succeed in its claim for misappropriation against Double Check, the GTSA requires that Double Check either used or acquired SMART's trade secrets with reason to know that they were acquired by ***improper means***.

-15-

SMART fails to show that Double Check used or possessed SMART trade secrets that were acquired through improper means. First, SMART focuses primarily on Double Check's engagement and communications with Yates. As SMART itself acknowledges, however, "several individuals employed by Yates are heavily involved in Double Check's operations." (Pl. Brief at 2). Thus, it is incredible for SMART to now assert that Double Check utilized SMART information to engage and reach out to Yates when Double Check clearly has no need for such information as it has personal connections to Yates that are completely unrelated and independent of any connection to SMART.  SMART provides no other allegations or assertions to support its baseless claim that Double Check in some way utilized SMART information to learn about or otherwise engage in business with Yates.

Additionally, the only allegation regarding Double Check communications with referral companies other than Yates is an allegation that Marsha contacted Brown & Brown in January 2018, weeks *after* his employment with SMART had terminated and he was officially employed by Double Check.  (Pl. Brief at 9). SMART acknowledges that Brown & Brown was a referral source for SMART while Marsha was employed (Pl. Brief at 8), indicating that Marsha did not need to utilize SMART's list to identify Brown & Brown as a referral source.  Again, use of personal knowledge cannot be the basis for a claim of misappropriation. *Wachovia*,

-16-

299 Ga. App. at 446 (finding no trade secrets in client contact information when the employees had their own client contact information that was derived from e-mail correspondence with clients or a client business card); *Allen*, 225 Ga. App. at 536 ("[U]tilization of personal knowledge may be forbidden through the use of restrictive covenants, but not under the Trade Secrets Act.").

While it is true that circumstantial evidence can sometimes support a claim for misappropriation, under Georgia law, the inferences to be drawn from the defendant's access to the plaintiff's proprietary information does ***not*** conclusively indicate misappropriation of plaintiff's proprietary information. *Tronitec, Inc. v. Shealy*, 249 Ga. App. 442, 446 (2001), overruled on other grounds by 279 Ga. 428 (2005).  Moreover, Georgia courts have recognized that a former employee's prior access to the plaintiff's contacts and customer lists "does not imply a physical taking, and a similarity in the [plaintiff's customer list and the defendant's prospect list] would be expected if [defendant former employees] compiled [the corporate defendant's] prospect list using their knowledge of [the plaintiff's] customer base." *Id.* (a former employee's knowledge of customer information is not the employer's property); *see also Amedisys*, 793 F. Supp. 2d at 1313 (speculation about use of misappropriated material was insufficient to show a likelihood of prevailing on the merits).

SMART has offered no evidence to support its misappropriation claim against Double Check as to the referral sources other than its unsubstantiated assertion that because Double Check has had communications with Yates and Brown & Brown that Double Check *must* be utilizing SMART trade secrets.   This fails to acknowledge that (1) Double Check has several independent relationships with Yates; (2) personal knowledge or information easily acquired by independent means is ineligible for trade secret protection, and as such cannot be the basis for a claim for misappropriation under the GTSA; and (3) there is no evidence that Double Check possesses or has actually used SMART trade secrets in initiating or maintaining any business relationships with independent referral sources.   Hence, SMART entirely fails to meet its burden to present clear and convincing evidence supporting its likelihood of success on its claim for misappropriation against Double Check as to the referral sources, and as such is not entitled to issuance of a TRO.

**B.** **SMART Presents No Evidence That Double Check Conspired To Breach Marsha's Fiduciary Duties To SMART.**

While Double Check disagrees with SMART's assertion that it is likely to succeed on the merits of its claim for breach of fiduciary duty against Marsha, even if SMART has met its burden in showing likelihood of success on this issue, it fails to allege any evidence, circumstantial or otherwise, that could establish Double Check's liability for conspiring with Marsha to breach Marsha's fiduciary duties.

-18-

Notably, "[u]nder Georgia law, a 'conspiracy' to effect what one has a legal right to do is not actionable." *Nelson v. M & M Prod. Co.*, 168 Ga. App. 280, 280 (1983).

Here, it is ***undisputed*** that none of SMART's "referrals", including Yates and Brown & Brown, owed SMART any duty to continue to providing them with referrals.  Thus, any claim against Double Check for conspiring to divert these referrals away from SMART must fail because Double Check's agents had a legal right to engage in such action.[5] *Miles v. Bibb Co.*, 177 Ga. App. 364, 365 (1985) (appellant's conspiracy claim failed because no actionable conspiracy arose from authorized exercise of individuals' legal right to discharge the appellant); *Barnwell v. Barnett & Co.*, 222 Ga. App. 694, 695 (1996) (supplier's vice-president of sales had authority to terminate distributorship contract, and therefore could not have conspired with supplier's product sales manager to tortiously interfere with distributor's business relations).

Furthermore, SMART fails to allege any evidence, circumstantial or otherwise, pointing to the fact that Double Check acted in concert with Marsha to breach Marsha's fiduciary duties.  To succeed on a civil conspiracy claim, SMART

---

[5] To the extent SMART claims that Double Check conspired with Marsha due to Marsha's own actions on behalf of Double Check, the claim must also fail because this amounts to a mere reassertion of the claims against Marsha. *See Kitfield v. Henderson, Black & Greene*, 231 Ga. App. 130, 135 (1998) (dismissing conspiracy claim because it was "merely a restatement" of another claim).

-19-

must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. *Zions First Nat'l Bank v. Macke*, 316 Ga. App. 744, 750 (2012). Here, SMART's basis for its conspiracy claim against Double Check is limited to the following assertion contained in its Motion to Amend: "[T]he actions Marsha took to compete with SMART were done on behalf of and for the benefit of Double Check." (Pl. Brief at 12). The Amended Complaint offers no additional factual allegations, merely asserting that "its conspiracy is inferable from the profits they have shared and the concerted nature of their activities." (Am. Compl. at ¶ 71). Furthermore, SMART does not identify what "profits" Double Check and Marsha have shared. SMART once again relies on pure unsubstantiated speculation to support its conclusory, and false assertions.

Consequently, SMART has demonstrated that it has no legitimate basis to allege a conspiracy claim against Double Check, relying solely upon speculation which is insufficient to support such a claim. *Macke*, 316 Ga. App. at 750 ("The circumstantial evidence pointed to by Macke from which he claims a conspiracy may be inferred is purely speculative. An inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility."). Moreover, merely acting to benefit a third party does not automatically create a conspiracy. *Tindall v. H & S Homes, LLC*, No. 5:10 CV 044 CAR, 2012

WL 895554, at *2 (M.D. Ga. Mar. 15, 2012) (evidence of a close relationship and "a conclusory, unsupported allegation that the Trusts would have benefitted from Horton's misdeeds" was insufficient to support claim for conspiracy). Thus, such blatantly unsupported and conclusory assertions cannot meet the burden of clear and convincing evidence required to support the issuance of a TRO as to the referral sources.

## II.   Additional Injunctive Relief Against Double Check Is Not Required To Prevent Irreparable Harm to SMART.

"A showing of irreparable injury is the *sine qua non* of injunctive relief." *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1357 (N.D. Ga. 2017) (*quoting Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* SMART claims that it faces the threat of lost customers in the absence of injunctive relief. (Pl. Brief at 13). Again, SMART bases its assertion that it faces irreparable harm on entirely speculative and conclusory statements. SMART has alleged ***no*** actual loss of customers and ***no*** loss of competitive edge whatsoever. This simply does not meet SMART's burden to show it faces a threat of irreparable harm. *Agilysys*, 258 F. Supp. 3d at 1358 (plaintiff failed to establish irreparable harm when company failed to identify a single customer it lost or would have lost based on employee's

actions, or explain how customer goodwill had been lost or would have been lost in the future).

Moreover, because Marsha is no longer employed by SMART and no longer owes any fiduciary duties to SMART, it is not possible for Double Check to conspire with Marsha to breach his fiduciary duties in the future. To the extent SMART seeks injunctive relief to prevent against any *future* damage done by Marsha's alleged wrongful conduct, SMART can be remedied by a monetary award, and as such, does not constitute irreparable harm. *St. James Entm't LLC v. Crofts*, 837 F. Supp. 2d 1283, 1293 (N.D. Ga. 2011) (denying request for injunctive relief based on breach of fiduciary duty claim because legal remedies were available to plaintiff if Defendant attempted to divert business from the Company). Accordingly, injunctive relief against Double Check is inappropriate.

### III. The Granting Of Injunctive Relief Will Result In Even Greater Harm To Double Check And Is Adverse To The Public Interest.

The threatened injury to SMART if the Court does not amend the TRO does not outweigh the damage that Double Check would sustain if the injunction is issued. Double Check has returned all SMART information in its possession and, as such, Double Check does not have access to any allegedly unlawfully obtained information. In contrast, SMART seeks to prevent Double Check from doing business with SMART's referral sources despite the fact that Double Check

-22-

45376656v.2

personnel have long-standing, independent relationships with Yates and personal knowledge of other referral sources.  SMART has no legal basis to conceivably attempt to limit who Double Check does business with, as SMART has ***explicitly conceded*** that a non-compete agreement it entered into with Marsha is unenforceable and invalid.  (*See* SMART Letter, attached hereto as **<u>Exhibit C</u>**).  Thus, while its attempt to prevent solicitation and competition from Marsha is undeniably baseless, its attempt to prevent Double Check from doing so ***absent any evidence*** of actual wrongful conduct is a blatant attempt to stop Double Check from engaging in lawful competition.  There is no identifiable legal precedent where SMART is entitled to such relief under the present circumstances.  Furthermore, due to SMART's failure to demonstrate any significant likelihood of success on the merits of its claim against Double Check, the balance of harms is in Double Check's favor.  *See Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 F. Supp. 2d 1368, 1380 (S.D. Ga. 2002) (denying motion for injunctive relief, explaining that Plaintiff supplied minimal evidence to tip the balance in its favor).

As such, granting the relief SMART requests would be in direct violation of the public interest, as it is in the public interest to allow for lawful competition, and against public interest to hinder it.  *See Flo-Con Sys., Inc. v. Leco Corp.*, 845 F. Supp. 1576, 1583 (S.D. Ga. 1993) ("[T]he public interest will be served by ensuring

the continued benefits of healthy competition."); *Corbitt*, 197 F. Supp. 2d at 1380 (holding that a preliminary injunction was unwarranted when issuance would not only limit the public's choices, but it could also affect the price they pay for goods and services). Thus, the balance of harms and the public interest favor a denial of additional injunctive relief against Double Check.

## CONCLUSION

WHEREFORE, Double Check respectfully requests that this Court enter an Order (1) denying Plaintiff SMART's Motion to Amend; (2) modifying of the existing temporary restraining order[6] to remove the prohibition against "doing business with or soliciting for business any actual or potential customer of SMART, with which SMART has done business or solicited for business within the past two years; and (3) granting Double Check any other relief that this Court deems appropriate.

---

[6] The TRO will expire by operation of law on April 4, 2018, at the latest.

Dated:  March 22, 2018.                    Respectfully submitted,


                                           By:*/s/Eric Barton*

                                           SEYFARTH SHAW, LLP

                                           Eric Barton
                                           Seyfarth Shaw LLP
                                           1075 Peachtree Street NW
                                           Atlanta, Georgia 30309
                                           (404) 885-6772

                                           *Attorney for Defendant Double Check
                                           Risk Solutions, LLC*

45376656v.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2018 this document was served on Plaintiff at the following known addresses by electronic mail, pursuant to Federal Rule of Civil Procedure 5.

Counsel for Plaintiff SMART Profitability Solutions, LLC:

Kathryn Hinton
David E. Gevertz
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA 30326
khinton@bakerdonelson.com
dgevertz@bakerdonelson.com

By:  */s/ Eric Barton* _____
          *Eric Barton*

-26-