## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SMART PROFITABILITY SOLUTIONS, LLC d/b/a SMART SAFETY GULF COAST, | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-00706-MHC |
| DOUBLE CHECK RISK SOLUTIONS, LLC, and JOHN MARSHA, II, | Honorable Judge Mark H. Cohen |
| Defendants. | |

## DEFENDANT DOUBLE CHECK RISK SOLUTIONS, LLC'S
## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
## TO EXTEND TEMPORARY RESTRAINING ORDER
## AND FOR PRELIMINARY INJUNCTION

Defendant Double Check Risk Solutions, LLC ("Double Check") responds in opposition to Plaintiff SMART Profitability Solutions, LLC's ("SMART") Motion to Extend Temporary Restraining Order and For Preliminary Injunction ("Motion to Extend"), showing the Court as follows:

## INTRODUCTION

There is no longer any legitimate basis to restrict Double Check from "doing business with or soliciting for business any actual or potential customer of SMART,

45591860v.2

with which SMART has done business or solicited for business within the past two years," as set forth in the Court's original temporary restraining order (the "TRO") (Dkt. No. 17). It is undisputed that Double Check has never entered into any type of customer non-compete or non-solicit agreement with SMART. Accordingly, SMART's request that Double Check be prohibited from doing business with certain customers -- even if Double Check does so **without using SMART's confidential information or trade secrets --** is a massive overreach and unsupported by any applicable law.

Just days before filing this lawsuit, SMART was adamant that its former employee, John Marsha ("Marsha"), was subject to post-employment customer non-solicit and non-compete restrictions.  In fact, SMART went so far as to have its legal counsel send Marsha a letter, dated February 5, 2018, in which they claimed that Marsha's work for Double Check and his solicitation of SMART's "customers for the purpose of providing services competitive with [SMART]" constituted "clear violations of the non-solicitation and non-compete covenants" contained in his Confidentiality, Non-Solicitation and Non-Competition Agreement (the "Agreement").  (*See* Am. Complt., Dkt. No. 21, at Ex. G)  On February 13, 2018, SMART sent Marsha a follow-up letter, once again claiming that Marsha had

"violated the non-solicitation and non-compete covenants" contained in his Agreement.  (*Id*. at Ex. H).

Marsha, of course, is ***not*** subject to any type of customer non-solicit or non-compete prohibitions.  SMART was forced to concede this point after Marsha filed a declaratory judgment action against it in Louisiana regarding the provisions.[1] (*See* SMART Letter, attached hereto as **Exhibit A**). This revelation was undoubtedly unwelcome news to SMART, who nevertheless remained desperate to prevent Marsha and his new employer, Double Check, from contacting its customers, prospects, and referrals.

SMART's goal is crystal clear -- prevent a new competitor from entering the marketplace. That said, SMART has failed to provide ***any*** facts that could conceivably form the legal basis allowing it to thrust a customer non-solicit and non-compete agreement on Double Check. SMART also cannot demonstrate its eligibility for any continued injunctive relief because: (1) it fails to show it will suffer irreparable injury absent injunctive relief; and (2) the "trade secret" and confidential information SMART points to as being used by Double Check is either based upon intangible knowledge retained by Marsha or information that is publicly available. Thus, the Court should deny SMART's Motion to Extend.

---

[1] This lawsuit, which was filed on February 16, 2018, also contains no such claims.

## BACKGROUND FACTS

**I.    Entry of the Temporary Restraining Order and Return of All SMART Information.**

On March 8, 2018, this Court entered a TRO against Double Check enjoining it from (1) using and possessing SMART'S confidential information and/or trade secrets; (2) doing business with any actual or potential customer of SMART with which SMART has done business or solicited for business within the past two years; (3) using any marketing and/or operational materials copied, sourced or otherwise derived from SMART'S information; and (4) aiding and abetting a breach of Marsha's employment agreement with SMART. (Dkt. No. 17). The TRO also ordered Double Check to produce any and all information belonging to SMART within its possession no later than March 12, 2018 and to engage in expedited discovery by March 19, 2018. (*Id.*)

Double Check has complied with all Court orders, willingly turned over all documents and devices containing SMART information, and propounded responses to SMART's written Interrogatories. The information that SMART has alleged Marsha misappropriated and/or shared with Double Check is information that SMART admits were on flash drives utilized by Marsha and in his Gmail Account,

-4-

all of which are all now in the possession of SMART.[2] (*See* Pl. Brief, Dkt. No. 24-1, at 3).  Double Check never requested that Marsha provide it with any SMART documents, including, but not limited to, any information contained within Marsha's flash drives or Gmail Account. (Declaration of John Marsha, attached as Exhibit B to Double Check's Response in Opposition to SMART's Motion to Amend the Order for TRO, Dkt. No. 28, at ¶ 21).  As such, SMART is now in exclusive possession, custody, and control of any device Marsha ever owned that contained SMART information, as well as his Gmail Account.  (*Id.* at ¶¶ 23-24; *see also* Double Check's Response in Opposition to SMART's Motion to Amend the Order for TRO, Dkt. No. 28, at 6-8, for factual background regarding how and why such information came into Marsha's possession).  Thus, to the extent that Marsha or Double Check ever had access to SMART information, this is no longer the case and is no longer a basis for injunctive relief.

On March 14, 2018, SMART filed its Motion to Amend, seeking to prevent Double Check from communicating or doing business with its "referral sources," with a special focus on Yates Insurance Agency ("Yates"), even if Double Check does so without using any information belonging to SMART. (Dkt. No. 22). In doing

---

[2] In fact, Double Check and Marsha voluntarily turned over the flash drives at issue and provided SMART's counsel with complete control over Marsha's Gmail account days **before** the Court even entered the TRO.

so, SMART seeks to improperly prevent Double Check from utilizing its own long-standing, independent business relationships. (*Id.*) On March 22, 2018, Double Check filed its Response in Opposition to SMART's Motion to Amend, which is still pending before the Court. (*See* Dkt. No. 28 for full explanation as to why these referral sources should not be included in a TRO against Double Check).

Now SMART seeks to extend the TRO, asserting that it has demonstrated "good cause" for doing so. (Dkt. No. 25). Although SMART claims that Marsha misappropriated its information and breached his fiduciary duties, it fails to recognize that (1) all SMART information it alleges to have been used by Double Check is either solely based on intangible knowledge held by Marsha or based upon documents/information that are publicly available; and (2) any past or future injury is fully compensable with money damages. (*Id.*) Accordingly, there is no basis to extend the TRO or enter a preliminary injunction as this case proceeds.

## II.    The Trade Secrets and Confidential Information SMART Alleges Double Check Unlawfully Utilized is Publicly Available.

SMART alleges that Marsha and/or Double Check wrongfully utilized the following materials: (1) SMART's Master Proposal Template; (2) SMART's Sales Proposals and Introduction Decks; (3) SMART's Services Agreement; and (4) SMART marketing materials. These materials, however, were not utilized by Marsha and/or Double Check in developing Double Check materials, are publicly

-6-

available online, and/or have been routinely shared with SMART customers and referral sources. (Declaration of John Marsha ("Marsha Decl."), attached hereto as **Exhibit B**, at ¶¶ 5-15).   Accordingly, none of them can be classified as "trade secrets" under Georgia law.

For example, SMART's Services Agreement is a virtually *identical* copy of a sample Safety and Health Consulting Agreement available to the general public online  at  http://cemins.com/pdf_applications/scsamplecontract.pdf.[3]  (*Id.*  at  ¶  5). SMART likewise overstates its assertion that it uses a "unique fee-based service model." (Pl. Brief at 4).   In reality, there are many safety consulting and services firms that offer fee-based service pricing and packages, and SMART's framework is just another example of this commonly utilized fee structure.  (*Id.* at ¶¶ 11-12).

Similarly, while SMART attempts to characterize its marketing materials as proprietary (Pl. Brief at 6), marketing materials that pertain to compliance with Occupational Safety and Health Administration's ("OSHA") safety regulations, and related proposals and presentations, almost always use the same basic language and offer the same services as SMART and Double Check. (Marsha Decl. at ¶ 9, and Exhibits referenced therein). In fact, a PowerPoint presentation presented by SMART's  West  Coast  founder,  Vince  Hundley,  is  available  online  at

---

[3] Substantively, only *one* paragraph is different between the two documents.

http://www.mctcjv.com/downloads/files/DBE%20Workshop%2004-12-2016/QC%20and%20Safety%20FINAL-04%2012%202016.pdf and includes several similarities to the "proprietary" marketing materials that SMART references, including slides titled "SMART Risk Management" and "SMART Safety System." (*Id.* at ¶ 10, and Exhibits referenced therein). SMART has also published at least one blog post online describing the "SMART Safety Group." (*Id.*).

Furthermore, SMART's Master Proposal Template and its Sales Proposals/Introduction Decks are routinely shared by SMART with its customers and referral sources. (*Id.* at ¶ 14). This occurs during the solicitation phase of the customer relationship, before SMART has entered into any contracts with these companies. (*Id.*) SMART would even routinely request prospective customers to provide edits on a "track changes" basis to the SMART Services Agreement "Health and Safety Consulting Agreement" when negotiating terms prior to any contract being executed. (*Id.*) SMART would also provide copies of the materials to customers, who would be permitted to keep them for their own use. (*Id.* at ¶ 15). It is also noteworthy that SMART does not require these customers to sign any type of non-disclosure or confidentiality agreement before providing them with these documents. (*Id.*)

SMART self-servingly alleges that a "comparison of [Double Check's] documents to SMART's own versions reveal that these Double Check documents were derived directly from SMART materials." (Pl. Brief at 5). Similarity of the documents, however, does not necessitate an assumption of misappropriation. Marsha created (1) "Safety, Health & Fleet Program Management Services" (Dkt. No. 24, at Ex. B); (2) "Mattex Master Proposal Template 2-1-18" (Dkt. No. 24, at Ex. C); and (3) the Mattex Services Agreement executed with Double Check on February 2, 2018 (Dkt. No. 24, at Ex. D) relying upon his memory, knowledge of the industry, materials provided by Mattex and other Double Check customers, as well as publicly available materials. (Marsha Decl. at ¶¶ 6-8). Marsha had created similar materials for SMART hundreds of times. (*Id.* at ¶¶ 6-7).

### III.    Marsha's Departure from SMART.

SMART asserts that Marsha's last day at SMART was January 2, 2018. (Pl. Brief at 6). It is undisputed, however, that Marsha informed SMART CEO Robert Turner of his resignation on December 18, 2017. (Marsha Decl. at ¶ 2). At that time, Marsha informed Mr. Turner that he expected to get paid for his unused vacation days. (*Id.* at ¶ 3). On December 20, 2017, however, Turner told Marsha that he would not be allowed to work after December 21, 2017. (*Id.*) Turner further demanded that Marsha lead a kickoff meeting on December 21, 2017 at a new

customer he had just signed, and then immediately hand in his keys to the office, laptop computer, and company car.  (*Id.*) Turner told Marsha he would have to use his unused vacation days. (*Id.*) Marsha complied with Mr. Turner's requests, handing over his SMART computer, leaving the property, and conducting no further work for SMART. (*Id.* at ¶ 4). Given that Mr. Turner made it clear that Marsha was no longer authorized to perform his job, Marsha understood that he was no longer "employed" by SMART as of December 21, 2017. (*Id.*) Thus, Marsha's last day of employment with SMART was no later than December 21, 2017, not January 2, 2018.

<u>**ARGUMENT AND CITATION TO AUTHORITY**</u>

**I.     The TRO Should Expire on April 4, 2018.**

Federal Rule of Civil Procedure 65 mandates that a TRO can last only 14 days, and cannot be extended beyond 28 days without the consent of the restrained party. Fed. R. Civ. P. 65(b)(2); *Levine v. Comcoa Ltd.*, 70 F.3d 1191, 1197 n.7 (11th Cir. 1995) (noting that where there has been no hearing on the various factors involved in considering a preliminary injunction, a TRO continued past the Rule 65 limit falls of its own weight); *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 946 (7th Cir. 2006) (even a TRO issued with notice to the parties is still subject to the 20 [now 28] automatic expiration period set forth in F.R.C.P. Rule 65(b)(2)). As

-10-

Double Check does not consent to the extension of the TRO and because there has been no Preliminary Injunction hearing, the TRO should not be extended past the time limit enunciated in Rule 65, and expire on April 4, 2018.

## II.    SMART Is Not Entitled To Continued Injunctive Relief Against Double Check.

SMART has failed to demonstrate that it is entitled to continued injunctive relief against Double Check. "[B]oth a temporary restraining order and a preliminary injunction are extraordinary remedies which are to be granted only by a showing of clear and convincing evidence of all of the elements of injunctive relief." *Brown Bark II, L.P. v. Dixie Mills, LLC*, No. 1:08-CV-1303-TWT, 2008 WL 11284843, at *1 (N.D. Ga. May 1, 2008). Accordingly, before SMART can obtain an extension of the TRO against Double Check or entry of a preliminary injunction, the law requires that it establish four elements with clear and convincing evidence: "(1) it has a substantial likelihood of prevailing on the merits; (2) it would suffer irreparable harm if the injunctive relief is not granted; (3) the threatened injury to [SMART] outweighs the damage that [Double Check] would sustain if the relief is not granted; and (4) granting injunctive relief would not be adverse to the public interest." *Regions Bank v. First Ga. Banking Co.*, No. 4:05-CV-97(HL), 2005 WL 2099341, at *1 (M.D. Ga. Aug. 29, 2005).

First and foremost, SMART has failed to provide any facts that could conceivably form the legal basis allowing it to thrust a non-compete agreement upon Double Check, prohibiting Double Check from doing business with any actual or potential customers of SMART, with which SMART has done business or solicited for business within the past two years.  SMART asserts that because Double Check allegedly possessed and used SMART information in the past, that it should now be prohibited from soliciting any entity that SMART unilaterally alleges is a "current or prospective customer,"[4] notwithstanding the fact that there is *no* applicable non-compete agreement and even if Double Check conducts the business *without* using any of SMART's property or information. SMART further fails to demonstrate its eligibility for any continued injunctive relief because (1) it fails to show it will suffer irreparable injury absent injunctive relief; and (2) the "trade secret" and confidential information SMART points to as being used by Double Check is either based upon intangible knowledge retained by Marsha or information that is publicly available. Thus, the Court should deny SMART's Motion to Extend.

---

[4] Neither SMART's original motion for TRO or Motion to Extend provide the identify of these "current or prospective customers."

A. **After Admitting It Cannot Enforce a Non-Compete Agreement Against Marsha, SMART Is Attempting To Baselessly Thrust a Non-Compete Agreement Upon Double Check.**

When SMART first sought injunctive relief in this case, Double Check made the deliberate decision not to oppose SMART's request for a TRO because: (1) Double Check had already returned all of SMART's information, (2) had not utilized any of SMART's information, (3) did not perform any work for any of SMART's customers or prospective customers, (4) did not intend to immediately work for any of SMART's current or prospective customers, (5) Defendant Marsha had just filed for bankruptcy, and (6) because it knew that the TRO was of limited duration. SMART's attempt to indefinitely extend the TRO, however, would place unlawful restrictions on Double Check's right to legitimately compete. While Double Check maintains that no injunctive relief is necessary to preserve SMART's protectable interests, Double Check specifically objects to any extension of the prohibition on Double Check doing business with any of SMART's actual or potential customers.

As noted above, Double Check has ***never*** entered into any type of non-compete agreement with SMART that limits what customers or referral sources Double Check can contact. Nevertheless, SMART seeks to extend the TRO to prevent Double Check's lawful competition even though it has presented no evidence that Double Check has utilized any of SMART's information to solicit any

-13-

of SMART's customers. Instead, SMART asserts that simply because Double Check allegedly possessed and used SMART information in the past, that SMART is now entitled to prohibit Double Check from soliciting *all* persons and entities SMART claims are "current or prospective customers" -- even though SMART has not even provided the identity of those alleged customers.  SMART has no legal basis to support its claim for such a sweeping prohibition of lawful competition.

There is no identifiable legal precedent whereby SMART is entitled to such relief under the present circumstances.  In fact, granting the relief SMART requests would be in direct violation of the public interest, as it is in the public interest to allow for lawful competition, and against public interest to hinder it. *See Flo-Con Sys., Inc. v. Leco Corp.*, 845 F. Supp. 1576, 1583 (S.D. Ga. 1993) ("[T]he public interest will be served by ensuring the continued benefits of healthy competition."); *Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 F. Supp. 2d 1368, 1380 (S.D. Ga. 2002) (holding that a preliminary injunction was unwarranted when issuance would not only limit the public's choices, but it could also affect the price they pay for goods and services).  Thus, SMART should not be permitted to cripple a competitor for lawfully competing with any person and/or entity it labels a "current or prospective customer" when it has failed to present any evidence, let alone clear and convincing

-14-

evidence, of past or threatened unlawful solicitation of each and every customer it now seeks to prevent Double Check from soliciting.

**B.    SMART is Not Entitled To Injunctive Relief Because All Alleged Injuries Are Compensable By Monetary Damages And SMART Cannot Establish Irreparable Harm.**

Double Check has every intention to comply with the law and refrain from engaging in any conduct that violates existing legal obligations that Double Check owes pursuant to statutory authority and the common law. SMART is not automatically entitled to entry of an order enjoining any and all alleged potential unlawful conduct by Double Check. First, SMART must demonstrate by clear and convincing evidence that it has met all applicable requirements for issuance of an injunction, including that injunctive relief is necessary to prevent irreparable harm. *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1357 (N.D. Ga. 2017) (*quoting Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)) ("A showing of irreparable injury is the *sine qua non* of injunctive relief."). SMART, however, is unable to demonstrate that it is entitled to entry of ***any*** further injunctive relief because all injuries SMART alleges to have suffered or asserts it is threatened to suffer in the future are either (1) past injuries that pose no threat of future injury; or (2) fully compensable with monetary damages, and as such, ineligible for injunctive relief.

### 1.    Past Injury Cannot Form Basis For Future Injunctive Relief.

Many of the alleged harms SMART points to in its Motion to Extend occurred unequivocally and indisputably in the past. (*See*, *e.g.*, Pl. Brief at 3 (allegations that Marsha shared a copy of SMART's services agreement with Double Check to assist with obtaining insurance); *Id.* at 4-5 (allegations that Marsha used SMART information to develop proposals for Mattex, Thayer Bray and SyncroFlo)).[5] Past injuries cannot establish the future irreparable harm that must be present for issuance of injunctive relief. *Hoop Culture, Inc. v. GAP Inc.*, 648 F. App'x 981, 986 (11th Cir. 2016) ("[P]ast harm is not a basis for preliminary injunctive relief, which requires a showing of likely future injury if an injunction does not issue.").

Furthermore, despite SMART's allegations, Double Check and Marsha pose no threat of any alleged future misappropriation because any SMART information or materials that Marsha and/or Double Check allegedly had access to were returned to SMART at the beginning of this suit. (Dkt. No. 28, Ex. B at ¶¶ 23-24). Thus, to the extent that SMART alleges that Marsha misappropriated information, Double Check and Marsha have returned all such materials, Marsha has turned over access to his Gmail Account, and neither Double Check nor Marsha have access to these

---

[5] Tellingly, nearly all descriptions of SMART's alleged injuries are described solely using the past tense. (*See*, *e.g.*, Pl. Brief at 2, 3, 6).

materials. Thus, there is no basis to fear future misappropriation of SMART's trade secrets.

### 2. SMART's Claimed Future Injury Would Be Fully Compensable With Money Damages.

SMART alleges that absent continued protection, Double Check will unfairly compete with SMART and cause irreparable harm to its customer and referral relationships because without injunctive relief, there is nothing stopping Double Check from "profiting off of Marsha's unlawful solicitation of SMART's referral sources, customers and potential customers." (Pl. Brief at 10).  Thus, by SMART's own admissions, it is seeking to prevent a monetary advantage it alleges Double Check has unlawfully gained and may unlawfully gain in the future. It is well established, however, that "[a] mere threatened monetary injury, which can be addressed in damages, is insufficient to establish the irreparable injury essential to the issuance of a preliminary injunction." *Tuff Wrap Installations, Inc. v. Wiant*, No. 2:13-CV-0004-RWS, 2013 WL 12101105, at *2 (N.D. Ga. Feb. 8, 2013).

SMART has alleged ***no future irreparable injury***.  Instead, it merely alleges that Double Check will be able to unfairly obtain profits in the future. (Pl. Brief at 2, 9, 10). Even if SMART is able to prove it has a protectable interest in any allegedly misappropriated trade secrets or that Double Check conspired to breach Marsha's fiduciary duties, the Court will be able to identify at a later date the amount of money

necessary to compensate SMART for the unlawful conduct. SMART simply has not met its burden of demonstrating a threat of irreparable harm. *See Diamond Power Int'l, Inc. v. Clyde Bergemann, Inc.*, 370 F. Supp. 2d 1339, 1349 (N.D. Ga. 2005) (manufacturer's allegation that competitor misappropriated trade secrets to create competing product was not sufficient to show that it would have been irreparably harmed since monetary damages were available for lost sales as consequence of alleged misappropriation); *Wiant*, 2013 WL 12101105, at *2 (finding that to the extent plaintiff could show that they lost business contracts because of defendants' use of plaintiff's confidential information or because of former employee's violation of the an employment agreement, those losses could be remedied with monetary damages); *St. James Entm't LLC v. Crofts*, 837 F. Supp. 2d 1283, 1293 (N.D. Ga. 2011) (denying request for injunctive relief based on breach of fiduciary duty claim because legal remedies were available to plaintiff if Defendant attempted to divert business from the Company). Accordingly, injunctive relief against Double Check is inappropriate because SMART has not established injunctive relief is necessary to prevent irreparable harm.

### C. The Materials Alleged To Have Been Unlawfully Utilized By Double Check Are Not Eligible For Trade Secret Protections.

A claim for misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA") requires a plaintiff to prove that "(1) it had a trade secret and (2) the

opposing party misappropriated the trade secret." *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998). The party asserting the existence of a trade secret has the burden of proving that the information qualifies for trade secret protection and that the accused party violated the Act. *Id.*

The documents and information SMART identifies as having being misappropriated are ineligible for trade secret protection. Several of the documents SMART asserts were improperly utilized by Marsha are composed of publicly available information, which precludes such information from trade secret protections under the GTSA. *Leo Publications, Inc. v. Reid*, 265 Ga. 561, 562, 458 S.E.2d 651, 652 (1995). Furthermore, SMART asserts misappropriation of intangible knowledge possessed by Marsha and/or Double Check which can never be a "trade secret" under Georgia law. *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 536 (1997).

### 1.   Documents Identified by SMART Are Not Trade Secrets Because There Is No Expectation Of Secrecy.

To be classified as a trade secret, the information in question must not be readily ascertainable by proper means by persons who can benefit from its use and the secrecy of those trade secrets must be maintained. Ga. Code Ann. § 10-1-761(4). Notably, "[i]nformation that has been publicly disclosed, such as through the sale or disclosure to customers, is not protected by the GTSA," and any "reasonable

expectation of secrecy is destroyed" when information has been placed into the public domain. *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1332–33 (N.D. Ga. 2007) (where the plaintiff has distributed to its customers schematic diagrams, repair instructions, product manuals, or similar information—even if they are labeled "proprietary" or "confidential"—the plaintiff's failure to maintain its secrecy precludes trade secret protection).

SMART claims that Double Check "appropriated SMART's most proprietary information." (Pl. Brief at 9). None of the documents that SMART identifies in its Motion to Extend, however, meet the definition of a trade secret under the GTSA because they are either publicly available or have been shared routinely with customers and referral sources, destroying any expectation of secrecy. (Marsha Decl. at ¶¶ 5-15; *see also*, *supra*, at 6-8). Hence, none of the documents identified by SMART in its Motion to Extend are entitled to trade secret protection under the GTSA. As such, SMART cannot succeed on a claim under the GTSA based upon purported misappropriation of these documents. *Davidson,* 540 F. Supp. 2d at 1335–37 (finding trade secret protections under the GTSA unavailable for information could be "retained indefinitely" by employees or provided on a regular basis to customers); *Leo Publications*, 265 Ga. at 562 (various customer information was not a trade secret because it was readily ascertainable by proper means); *Wachovia Ins.*

*Servs., Inc. v. Fallon*, 299 Ga. App. 440, 447 (2009) (claim for misappropriation failed because the information contained in allegedly misappropriated documents was available from a public website).

> ### 2.   Knowledge Held By Marsha And/Or Double Check Is Not Trade Secret Information.

Any intangible information and knowledge possessed by Marsha and/or Double Check agents and employees by virtue of their memory, knowledge of the industry, and relationships is conclusively not a trade secret under the GTSA. *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 536 (1997) ("[U]tilization of personal knowledge may be forbidden through the use of restrictive covenants, but not under the Trade Secrets Act."); *Wolff v. Protege Sys., Inc.*, 234 Ga. App. 251, 254 (1998), disapproved of on other grounds by 250 Ga. App. 317 (2001) ("Knowledge on the part of the employee concerning the names and addresses of customers is not the property of the employer."). Despite this well-established principle, SMART continues to assert that Marsha and Double Check are not lawfully permitted to (1) follow up on customer leads it receives from sources outside of SMART (*see*, *e.g.*, Verified Responses to SMART's First Set of Interrogatories, attached as Exhibit A to Dkt. No. 28, at 5); and (2) communicate or do business with SMART's "referral sources," with a special focus on Yates, and seeking to prevent Double Check from utilizing its own long-standing, independent business relationships. (*See* Dkt. No. 28

for full explanation as to why these referral sources should not be included in a TRO against Double Check).

Furthermore, in creating the Double Check documents SMART identifies in its Motion to Extend, Marsha did not need to utilize SMART documents to recreate similar formatting and organization because Marsha had created over 100 proposal templates and similar documents while employed by SMART. (Marsha Decl. at ¶¶ 6-7). Personal knowledge is not protected under the GTSA, as only "handwritten, typed, printed or written information" regarding SMART's information and resources can conceivably be protected.  *Allen*, 225 Ga. App. at 536 (information which allegedly would allow franchisee to contact suppliers not generally known to competitors was not protectable as trade secret, as franchisor did not claim franchisee misappropriated tangible supplier list, and personal knowledge of suppliers was not a trade secret). In fact, Georgia courts have recognized that it would be expected that materials created by a former employee would be similar to those prepared for prior employer, and this does not necessarily show misappropriation. *Tronitec, Inc. v. Shealy*, 249 Ga. App. 442, 446 (2001), overruled on other grounds by 279 Ga. 428 (2005) (a former employee's prior access to the plaintiff's contacts and customer lists "does not imply a physical taking, and a similarity in the [plaintiff and defendant's materials] would be expected if [former

employees] compiled [the corporate defendant's materials] using their knowledge"). As Marsha was the individual creating such documents at SMART (Marsha Decl. at ¶¶ 6-7), it would be expected that any materials he created using his own knowledge would be comparable to the documents he created at SMART.

As such, SMART cannot establish that such information is entitled to protection under the GTSA and cannot succeed on its claim for misappropriation.

## <u>CONCLUSION</u>

WHEREFORE, Double Check respectfully requests that this Court enter an Order (1) denying Plaintiff SMART's Motion to Extend the TRO; (2) denying Plaintiff SMART's Motion for Entry of a Preliminary Injunction; (3) allowing the TRO to expire by operation of law on April 4, 2018; and (4) granting Double Check any other relief that this Court deems appropriate.

45591860v.2

Dated:  April 4, 2018.                     Respectfully submitted,


                                           By:*/s/Eric Barton*

                                           SEYFARTH SHAW, LLP

                                           Eric Barton
                                           Seyfarth Shaw LLP
                                           1075 Peachtree Street NW
                                           Atlanta, Georgia 30309
                                           (404) 885-6772

                                           *Attorney for Defendant Double Check
                                           Risk Solutions, LLC*

45591860v.2

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2018 this document was served on Plaintiff at the following known addresses by electronic mail, pursuant to Federal Rule of Civil Procedure 5.

Counsel for Plaintiff SMART Profitability Solutions, LLC:

Kathryn Hinton
David E. Gevertz
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA 30326
khinton@bakerdonelson.com
dgevertz@bakerdonelson.com

By:   */s/ Eric Barton*                              
          *Eric Barton*

45591860v.2