# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SMART PROFITABILITY SOLUTIONS, LLC d/b/a SMART SAFETY GULF COAST,<br><br>    Plaintiff,<br><br>vs.<br><br>DOUBLE CHECK RISK SOLUTIONS, LLC AND JOHN MARSHA II<br><br>    Defendants. | Civil Action No. 1:18-cv-00706-MHC<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION TO MODIFY TEMPORARY RESTRAINING ORDER

Plaintiff requests that the Court extend the protections of the TRO it entered on March 8, 2018 to prohibit Defendant Double Check Risk Solutions, LLC ("Double Check" or "Defendant") from communicating or doing business with any referral source or channel partner Double Check acquired through its agent John Marsha's retention of SMART's confidential information and/or trade secrets, or Marsha's breach of fiduciary duty to SMART. Double Check objects to this

1

request, contending that: (1) it did not use any of SMART's confidential or trade secret information; (2) SMART's referral source information appropriated by Marsha is not protectable as a trade secret; and (3) there is no evidence that Double Check conspired with Marsha in breaching his fiduciary duty to SMART by soliciting SMART's referral sources. By so arguing, Double Check seeks to benefit from the unlawful acts of its agent while avoiding any negative consequences. It does so by downplaying the true scope of Marsha's misconduct and its own culpable involvement in and encouragement of it.

The record evidence does not support Double Check's version of events. Nor does the law absolve it of culpability. Accordingly, Plaintiff respectfully requests that the Court expand the scope of the TRO as outlined in its initial Motion.

## I.   Double Check's Assertion of Innocence Is Without Merit.

Double Check asserts that Marsha *inadvertently* retained three storage devices containing SMART's highly confidential and trade secret information, which he discovered "in an old work bag" after he was prompted to conduct a search of his house by SMART's threat of litigation in early February 2018. (Defendant's Response, 7;  Declaration of John Marsha, Dkt. 28-2).  Marsha's sworn testimony is utterly unbelievable. *Thousands* of documents contained on

2

one of these devices -- including many of SMART's actual and potential customer files -- were copied to the device on December 15 and 17, 2017, immediately prior to Marsha's submission of his notice of resignation to SMART on December 18. (*See* Declaration of Greg Freemyer, attached as **Exhibit 1**, at ¶ 6 and its Ex. B). Double Check can provide no reasonable explanation for why Marsha would need to copy SMART's files to his personal storage device mere days before his departure. Additionally, some of the files on two of the devices were downloaded as recently as February 2018, indicating that Marsha was actively using them up until the time he decided to turn them over to his attorney. (*Id*. at Ex. B and C).

Similarly, Double Check claims that it did not use any of SMART's information. Again, this assertion is contradicted by record evidence. To date, SMART has discovered that Double Check used its Master Proposal Template to price and package services for at least two customers. (*See* Declaration of Robert L. Turner, Dkt. 24-2, at ¶¶ 4-6). Further, the similarities between Double Check's and SMART's marketing brochures and sales presentations are obvious, indicating that Double Check is copying SMART's proprietary protocols and service model in most if not all respects. (*See id*. at ¶¶ 5-7). Plaintiff's Brief in Support of Motion to Extend TRO and for Preliminary Injunction ("Motion to Extend"), Dkt. 24-1 at pp.

3

5-6). Moreover, Double Check agent Ben Newton asked Marsha -- while Marsha was still employed by SMART -- to provide him with SMART's confidential pricing information for one of its customers (U TEC Construction) in order to assist Double Check in competing for that customer's business. (Motion to Extend, 8 and its Ex. J). Marsha did so. (*Id*.; Deposition of John Clark Marsha, II ("Marsha Tr."), relevant portions attached as **Exhibit 2**, at 231).[1]  Marsha continued to actively solicit this customer up until two days before the Court entered the TRO. (Marsha Tr., 232; Motion to Extend, Ex. K).

Finally, Double Check contends there is no evidence that it conspired with Marsha to breach his fiduciary duty to SMART with respect to his solicitation of SMART's referral sources. Again, documentary evidence -- much of it produced by Double Check -- proves this to be false. In the weeks leading up to Marsha's departure from SMART,[2] he recounted his solicitation efforts with respect to

---

[1] SMART took Marsha's deposition within the context of his bankruptcy proceeding currently pending in the U.S. Bankruptcy Court for the Northern District of Georgia on March 30, 2018.

[2] Marsha contends that his SMART employment terminated on December 21, 2017, when he was asked to turn in his SMART computer and walked out of the office. (Marsha Tr., 165-66). However, he also admits that the December 18, 2017 resignation notice he submitted included an effective date of January 2, 2018,

SMART's referral sources, including Starr Matthews Insurance Agency and Brown and Brown, to his Double Check colleagues Newton and Keith Wood. *See* Motion to Extend, pp. 6-7. Both Newton and Wood responded positively. *Id*. at 7. Unsurprisingly, no one from Double Check ever directed Marsha to stop soliciting SMART's referral sources while he was still employed by SMART.[3] Double Check has secured at least two customers through Marsha's referral sources (including Starr Matthews) to date. (Marsha Tr., 116). Double Check's attempt to distance itself from Marsha's actions and paint itself as an innocent bystander fails.

## II.     SMART's GTSA Claim Is Likely to Succeed Against Double Check.

Double Check asserts that the information related to SMART's referral sources appropriated by Marsha does not rise to the level of a trade secret, as it constitutes nothing more than an "ordinary list" of customers and insurance brokers. This is incorrect. Among the documents Marsha unlawfully retained is a document entitled "Insurance Customer List 8-30-2017" (the "ICL"). Marsha not

---

and that he was on paid vacation leave (vacation accrued with and paid by SMART) through that date. (*Id*. at 165-66).

[3] The only directive Marsha received from his Double Check colleagues was not to attend meetings with potential customers on behalf of Double Check until his resignation from SMART became effective. (Marsha Tr., 236). Marsha admits Double Check asked him for many other kinds of support while he was still employed by SMART. (*Id*. at 236-37).

5

4852-9728-7776 v1
2904860-000002 04/05/2018

only copied the ICL to one of his external storage devices just before he resigned, but he also emailed a copy from his SMART email account to his personal Gmail account in late August 2017, a month after he had begun discussions with Newton and others about the possible creation of a competitor to SMART. (Freemyer Dec., ¶ 6 and its Ex. E (ICL); Marsha Tr., 146 and its Ex. 18).The ICL is a list of SMART customers and their insurance brokers, including the name of their brokerage firm and the name, phone number, and email address of each customer's specific broker within the firm. (Marsha Tr., 146; Freemyer Dec. and its Ex. E). For some of the customers, it also identifies their insurance provider, loss control provider, and insurance underwriter. (Freemyer Dec. and its Ex. E). This list was compiled with information derived from several SMART employees, as part of SMART's effort to better tailor its marketing efforts towards insurance brokers, one of SMART's key referral sources. (Marsha Tr., 148-49; Turner Dec., ¶ 12(b)). Marsha admits that the ICL contains information relating to customers that were not his own, and admits that he cannot recreate the information it contains from memory. (Marsha Tr., 147). He also admits that the list is not publicly known. (Marsha Tr., 148-49).

4852-9728-7776 v1
2904860-000002 04/05/2018

Accordingly, the ICL constitutes a trade secret protectable under the Georgia Trade Secrets Act ("GTSA"). *See DeGiorgio v. Megabyte Intern., Inc*., 266 Ga. 539, 539 (1996) (lists which "contain the identities of actual customers and vendors of [defendant] and specific information concerning them" contained information that "was not readily ascertainable from any source other than [defendant's] business records" and thus constituted trade secrets). While Double Check contends that the ICL contains "publicly known information," it provides no evidentiary support for this assertion. Further, even if a general list of insurance brokers could be derived from a public source, Double Check fails to explain how a list of specific brokers which service SMART's actual customers, along with contact information for the specific individual servicing each customer on behalf of each broker, could be compiled from anything but SMART's own confidential records. *See Avnet, Inc. v. Wyle Labs., Inc*., 263 Ga. 615, 617 (1993) ("Obviously, there are innumerable other proper sources from which Wyle might derive a general list of *potential* customers for its electronic components. However, the only logical source from which Wyle might secure lists containing specific information regarding the *actual* customers for Avnet's and Hall-Mark's electronic components is business records generated by Avnet and Hall-Mark.").

7

Double Check next asserts that there is no evidence that it used, or would need to use, SMART's ICL to solicit insurance brokers, relying largely on the fact that Newton and Wood are closely affiliated with one of those brokers, Yates Insurance Agency ("Yates"). However, Double Check's affiliation with Yates does not explain how Double Check could have knowledge of the dozens of other insurance brokers listed in the ICL with the potential to refer business to a safety services company. It also does not explain why, if Newton and Wood have insurance broker contacts of their own, Double Check has not produced any documentation reflecting solicitation efforts by either man. Indeed, the documents produced by Double Check to date reveal that the company has relied largely, if not solely, on Marsha to solicit referral sources on behalf of Double Check -- even those within Yates! (*See* Exhibit K to Motion to Extend). Several of the individual insurance brokers and all of the brokerage firms Marsha contacted on behalf of Double Check in these communications are listed in the ICL. (*Compare* Motion to Extend, Ex. K *with* ICL). This coincidence, combined with the evidence SMART has already presented of Marsha's use of its information on behalf of Double Check, provides a sufficient basis to establish a reasonable likelihood of success on the merits of SMART's misappropriation claim against Double Check.

8

*See Amedisys Holding, LLC v. Interim Healthcare of Atl., Inc.*, 793 F. Supp. 2d 1302, 1313 n.14 (N.D. Ga. 2011) (Duffey, J.) (plaintiff established likelihood of success on merits of GTSA claim against former employee's new employer where employee was acting within scope of new employment in using misappropriated trade secrets to benefit of new employer, even where no evidence that new employer asked for the materials or "was even aware" of them).

Moreover, Double Check's reliance on Marsha's representation that he has returned all SMART information in his possession does not remove the need for injunctive relief. First, Double Check has not identified any concrete steps it has taken, such as conducting a forensic examination of Marsha's Double Check computer, to ensure Marsha's representation is accurate. Double Check's expectation that SMART could or would rely on Marsha's self-serving assurances alone is unreasonable given his conduct to date. Further, Marsha retained SMART's information for more than a month following his departure from SMART, such that he has had sufficient opportunity to absorb whatever information he deems most useful to his new role. See *Pinnacle Ag. Distrib., Inc. v. Mayo Fertilizer, Inc.*, 2017 WL 889542, *7 (M.D. Ga. Mar. 6, 2017) (enjoining defendants' solicitation of plaintiff's customers despite defendants' contention they

4852-9728-7776 v1
2904860-000002 04/05/2018

had returned all of plaintiff's information previously in their possession; "Reclaiming the documents does not address the harm resulting from the assimilation of this information by [defendant-employee] and other[s] during the time that it was in [defendant-employer]'s possession.").

Finally, to the extent Double Check argues Marsha should be allowed to use information pertaining to SMART's customers or referral sources contained within his mind rather than on a tangible list, this argument also fails.  While Marsha's knowledge of SMART's customers contained within his own head may not be protected by the GTSA, it is protected by the non-disclosure agreement he signed prior to the commencement of his SMART employment.  (*See* Verified Amended Complaint, Dkt. 21, at ¶¶ 11-12; Motion for TRO, Dkt. No. 5-1, pp. 17-20).  *Tom James of Atl., Inc. v. McClure*, 2002 WL 31749558, *2 (N.D. Ga. Jan. 16, 2002) (Forrester, J.) ("[T]o achieve broader protection so as to preclude former employees from using their personal knowledge of customer information, an employer should require prospective employees to sign restrictive covenants in their employment contacts prohibiting disclosure of such information.") (quoting *Avnet*, 263 Ga. at 620).  Accordingly, to the extent Marsha or Double Check seek to use such information to solicit SMART's referral sources, an injunction on such

10

conduct is warranted by Georgia law. *See Lee v. Environmental Pest & Termite Ctrl., Inc.*, 271 Ga. 371, 374-75 (1999) (upholding grant of preliminary injunction prohibiting former employee and new employer from soliciting customers that employee had contacted or learned about through his prior employment on basis of non-disclosure agreement); *Tom James*, 2002 WL 31749558, at *3 (enjoining former employee from "using any information regarding the identity of Plaintiffs' customers, customers' requirements, products, prices, and costs, whether such information is in the form maintained by Plaintiffs, derived from Plaintiffs' records, or reconstructed from a memory of such information acquired during and in the course of his employment with the Plaintiffs" on basis of non-disclosure agreement).

**III.   Expanded Injunctive Relief Is Further Warranted by Double Check's Involvement in Marsha's Breach of Fiduciary Duty.**

    **A.   SMART Has Presented Sufficient Evidence that Double Check Conspired with Marsha to Breach His Fiduciary Duty In Diverting Referral Sources.**

After Plaintiff submitted its Motion to Modify the TRO, Double Check produced documents responsive to the expedited discovery requests authorized by this Court. As outlined above and in Plaintiff's Motion to Extend, within Double

11

Check's production Plaintiff discovered documents showing that Marsha actively and repeatedly solicited SMART referral sources on behalf of Double Check prior to the termination of his SMART employment. Furthermore, these documents also revealed that Marsha's Double Check colleagues were fully aware of and encouraged Marsha's unlawful solicitation efforts.  Double Check benefitted from Marsha's fiduciary duty breach, as Marsha obtained customers for Double Check through two of the referral sources he had solicited while still employed by SMART.[4]  (Marsha Tr., 116).

This is more than sufficient to establish a likelihood of success on the merits of SMART's conspiracy claim.  As the Georgia Court of Appeals has explained:

> Civil conspiracy is an act which is by its very nature covert and clandestine, and usually not susceptible of proof by direct evidence. Concert of action, amounting to conspiracy, may be shown by circumstantial as well as direct evidence.  It is not necessary to prove an express agreement or compact among the wrongdoers; their common design may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances.

---

[4] These referral sources were Starr Mathews and Angie Reese of Accu Protect. (Marsha Tr., 116, 168, 303).

4852-9728-7776 v1
2904860-000002 04/05/2018

*Wright v. Apartment Inv. and Mgmt. Co.,* 315 Ga. App. 587, 595 (2012) (quoting *First Fed. Savings Bank v. Hart*, 185 Ga. App. 304, 305 (1987)).

Further, Double Check's contention that it cannot be liable for Marsha's unlawful solicitation of SMART's referral sources because its agents "had a legal right to engage in such action" is also without merit.  The cases to which Double Check cites for this contention are wholly distinguishable, as they involve conspiracy claims in which *all* alleged parties to the conspiracy had the legal right to take the action in question. *See Miles v. Bibb Co.*, 177 Ga. App. 364, 265 (1985) (conspiracy claim failed where defendants had authority to terminate plaintiff's employment); *Barnwell v. Barnett & Co.*, 222 Ga. App. 694, 695 (1996) (no conspiracy claim where all defendants had right to terminate contract plaintiff alleged was tortiously interfered with).  Here, Marsha had a fiduciary duty not to compete with SMART while employed.  Double Check, through Newton and Wood, conspired with Marsha to breach his duty to SMART by actively encouraging his unlawful solicitation efforts and his sharing of SMART's proprietary information.  While Double Check may have lawfully solicited SMART's referral sources independently of Marsha and without SMART's

13

information, it did not choose that path. Accordingly, SMART's conspiracy claim stands.

### B. SMART Has Established a Risk of Irreparable Injury.

To date, Marsha has already successfully diverted at least two customers away from SMART to Double Check by virtue of his unlawful solicitation of SMART's referral sources while still employed by SMART. (Marsha Tr., 116, 168, 303). Given the importance of referral sources to SMART's customer pipeline, it is evident that should Double Check continue to be allowed to solicit and do business with those referral sources Marsha unlawfully began soliciting in breach of his fiduciary duty to SMART, SMART will likely suffer additional lost business and loss of goodwill. As "the loss of customers and goodwill is an irreparable injury," injunctive relief as to these referral sources is warranted. *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991); *see also Pinnacle Ag. Distrib., Inc. v. Mayo Fertilizer, Inc.*, 2017 WL 889542 (M.D. Ga. Mar. 6, 2017) (finding continued solicitation of plaintiff's customers by defendants risked irreparable injury; granting injunctive relief prohibiting defendants from continued solicitation based on underlying breach of fiduciary duty and GTSA claims).

4852-9728-7776 v1
2904860-000002 04/05/2018

## IV. Conclusion.

In light of the foregoing, as well as the evidence and arguments presented in Plaintiff's Brief in Support of its Motion to Modify and its Motion to Extend, SMART respectfully requests that the Court modify the TRO as outlined in Dkt. No. 22-9.

Respectfully submitted this 5th day of April, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
David E. Gevertz
GA Bar No. 292430
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA  30326
Phone: 404-223-2216
Email:   khinton@bakerdonelson.com
         dgevertz@bakerdonelson.com

4852-9728-7776 v1
2904860-000002 04/05/2018

## **CERTIFICATE OF SERVICE**

I certify that on this date I caused to be served a true and correct copy of *Plaintiff's Reply in Support of Its Motion to Modify Temporary Restraining Order* as follows:

*Via ECF*

Eric Barton, Esq.
Seyfarth Shaw LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309-3958

*Counsel for Defendant Double Check Risk Solutions, LLC*

*Via FedEx*

John C. Marsha, II
119 Foxdale Way
Dallas, GA 30132

Respectfully submitted this 5th day of April, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
*Attorney for Plaintiff*

4852-9728-7776 v1
2904860-000002 04/05/2018