**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **SMART PROFITABILITY SOLUTIONS, LLC d/b/a SMART SAFETY GULF COAST,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 1:18-cv-00706-MHC** |
| **vs.** | ) ) ) | |
| **DOUBLE CHECK RISK SOLUTIONS, LLC, JOHN MARSHA II, WILLIAM KEITH WOOD, JOSEPH BENJAMIN NEWTON, JEFFREY JOHN BLANTON, AND LAUTUS SPECIAL RISKS, LLC** | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) ) | |

**SECOND AMENDED VERIFIED COMPLAINT
FOR DAMAGES AND INJUNCTIVE RELIEF**

COMES NOW Smart Profitability Solutions, LLC d/b/a SMART Safety

Gulf Coast  ("SMART" or the "Company"), by and through Counsel, and files its

Second Amended Verified Complaint pursuant to Fed. R. Civ. P. 15(a)(2) against

Defendants Double Check Risk Solutions, LLC ("Double Check"), John Marsha, II

1

("Marsha"), William Keith Wood[1] ("Wood"), Joseph Benjamin Newton[2] ("Newton"), Jeffrey John Blanton ("Blanton") and Lautus Special Risks, LLC ("Lautus") (collectively, "Defendants"), stating as follows:

## PARTIES

1.

SMART is a corporation organized under the laws of the State of Delaware, with its principal place of business in Marietta, Georgia.

2.

Defendant Double Check is a Georgia limited liability company, with its principal place of business located in Atlanta, Georgia. Double Check may be served with process through its registered agent, Ben Newton, at 2800 Century Parkway, Suite 300, Atlanta, Georgia 30345.

3.

Defendant John Marsha, II is an individual who resides in Paulding County, Georgia. He may be served with a copy of this Complaint at his home address, 119 Foxdale Way, Dallas, Georgia 30132.

---

[1] Defendant Wood is generally referred to as Keith Wood.
[2] Defendant Newton is generally referred to as Ben Newton.

4821-2980-8226 v1
2904860-000002 04/13/2018

4.

Upon information and belief, Defendant William Wood is an individual who resides in DeKalb County, Georgia. On information and belief, he may be served with a copy of this Complaint at his home address, 4570 E. Brookhaven Drive NE, Brookhaven, GA 30319.

5.

Upon information and belief, Defendant Joseph Newton is an individual who resides in DeKalb County, Georgia. On information and belief, he may be served with a copy of this Complaint at his home address, 4310 E. Brookhaven Drive NE, Atlanta, GA 30319.

6.

On information and belief, Defendant Jeff Blanton is an individual who resides in Fulton County, Georgia. On information and belief, he may be served with a copy of this Complaint at his home address, 120 High Bluff court, Duluth, GA 30097.

7.

Defendant Lautus Special Risks, LLC is a Georgia limited liability company with its principal place of business located in Atlanta, Georgia. Lautus may be

3

served with process through its registered agent, Defendant William Wood, at 2800 Century Parkway, Suite 300, Atlanta, Georgia 30345.

## JURISDICTION AND VENUE

8.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it involves federal questions arising under the Computer Fraud and Abuse Act of 1986, as amended, 18 U.S.C. § 1030 ("CFAA").  This Court also has supplemental jurisdiction over all of the state law claims in this action because they arise out of the same facts and circumstances underlying the CFAA claim.

9.

This Court has personal jurisdiction over Defendant Double Check because the claims alleged against it arise from its transaction of business in the State of Georgia, and/or from Defendant Double Check's commission of tortious acts in the State of Georgia.

10.

This Court has personal jurisdiction over Defendant Marsha because, as a Georgia resident, he is subject to general personal jurisdiction in Georgia.

4

11.

This Court has personal jurisdiction over Defendant Wood because, as a Georgia resident, he is subject to general personal jurisdiction in Georgia.

12.

This Court has personal jurisdiction over Defendant Blanton because, as a Georgia resident, he is subject to general personal jurisdiction in Georgia.

13.

This Court has personal jurisdiction over Defendant Lautus because the claims alleged against it arise from its transaction of business in the State of Georgia, and/or from Defendant Lautus's commission of tortious acts in the State of Georgia.

14.

This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and Division.[3]

---

[3] While the agreement upon which SMART's breach of contract claims are based contains an exclusive venue provision in Louisiana, SMART expressly waives that provision. This provision was included at SMART's direction for its convenience. All parties are located in this venue and all of the events giving rise to this action

## **FACTS**

### 15.

SMART provides safety management, OSHA training, and professional safety staffing solutions to companies in a variety of industries throughout the United States.   SMART primarily provides such services to companies in the construction industry, but also serves those in distribution, manufacturing, and similar industries.  Robert L. Turner, III ("Turner") is the Company's President and Chief Executive Officer.

### 16.

Defendant Marsha began his relationship with SMART as an independent contractor on or about May 30, 2014.

### 17.

In conjunction with the commencement of his engagement with SMART, Defendant Marsha executed a Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Non-Disclosure/Non-Solicitation Agreement"). A true and correct copy of the Non-Disclosure/Non-Solicitation Agreement is attached as **Exhibit A**.

occurred in this venue, such that the interests behind the venue provision are moot with respect to this action.

4821-2980-8226 v1
2904860-000002 04/13/2018

18.

Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement contains a

confidentiality provision, which provides:

> Confidential Information.  I recognize that during my employment I
> will receive, develop, or otherwise acquire information which is of a
> secret or confidential nature,    including  Confidential  Information
> regarding Smart and its Clients.  Except as authorized     by  Smart, I
> will not disclose, directly or indirectly, any Confidential Information
> of Smart or its Clients to any third party including, without limitation,
> other  customers  or  suppliers.     Further,  I  will  only  use  such
> Confidential Information in the faithful performance of my duties for
> Smart.  The confidentiality provisions of this Agreement shall survive
> the termination of my employment at Smart. I also acknowledge that
> all     files, records, documents, drawings, specifications, equipment,
> and similar items (regardless of media) relating to Smart's business,
> whether prepared by me or otherwise coming into my possession,
> shall remain the exclusive property of Smart.  Upon the conclusion of
> my employment, I agree to return to or leave with Smart all of such
> written or other records and all copies thereof.

(Exhibit A, ¶ A).

19.

"Confidential Information" is defined as:

> any and all trade secrets and other confidential information relating to
> the  disclosing  party's  business  or  the  business  of  its  customers,
> suppliers, equipment manufacturers   and/or consultants with whom
> it  conducts  business  ("Clients")  including,  but  not  limited  to
> information  concerning  management,  engineering,  finances,  human
> resources,  information  services,  legal,  manufacturing,  marketing,

7

project management, research and development, business forms, sales, products and product plans; computer software; processes; procedures; pricing; business costs; business plans; ideas, drawings and technical data; financial data and plans; identity of actual and potential customers; identity, capability, responsibilities, and/or compensation of its employees; recruiting plans; customer specifications and job requirements; and proposals and bidding information.

(Exhibit A, ¶ 2).

20.

Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement also contains a non-solicitation of employees provision, which provides: "I agree that, during the Prohibited Term, I will not directly or indirectly, solicit, recruit or induce any Smart employee to leave employment with Smart or to work for any other person or business." (Exhibit A, ¶ C).

21.

"Prohibited Term" is defined as "during employment, and the two year period immediately following the termination of my employment with Smart (regardless of the reason for such termination."). (Exhibit A, ¶ 3).

22.

On or about September 4, 2014, SMART hired Defendant Marsha as its Business Development Officer. Upon accepting SMART's offer of employment,

8

Defendant Marsha signed an offer letter acknowledging and agreeing to the terms of his employment (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached as **Exhibit B.**

23.

The Employment Agreement specifically incorporates Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement as a condition of Defendant Marsha's employment. (Exhibit B, p. 5). Accordingly, by signing the Employment Agreement, Defendant Marsha re-affirmed his contractual obligations outlined in the Non-Disclosure/Non-Solicitation Agreement, including those outlined above.

24.

As SMART's Business Development Officer, Defendant Marsha reported directly to CEO Turner and was one of the top four executives in SMART's organization. During his employment, Defendant Marsha was one of only four employees who received grants of equity awards from the Company.

25.

In this role, Defendant Marsha was responsible for directing SMART's sales efforts across all regions, services, and industry segments serviced by SMART;

4821-2980-8226 v1
2904860-000002 04/13/2018

overseeing SMART's marketing functions; and managing the activities of SMART employees engaged in sales activities and SMART's field safety personnel.

26.

Defendant Marsha had the authority to submit proposals to SMART's customers and potential customers, to negotiate pricing, and to modify service terms as necessary to secure sales.

27.

Defendant Marsha was also entrusted with cultivating SMART's most valuable business relationships, including those with SMART referral sources/channel partners (insurance brokers, law firms, etc.) and SMART customers and potential customers.

28.

Defendant Marsha was likewise entrusted with SMART's most valuable proprietary information, including but not limited to its strategic planning data, actual and prospective customer data, sales proposals and contracts, confidential marketing and business development materials, and proprietary pricing and sales methodologies.

4821-2980-8226 v1
2904860-000002 04/13/2018

29.

In or around July 2017, while still employed as SMART's Business Development Officer, Defendant Marsha approached Brandon Chapman, Vice President of the Gulf Coast Region of SMART, and asked him if he would be interested in starting a competing safety services company with him. During this conversation, Defendant Marsha encouraged Chapman to leave SMART and join him in a competitive venture.

30.

Upon information and belief, Defendant Blanton is an insurance broker with Yates Insurance Agency ("Yates"). Yates is one of SMART's referral sources/channel partners.

31.

Upon information and belief, Defendants Newton and Wood own and/or are employed by Defendant Lautus.

32.

In or around July or August 2017, Defendants Newton, Blanton, and Wood had a breakfast meeting with Defendant Marsha. Defendant Blanton arranged this meeting to discuss his idea of forming a new venture competitive with SMART

4821-2980-8226 v1
2904860-000002 04/13/2018

and servicing several of SMART customers.   Defendant Blanton informed Defendant Marsha and the others that several of the customers he had previously referred to SMART were unhappy with SMART.   Accordingly, he saw an opportunity to start a competing venture to service SMART's customers and others.

33.

Upon information and belief, the venture discussed at this meeting eventually became Defendant Double Check.  Defendant Marsha did not inform SMART that Defendant Blanton intended to form a competing company.

34.

On or about August 7, 2017, Defendant Newton engaged Brian Casey, an attorney, to evaluate the enforceability of Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement.   Defendant Newton requested and obtained the Non-Disclosure/Non-Solicitation Agreement from Defendant Marsha. Defendant Marsha was aware of the purpose of Defendant Newton's request. Therefore, upon information and belief, all Defendants were aware of the existence of Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement.

4821-2980-8226 v1
2904860-000002 04/13/2018

35.

Defendant Marsha provided Casey's legal opinion regarding the enforceability of his Non-Disclosure/Non-Solicitation Agreement to Chapman. Upon information and belief, Defendant Marsha did this in an attempt to encourage Chapman to leave SMART.

36.

On or about August 17, 2017, Defendant Newton met with Defendant Marsha to discuss the formation of the entity that would become Defendant Double Check.

37.

On or about September 21, 2017, Defendant Newton retained the law firm Carter Allen, P.C. to create Defendant Double Check.

38.

In or around September/October 2017, while still employed as SMART's Business Development Officer, Defendant Marsha asked Ted Low, Vice President of National Operations, to leave SMART and start a competing safety services company with him. Defendant Marsha also informed Low that he had already approached Chapman about the idea, and Defendant Marsha encouraged Low to

13

join him.  Defendant Marsha further told Low that although he knew he had agreed to certain restrictive covenants in the Non-Disclosure/Non-Solicitation Agreement, he did not think it would be an issue because SMART did not have the stomach to try to enforce it against him.

39.

On or about October 2, 2017, Defendant Newton stated that Defendant Lautus would own 51% of the yet-to-be-named entity and asked Defendants Marsha and Blanton to decide how they wanted to split the remaining ownership interest.  Defendant Newton also stated that he was thinking about the best way to approach Defendant Marsha's Non-Disclosure/Non-Solicitation Agreement, and he asked Defendant Marsha to provide input on content for the entity's website. Defendant Marsha responded that he would discuss the equity question with Defendant Blanton and asked for the contact information of the person building the website so that he could discuss its content.

40.

On or about October 12, 2017, Defendant Newton introduced Defendant Marsha to Naveen Dittakavi, the individual engaged to create Defendant Double Check's website, for the purpose of having Defendant Marsha provide guidance as

14

to the content to be included on the website. All Defendants knew Defendant Marsha was a SMART employee at the time this request was made of Defendant Marsha. Moreover, all Defendants encouraged, authorized, and ratified Defendant Marsha's actions on their behalf.

41.

On or about October 30, 2017, Defendant Newton asked Defendant Marsha to provide an opinion on possible logos for Defendant Double Check. All Defendants knew Defendant Marsha was a SMART employee at the time this request was made of Defendant Marsha. Moreover, all Defendants encouraged, authorized, and ratified Defendant Marsha's actions on their behalf.

42.

On or about November 10, 2017, Defendants Marsha, Blanton, and Newton met for lunch and assigned Defendant Marsha the task of creating a checklist of services to be provided by Defendant Double Check to its customers. All Defendants knew Defendant Marsha was a SMART employee at the time this request was made of Defendant Marsha. Moreover, all Defendants encouraged, authorized, and ratified Defendant Marsha's actions on their behalf.

15

43.

On or about November 16, 2017, Defendant Double Check filed its Articles of Organization with the Georgia Secretary of State.  Upon information and belief, Defendant Marsha, as the President of Double Check, authorized Defendant Double Check's creation.

44.

On or about December 1, 2017, Defendant Newton provided a draft of Double Check's Operating Agreement to Defendant Marsha.  Later that day, Defendant Marsha met with Defendant Blanton for lunch to discuss Defendant Double Check.  Defendant Newton was invited to the meeting but was unable to attend.  Defendant Marsha subsequently submitted a reimbursement expense request to SMART for the lunch.  SMART reimbursed Defendant Marsha accordingly.

45.

On or about December 5, 2017, Defendant Newton asked Defendant Marsha to provide a Double Check independent contractor agreement for Gordy Adams, a potential new hire.  Defendant Marsha, in an email to Defendants Newton, Blanton, and Wood, obliged.  Upon information and belief, Adams was

4821-2980-8226 v1
2904860-000002 04/13/2018

intentionally hired to service U-Tec, a SMART customer.  All Defendants knew Defendant Marsha was a SMART employee at the time this request was made of Defendant Marsha.  Moreover, all Defendants encouraged, authorized, and ratified Defendant Marsha's actions on their behalf.

46.

On or about December 11, 2017, Defendant Newton asked Defendant Marsha to undertake and oversee the completion of information for Defendant Double Check's insurance underwriter.  Defendant Marsha, in an email addressed to Defendants Blanton, Wood, and Newton, obliged.  Defendant Marsha shared a copy of SMART's standard service agreement, modified to look like a Double Check agreement, with Defendant Newton for the purpose of sharing it with Defendant Double Check's underwriter.  All Defendants knew Defendant Marsha was a SMART employee at the time this request was made of Defendant Marsha. Moreover, all Defendants encouraged, authorized, and ratified Defendant Marsha's actions on their behalf.

47.

On or about December 13, 2017, Defendant Marsha proposed a service package for Double Check to offer to U-Tec.  Defendants Blanton, Newton, and

17

Wood authorized and requested this from Defendant Marsha. In response, Defendant Newton asked Defendant Marsha how much U-Tec was currently paying SMART for its services. Defendant Marsha provided the requested information via an email to Defendant Newton, copying Defendants Blanton and Wood.

48.

On or about December 14, 2017, in an email to Defendants Newton, Wood, and Blanton, Defendant Marsha indicated that had contacted Brown & Brown Insurance ("Brown & Brown") about working together. Brown & Brown is one of SMART's key referral sources.

49.

On or about December 18, 2017, Defendant Double Check's Operating Agreement was executed. According to the Operating Agreement, Defendant Lautus is a majority member and Defendant Marsha is a minority member of Defendant Double Check. Defendant Marsha, Defendant Newton, and Defendant Wood are named as Defendant Double Check's President, Treasurer, and Secretary, respectively. Defendants Newton and Wood executed the Operating Agreement as individuals and as authorized representatives of Defendant Lautus.

18

50.

On or about December 18, 2017, Defendant Marsha voluntarily resigned from SMART, with his last official day of employment being January 2, 2018.

51.

During Defendant Marsha's exit interview with Turner, Defendant Marsha told Turner that he was leaving SMART to become President of an entity which resold auto insurance warranties.   Defendant Marsha explicitly represented to Turner that this company was not a competitor of SMART.

52.

Defendant Marsha turned in his company-issued computer to SMART on or about December 21, 2017.

53.

On or about December 27, 2017, Defendant Marsha recounted to Defendants Newton and Wood his solicitation efforts with respect to Starr Mathews Insurance Agency ("Starr Mathews"), another SMART referral source.   Defendants Newton and Wood responded positively.   Defendant Marsha expressly stated that Starr Mathews had been the source of several referrals to SMART during the previous year.   No Defendant ever directed Defendant Marsha to stop soliciting SMART's

4821-2980-8226 v1
2904860-000002 04/13/2018

referral sources while he was still employed by SMART.  Rather, each encouraged, authorized, and ratified his actions.

54.

Defendants Newton, Blanton, Wood, Lautus, and Double Check were aware that Defendant Marsha was employed by SMART through the date of his voluntary resignation. At no point did they instruct Defendant Marsha not to participate in the creation and promotion of Defendant Double Check while he was still employed by SMART.  Rather, each encouraged, authorized, and ratified his actions.

55.

Following his voluntary resignation, Defendant Marsha updated his LinkedIn profile to include his new role as President of Defendant Double Check. A true and correct copy of Defendant Marsha's LinkedIn profile is attached as **Exhibit C.**  Defendant Double Check's LinkedIn profile describes the company as one that "manages customized programs for auto dealers, manufacturers, and distribution companies."  It further lists Defendant Double Check's specialties as including "safety" and "OSHA." A true and correct copy of Defendant Double Check's LinkedIn profile is attached as **Exhibit D**.

20

56.

Based on its own publicized statements, Defendant Double Check and its agents are providing services competitive with SMART.

57.

In light of this discovery, SMART began investigating Defendant Marsha's departure from the Company, including undertaking a third-party forensic examination of Defendant Marsha's SMART computer.

58.

This examination revealed that in the week before Defendant Marsha's return of his SMART computer, Defendant Marsha connected several foreign external storage devices to the SMART computer.  He then accessed numerous files on that device, revealing that Defendant Marsha had either just downloaded the files to the device or had done so previously.  These files contained significant amounts of SMART's confidential information and trade secrets, to which Defendant Marsha had been provided access over the last three years solely by virtue of him serving as a key SMART executive, who had signed a non-disclosure agreement.

21

59.

Specifically, SMART's investigation revealed that Defendant Marsha kept SMART's customer lists, referral source/channel partner information, prospective customer information, pricing data, strategic planning materials, proprietary training materials (which SMART sells to its customers), and similar highly confidential and trade secret information in his possession. Defendant Marsha did not return any of this information to SMART following his voluntary resignation as he was contractually obligated to do. By virtue of his incorporation of SMART's trade secrets and confidential information into Defendant Double Check's work product, Defendants still retain SMART's proprietary information in their possession.

60.

In particular, some of the documents Defendant Marsha retained include: SMART's "ATL Ops Audit Tracker," a detailed list of SMART's Atlanta-area customers including services performed for these customers each month, operations planning, and contact information of key customer executives; SMART's customer portfolio for the Baton Rouge/Houston region; SMART's proprietary training materials, which it provides to customers for a fee; SMART's

22

prospective client list;  SMART's customer proposals and contracts, which contain details of SMART's confidential pricing model and service terms; SMART's Strategic Plan Starter, which contains the Company's 2018 strategic planning framework; SMART's list of customers with their insurance broker information; and SMART's Budgeting and Revenue Forecast Tracker, which outlines SMART's plans for acquiring new business and contains.

61.

All Defendants have incorporated SMART's marketing materials, sales proposals, and proprietary pricing template (the Master Proposal Template) into Defendant Double Check's own work product.

62.

SMART takes all reasonable steps to ensure that its proprietary information is protected from disclosure. It does not share any of this information publicly, and it limits access to this information internally to only its highest-level employees, such as Defendant Marsha. All of SMART's computers are password-protected, and employees must have a username and password to access SMART's email and document management system.

63.

23

SMART also discovered a draft services contract between Russell Landscaping, Inc. ("Russell Landscaping") and Defendant Double Check saved on Defendant Marsha's SMART computer. As written, the agreement provides that Defendant Double Check "shall provide services, training and advice relating to safety, risk and health" to Russell Landscaping. A true and correct copy of the agreement between Russell Landscaping and Defendant Double Check is attached as **Exhibit E.**

64.

Russell Landscaping is one of SMART's active sales prospects. SMART submitted several proposals to perform services to Russell Landscaping during Defendant Marsha's SMART employment, with Defendant Marsha's knowledge and active participation.  Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

65.

Upon information and belief, Defendant Marsha used SMART's proprietary information to appropriate this opportunity away from SMART on behalf of his new competing venture, Defendant Double Check.  Defendant Marsha did this at

24

the request, with the authorization, and with the ratification of the other Defendants.

66.

Upon information and belief, Defendant Marsha diverted and/or appropriated other sales prospects and opportunities away from SMART to Defendant Double Check while still employed with SMART. Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

67.

By way of example, upon information and belief, Defendant Marsha utilized the relationships he developed with SMART's referral sources/channel partners (including representatives of Yates), using these contacts to identify and attract new business opportunities that would have otherwise gone to SMART. Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

68.

Further, on information and belief, Defendant Marsha used SMART's proprietary and trade secret information to secure referrals from referral

4821-2980-8226 v1
2904860-000002 04/13/2018

sources/channel partners such as Yates.  Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

69.

Defendant Marsha utilized his relationship with Yates representatives -- which he developed through his SMART employment -- to secure funding for Defendant Double Check and/or the services of Defendant Double Check's registered agent. Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

70.

Since his departure from SMART, Defendant Marsha, on behalf of Defendants, solicited at least one of SMART's current customers, Manufacturing Resources, Inc. ("MRI"), to provide services competitive with SMART.  Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.  Defendants used SMART's proprietary information and trade secrets to aid in this solicitation.

71.

Defendant Marsha also used his position with SMART to recruit SMART's employees to leave SMART and work for Defendant Double Check.  In addition to

4821-2980-8226 v1
2904860-000002 04/13/2018

his solicitation of Chapman and Low, Defendant Marsha also solicited SMART's employee, Marcial Marquez.  Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

72.

In the course of its review of Defendant Marsha's computer, SMART's third-party forensics vendor also discovered an unexecuted independent contractor agreement between Marquez and Defendant Double Check dated December 20, 2017, prior to Defendant Marsha's departure from the Company.  A true and correct copy of this employment contract is attached as **Exhibit F**.

73.

Marquez was an employee with SMART who had recently completed a project for SMART in late November 2017.  Following the conclusion of that assignment, Turner met with Marquez in December 2017 to discuss future opportunities with SMART, and had him meet one of SMART's clients to discuss specific opportunities with it. Upon information and belief, Marquez decided not to continue his relationship with SMART because Defendant Marsha solicited him to work for Defendant Double Check.  Defendant Marsha did this at the request, with the authorization, and with the ratification of the other Defendants.

27

74.

On February 5, 2018, SMART's counsel sent a letter to Defendants Marsha and Double Check, notifying them that SMART was aware that they were unlawfully competing with it and were initiating an investigation into Defendant Marsha's departure from the Company.  Further, SMART's counsel demanded that Defendant Marsha return any and all SMART property in his possession immediately.   A true and correct copy of this correspondence is attached as **Exhibit G.**  Neither Defendant responded.

75.

Thereafter, on February 13, 2018, SMART's counsel sent a second letter to Defendants Marsha and Double Check notifying them that SMART had evidence that Defendant Marsha had its confidential and trade secret information in his possession. Again, SMART demanded that Defendants return this information immediately.   A true and correct copy of this letter is attached as **Exhibit H.** Again, Defendants refused to respond.

76.

As a result of all Defendants' unlawful actions, SMART has been damaged, including but not limited to by the loss of prospective customers such as Russell

Landscaping, the loss of Marquez, and the loss and misappropriation of its proprietary information and trade secrets.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT AGAINST DEFENDANT MARSHA
*Breach of the Confidentiality and Non-Solicitation Provisions*

77.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

78.

Defendant Marsha executed valid agreements with Plaintiff in exchange for valuable consideration, through which he agreed to refrain from using any of SMART's confidential information for any purpose except to perform services for SMART, and to not directly or indirectly solicit, recruit or induce any SMART employee to leave employment with SMART.

79.

Notwithstanding his contractual obligations to the contrary, Defendant Marsha materially breached his Employment and Non-Disclosure/Non-Solicitation Agreements by disclosing and using SMART's trade secret and/or confidential and

4821-2980-8226 v1
2904860-000002 04/13/2018

proprietary information to and for the benefit of himself and Double Check. Defendant Marsha's breach of the Employment and Non-Disclosure/Non-Solicitation Agreements is further evidenced by his refusal to return SMART's information at the end of his employment with SMART.

80.

Defendant Marsha also materially breached his Employment and Non-Disclosure/Non-Solicitation Agreements by directly soliciting, or participating in the solicitation of, SMART employees to leave SMART and come to work for competitor Double Check, including Ted Low, SMART's Vice President of National Operations ; Brandon Chapman, SMART's Vice President of Gulf Coast Region; and Marcial Marquez.

81.

As a direct and proximate result of Defendant Marsha's breach of his Employment and Non-Disclosure/Non-Solicitation Agreements, SMART has suffered, and will continue to suffer, immediate and irreparable injury, for which SMART has no adequate remedy at law, and for which SMART is entitled to preliminary and permanent injunctive relief.

82.

30

As a direct and proximate result of Defendant Marsha's breach of his Employment and Non-Disclosure/Non-Solicitation Agreements, SMART has suffered actual damages, including the loss of at least one sales opportunity and the loss of one of its independent contractors.

83.

SMART is also entitled to attorney's fees and costs of litigation pursuant to the terms of the Non-Disclosure/Non-Solicitation Agreement.

## COUNT II
## BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT MARSHA

84.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

85.

As a SMART executive officer who was entrusted with SMART's confidential and proprietary information, who had the authority to offer pricing and other contract terms to current and prospective clients, and to amend proposals with customers and other third parties, Defendant Marsha was an agent of SMART and owed it a fiduciary duty of loyalty.

4821-2980-8226 v1
2904860-000002 04/13/2018

86.

Defendant Marsha breached his fiduciary duties to SMART by:

(a)     disclosing SMART's confidential and proprietary information and trade secrets to the other Defendants without the Company's consent, both before and after the termination of his SMART employment;

(b)     misappropriating SMART's confidential and proprietary information and trade secrets to benefit himself and Defendants, both before and after the termination of his SMART employment;

(c)     soliciting SMART employees, including but not limited to, Brandon Chapman, Ted Low, and Marcial Marquez, to leave SMART and work for a competitor;

(d)     appropriating or attempting to appropriate SMART's corporate opportunities for his own benefit and the benefit of Defendants, including but not limited to SMART's current client, U-Tec; SMART's prospective client, Russell Landscaping; and referrals from several of SMART's most important referral sources, including Yates, Brown & Brown, and Starr Mathews; and,

(e)     refusing to inform SMART of certain alleged customer dissatisfaction, as referenced in Paragraphs 32-33 herein.

4821-2980-8226 v1
2904860-000002 04/13/2018

87.

Defendant Marsha breached his fiduciary duty to SMART in bad faith, such that SMART is entitled to an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

88.

As a result of the foregoing breaches of Defendant Marsha's fiduciary duty, SMART has been damaged in an amount to be proven at trial, and it additionally has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS

89.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

90.

The customer lists, referral source/channel partner information, sales prospect data, pricing data, marketing materials, strategic plans, and training materials which SMART sells to customers and other documents described above

4821-2980-8226 v1
2904860-000002 04/13/2018

constitute "trade secrets" within the meaning of O.C.G.A. § 10-1-761.  They are not commonly known by or available to the public; derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and are the subject of efforts by SMART that are reasonable under the circumstances to maintain their secrecy.

91.

Defendant Marsha disclosed and/or used the trade secrets described above without express or implied consent, and used improper means to acquire knowledge of such trade secrets because he acquired such knowledge by breaching his confidential fiduciary relationships with SMART and his contractual obligation to maintain their secrecy and/or limit their use.

92.

Defendants Newton, Wood, Blanton, and Lautus acquired some or all of the trade secrets described above from Defendant Marsha prior to the execution of Defendant Double Check's Operating Agreement and knew or had reason to know that Defendant Marsha acquired such trade secrets by improper means.

4821-2980-8226 v1
2904860-000002 04/13/2018

93.

Defendants Newton, Wood, Blanton, and Lautus used the trade secrets described above without express or implied consent, and they used improper means to acquire knowledge of such trade secrets because they acquired such knowledge by inducing breaches of confidential fiduciary relationships and duties to maintain secrecy and/or limit use.

94.

Defendants Newton, Wood, Blanton, and Lautus used the trade secrets described above without express or implied consent, and at the time of use, they knew or had reason to know that knowledge of such trade secrets was: derived from John Marsha, who had utilized improper means to acquire it; acquired by John Marsha under circumstances giving rise to duties to maintain secrecy and/or limit use; and derived from John Marsha, who owed SMART duties to maintain secrecy and/or limit use.

95.

Likewise, Defendant Double Check acquired the trade secrets described above from Defendant Marsha and knew or had reason to know that Defendant Marsha acquired such trade secrets by improper means.

35

96.

Defendant Double Check used the trade secrets described above without express or implied consent, and it used improper means to acquire knowledge of such trade secrets because it acquired such knowledge by inducing breaches of confidential fiduciary relationships and duties to maintain secrecy and/or limit use.

97.

Defendant Double Check used the trade secrets described above without express or implied consent, and at the time of use, it knew or had reason to know that knowledge of such trade secrets was:  derived from John Marsha, who had utilized improper means to acquire it; acquired by John Marsha under circumstances giving rise to duties to maintain secrecy and/or limit use; and derived from John Marsha, who owed SMART duties to maintain secrecy and/or limit use.

98.

As a result of Defendants' misappropriation of its trade secrets, SMART has been damaged in an amount to be proven at trial, and it additionally has suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

36

99.

Further, Defendants' misappropriation of SMART's trade secrets was willful and malicious; and SMART should be awarded exemplary damages and attorneys' fees under O.C.G.A. §§ 10-1-763 and 764.

## COUNT IV
## CIVIL CONSPIRACY AGAINST ALL DEFENDANTS

100.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

101.

Defendants have acted in concert to undertake the tortious conduct and other wrongs alleged herein, specifically Defendant Marsha's breach of fiduciary duty.

102.

For instance, Defendants Newton, Wood, Blanton, Double Check, and Lautus were aware of and encouraged Defendant Marsha's solicitation of SMART's referral sources and directed the use of Defendant Marsha's time and professional services while Defendant Marsha was still employed by SMART.

37

103.

Additionally, Defendants Blanton, Newton, and Wood authorized and encouraged Defendant Marsha to assist Defendant Double Check's solicitation of one of SMART's customers, U-Tec, while Defendant Marsha was still employed by SMART, including by engaging a contractor to provide services to U-Tec, drafting a service agreement, and providing SMART's confidential pricing info to Defendant Double Check to prepare a competitive offer for U-Tec.

104.

Further, this conspiracy is inferable from the profits they have shared and the concerted nature of their activities, *e.g.*, the distribution of information/items taken from SMART.

105.

This conspiracy is further inferable from the multiple meetings and communications involving Defendants in which Marsha was requested and encouraged to participate in the creation and establishment of a business competitive with SMART.

106.

Defendants' civil conspiracy is continuous and ongoing.

38

107.

Under the conspiracy, all tortious conduct and other wrongs by any one conspirator shall be chargeable to all Defendants.

**COUNT V**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C.**
**§§ 1030(a)(2)(C), 1030(b) AND 1030(g)**
**AGAINST ALL DEFENDANTS**

108.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

109.

As a SMART officer, Defendant Marsha had access to SMART's computer network and hardware.

110.

Defendant Marsha, with the other Defendants encouragement, authorization and ratification, intentionally accessed SMART's protected network and computer without authorization or in such a way that exceeded his authorization by misappropriating SMART's confidential and proprietary information to benefit himself and Defendants in direct completion with SMART.

39

111.

Defendant Marsha's unauthorized access of SMART's protected computer and network resulted in a loss to SMART of at least or exceeding $5,000 in value. SMART was required to expend time, resources and money investigating the cause and scope of Marsha's computer intrusion and breaches of confidentiality, and has lost an amount to be determined at trial from Marsha's unlawful use of its confidential information he and the other Defendants misappropriated by virtue of his unauthorized access.

## COUNT VI
## TORTIOUS INTERFERENCE AGAINST DEFENDANTS NEWTON, WOOD, BLANTON, DOUBLE CHECK, AND LAUTUS

112.

SMART incorporates by reference and re-alleges the allegations contained in all preceding Paragraphs as if fully set forth herein.

113.

Defendants Newton, Wood, Blanton, Double Check, and Lautus were aware of Defendant Marsha's Employment and Non-Disclosure/Non-Solicitation Agreements with SMART and the restrictive covenants contained within those documents.

40

114.

For the indirect purpose of injuring SMART or benefitting themselves at SMART's expense, Defendants Newton, Wood, Blanton, Double Check, and Lautus encouraged and persuaded Defendant Marsha to solicit Marquez, a SMART employee, to work for Defendant Double Check in direct violation of Defendant Marsha's Employment and Non-Disclosure/Non-Solicitation Agreements with SMART.

115.

For the indirect purpose of injuring SMART or benefitting themselves at SMART's expense, Defendants Newton, Wood, Blanton, Double Check, and Lautus encouraged and persuaded Defendant Marsha to violate his Employment and Non-Disclosure/Non-Solicitation Agreements with SMART by utilizing SMART's confidential and trade secret information to establish and promote a competing venture.

116.

Defendants Newton, Wood, Blanton, Double Check, and Lautus are strangers to the Employment and Non-Disclosure/Non-Solicitation Agreements between Defendant Marsha and SMART.

41

117.

By acting in the manner described in Paragraphs 113 and 114 above, Defendants Newton, Wood, Blanton, Double Check, and Lautus acted improperly and without privilege.

118.

By acting in the manner described in Paragraphs 113 and 114 above, Defendants Newton, Wood, Blanton, Double Check, and Lautus acted purposely and with malice and intent to injure SMART.

119.

As a result of Newton's, Wood's, Blanton's, Double Check's, and Lautus's willful interference with Defendant Marsha's Employment and Non-Disclosure/Non-Solicitation Agreements, SMART has been damaged in an amount to be proven at trial, and it additionally has summered and will continue to suffer irreparable harm that is not fully compensable by money damages and may only be remedied by injunctive relief.

42

120.

Defendants Newton, Wood, Blanton, Double Check, and Lautus tortuously interfered in SMART's business relationship in bad faith, such that SMART is entitled to an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

## COUNT VII
## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

121.

Defendants have been unjustly enriched by virtue of their misappropriation of SMART's confidential information and trade secrets, to the detriment of SMART.

122.

Additionally, to the extent SMART reimbursed Marsha for business-related expenses, or compensated him for time he spent engaging in competitive activities on behalf of himself or Double Check, Marsha has been unjustly enriched to the detriment of SMART.

123.

As Defendants have obtained benefits which should be returned to SMART and/or for which SMART should be compensated under rules of equity, a claim for

43

unjust enrichment is warranted and SMART should be made whole for its losses resulting in a benefit and/or windfall to Defendants.

## PRAYER FOR RELIEF

WHEREFORE, SMART prays for judgment as follows:

1.     That Defendants be temporarily, preliminarily, and permanently enjoined from disclosing or using any confidential information or trade secrets of SMART, and that Defendants be mandated to return all of SMART's property in their possession immediately;

2.     That Defendants be temporarily, preliminarily, and permanently enjoined from soliciting for business or continuing to do business with any referral source/channel partner or customer which they acquired either in violation of Marsha's fiduciary duty to SMART or with SMART's confidential information and/or trade secrets (which equates to all SMART referral sources/channel partners, actual and potential customers whom SMART has solicited for business or done business with in the past two years);

3.     That the Court honor the choice-of-law provisions in the Non-Disclosure/Non-Solicitation Agreement and apply the substantive laws of the State

44

of Louisiana as to the breach of contract claim in this action; however, the Court shall apply the laws of the State of Georgia as to the tort claims in this action;

4.    For an award of compensatory damages against all Defendants in an amount to be proven at trial;

5.    For an award of exemplary damages against all Defendants in an amount twice the compensatory damages awarded on the misappropriation claim;

6.    For an award of punitive damages against all Defendants in light of the willful, malicious, and intentional nature of Defendant's actions;

7.    For attorneys' fees against all Defendants as provided in O.G.C.A. § 10-1-764,   O.G.C.A.§   13-6-11,   and   the   Non-Disclosure/Non-Solicitation Agreement;

8.    For an award of SMART's costs against all Defendants incurred in pursuing this action;

9.    For a disgorgement of any compensation and reimbursements paid by SMART to Defendant Marsha during the pendency of his breach of fiduciary duty, as well as any profits acquired by all Defendants by virtue of Marsha's breach of fiduciary duty;

10.   For any further or additional relief that justice requires; and

4821-2980-8226 v1
2904860-000002 04/13/2018

11.    Pursuant to Fed. R. Civ. P. 38, SMART demands a jury trial on all issues so triable.

Respectfully submitted this 18th day of April, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
David E. Gevertz
GA Bar No. 292430
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, PC
3414 Peachtree Rd. NE, Ste. 1600
Atlanta, GA  30326
Phone: 404-223-2216
Email:   khinton@bakerdonelson.com
             dgevertz@bakerdonelson.com

4821-2980-8226 v1
2904860-000002 04/13/2018

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date I caused to be served a true and correct copy of

*Second Amended Verified Complaint for Damages and Injunctive Relief* via the

Court's ECF filing system as follows:

### <u>Via ECF Filing Notification:</u>

Eric Barton, Esq.
Seyfarth Shaw LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309-3958
***Attorney for Defendants***

### <u>Via Federal Express</u>

John C. Marsha, II
119 Foxdale Way
Dallas, GA 30132

Respectfully submitted this 18th day of April, 2018.

s/ Kathryn Hinton
Kathryn Hinton
GA Bar No. 542930
*Attorney for Plaintiff*

4821-2980-8226 v1
2904860-000002 04/13/2018

# Exhibit A

# SMART PROFITABILITY SOLUTIONS, LLC
## Confidentiality, Non-Solicitation and Non-Competition Agreement

In consideration of my employment or work as a Contractor/Consultant, or continued employment, by SMART PROFITABILITY SOLUTIONS, LLC ("Smart") and in further consideration of the compensation paid me and to be paid me, I, the undersigned employee, understand that I will obtain knowledge of, and have access to, Smart's Confidential Information. Therefore, I agree to the following:

**Definitions.**  As used in this Agreement:

"Confidential Information" means any and all trade secrets and other confidential information relating to the disclosing party's business or the business of its customers, suppliers, equipment manufacturers and/or consultants with whom it conducts business ("Clients") including, but not limited to, information concerning management, engineering, finances, human resources, information services, legal, manufacturing, marketing, project management, research and development, business forms, sales, products and product plans; computer software; processes; procedures; pricing; business costs; business plans; ideas, drawings and technical data; financial data and plans; identity of actual and potential customers; identity, capability, responsibilities, and/or compensation of its employees; recruiting plans; customer specifications and job requirements; and proposals and bidding information.

"Prohibited Term" shall mean during employment, and the two year period immediately following the termination of my employment with Smart (regardless of the reason for such termination).

"Prohibited Area" shall mean the United States of America.

"Smart's Business" shall mean providing products, services, training, and staffing relating to construction safety.

**A.**      **Confidential Information.**  I recognize that during my employment I will receive, develop, or otherwise acquire information which is of a secret or confidential nature, including Confidential Information regarding Smart and its Clients.  Except as authorized by Smart, I will not disclose, directly or indirectly, any Confidential Information of Smart or its Clients to any third party including, without limitation, other customers or suppliers.  Further, I will only use such Confidential Information in the faithful performance of my duties for Smart.  The confidentiality provisions of this Agreement shall survive the termination of my employment at Smart.  I also acknowledge that all files, records, documents, drawings, specifications, equipment, and similar items (regardless of media) relating to Smart's business, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of Smart.  Upon the conclusion of my employment, I agree to return to or leave with Smart all of such written or other records and all copies thereof

**B.**      **Unlicensed Third Party Information.**  Smart understands that prior to my employment by Smart I may have had access to the Confidential Information of entities other than Smart.  I understand that Smart does not permit employees to disclose or use the unlicensed Confidential Information of third parties  and I represent and warrant that I will not disclose to Smart, receive, or use or incorporate into any work for or on behalf of Smart, any Confidential Information of third parties.  Prior to signing this agreement and without breaching any obligation, I shall disclose to Smart below, any restrictions that may affect my ability to work on behalf of Smart, including any existing non-compete agreements, confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties.

**C.**      **Non-Solicitation.**

**1.**      **Non-Solicitation of Clients and Prospective Clients.**  I agree that, during the Prohibited Term and in the Prohibited Area, I will not, directly or indirectly, on behalf of myself or any other person or business, solicit, contact, call upon or do any transaction/business with (a) any client of Smart which was a Smart client at the time of the termination of my employment with Smart or at any time in the 12-month period immediately preceding the termination of my employment with Smart, or (b) any prospective Smart client known to me to be such during the course of my employment with Smart or contacted or solicited by me, either directly or indirectly, or by anyone under my supervision or direction, within the 12-month period prior to the termination of my employment with Smart.

**2.**      **Non-Solicitation of Employees.**  I agree that, during the Prohibited Term, I will not directly or indirectly, solicit, recruit or induce any Smart employee to leave employment with Smart or to work for any other person or business.

**D.**      **Non-Competition.**  I agree that during the Prohibited Term and in the Prohibited Area I will not provide services competitive with Smart's Business and I will not own, manage, control or operate, or act as an employee, representative, consultant or independent contractor for any business which is engaged in any line of business that is the same as, similar to or otherwise competitive with Smart's Business.    I further agree that I have carefully reviewed the Prohibited Term and the

1

Prohibited Area and agree that both (and this paragraph as a whole) are fair, reasonable and necessary to protect Smart's legitimate competitive business interests under the circumstances.

## E.   Enforcement of Agreement and Miscellaneous Provisions

1.   **Remedies for Breach.** I have carefully reviewed this Agreement and agree that its terms and restrictions are fair and reasonable. I also agree that Smart would be irreparably injured in its business and would not have an adequate remedy if I were to breach my obligations hereunder. Therefore, I agree that Smart's remedies in the event of any such breach by me would be cumulative and that Smart could seek money damages, specific performance, a temporary restraining order and preliminary and permanent injunctive relief, as appropriate. I also agree that if Smart must pursue any legal action to enforce this Agreement, and prevails in doing so, Smart is entitled to recover from me its actual attorney fees and costs of litigation.

2.   **Severability of Provisions.** If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable, to any extent, the remainder of the Agreement shall not be affected. Further, a court of competent jurisdiction may modify any provision of this Agreement deemed invalid or unenforceable to the extent necessary to render that provision valid and enforceable.

3.   **Modifications.** To be effective and binding upon Smart, any modification of this Agreement and any consent under it must be made in writing and signed by an officer of Smart.

4.   **Employment Relationship.** I acknowledge that this Agreement does not constitute a contract of employment for any definite period of time, that I am and remain employed at the will of Smart and that my employment may be terminated at any time with or without notice or cause.

5.   **Governing Law, Jurisdiction and Venue.** This Agreement is entered into in the State of Louisiana and shall be governed by, and construed and enforced in accordance with, the laws of Louisiana without regard to the conflicts of law provisions thereof. I agree that, should any litigation arise out of, in connection with, or relating to this Agreement, such litigation will be commenced in a state court situated in East Baton Rouge Parish, Louisiana, or in the United States District Court for the Eastern District of Louisiana. I specifically agree that either of these courts shall have personal jurisdiction over me and venue over any dispute arising under this Agreement.

6.   **Construction.** Although this Agreement was drafted by Smart, I agree that it accurately reflects our intent and understanding and should not be construed against Smart if there is any dispute over the meaning or intent of any provisions.

7.   **Successors and Assignment.** I understand that this is not a personal services agreement, and is fully assignable by Smart and this Agreement shall inure to the benefit of Smart and its successors or assigns.

**By my signature below, I acknowledge that (i) I have had sufficient opportunity to, and have, carefully read each provision of this Agreement, (ii) I have had the opportunity to review this Agreement with legal counsel of my own choice, (iii) I understand each provision, (iv) I am not under any duress, (v) I am not relying upon any representations or promises that are not set forth in this Agreement, and (vi) I am freely and voluntarily signing this Agreement and intend to be bound by it.**

| ☑ I have NO RESTRICTIONS that may affect my ability to work on behalf of Smart, including any existing non-compete or confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties. | ☐ YES, I have RESTRICTIONS that may affect my ability to work on behalf of Smart, including any existing non-compete agreements, confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties, as described in detail below: |
|---|---|
| Signature _John Marsh_ | _____ |
| Printed Name _John Marsh_ | _____ |
| Date: _5/30/14_ , 20 _14_ | _____ |

# Exhibit B



**SAFETY GROUP**

Transmitted Via Electronic Mail: ████████████ Page 1 of 5

September 4, 2014

Mr. John Clark Marsha, II

*Cell #* ████████████

████████████

Dear John,

We are pleased to confirm this offer of employment with Smart Profitability Solutions, LLC dba Smart Safety Gulf Coast and Smart Safety Southeast, a wholly owned subsidiary of Pala Group, Inc. This position is an "at will" salaried exempt position.

This letter memorializes the terms of your employment which, we have discussed with you:

**Position Title: Business Development Officer**

**Company:** Smart Profitability Solutions, LLC dba Smart Safety Gulf Coast, dba Smart Safety Southeast, a wholly owned subsidiary of Pala Group, Inc.

**Position Description:**

The Business Development Officer is responsible for developing strategies, and executing tactics which generate customer leads and close profitable customer relationships.

Smart's proven business model is now positioned for rapid growth. In addition to sales leadership, this will require scaling the operating model to ensure customer satisfaction and profitability.

The Director of Sales & Marketing will be a key member of Smart's Executive Team, a "thought partner" to shape growth strategies, and a team player to ensure cross-functional sales and operations teamwork.

**<u>Key functional components of responsibilities are as follows:</u>**

- **<u>Direct Sales Across All Regions, Services, and Industry Segments.</u>**
  - o Efforts to prospect, qualify, propose, and close customer deals.
  - o Generate leads and setup meetings. (For Smart managers.)
  - o Above, plus in some cases assist up through propose and close.



**SAFETY GROUP**

Page 2 of 5

- o  <u>Regions</u>: Atlanta/Southeast; Gulf (New Orleans, Baton Rouge); and other TBD (including North Carolina, Florida, and Houston).
- o  <u>Services</u>: Program Management; Staffing; and Training.
- o  <u>Industry Segments</u>: Construction; Manufacturing; and Distribution.

- **Pipeline Management Process Responsibility** (Pipeline Deals aka PLD)
  - o  Set rules for Smart team's effective use of this tool.
  - o  Lead by example, and monitor team's timely/accurate entry of activities.
  - o  Reporting of progress. (Upward, downward, regionally, etc.)

- **Proposals**
  - o  Learn, support, and improve/streamline proposal development process.

- **Business Development**
  - o  Channel partner relationship development. (Associations, Insurance, others.)

- **Marketing**
  - o  <u>Collateral Materials</u>: Manage branded library of materials, update, develop.
  - o  <u>Marketing Prospect Databases</u>: Manage, secure, use as needed.
  - o  <u>Drip Marketing Campaign</u>: Approximately quarterly to 5,000+ firms
  - o  <u>Special Promotions</u>: TBD Develop and manage.
  - o  <u>Social Networking Media</u>: Manage, update, promote, postings.
    - ▪  SMART Facebook page.
    - ▪  SMART LinkedIn page.

- **Sales Team Management** (Train, Coach, Monitor, Build Team)
  - o  Smart Safety Account Managers (Coach, assist)
  - o  Independent Sales Agents (Build team, coach, motivate.)
  - o  Build Smart Dedicated Sales Team. (TBD, based on growth & ROI)
    - ▪  Inside Sales
    - ▪  Outside Sales

- **Safety Management Backup**
  - o  Take the OSHA 10 Hour Course
  - o  Visit jobsites with Safety Managers during first 3 months.
  - o  Be prepared to "walk the talk", and serve as audit/service backup.

- **Special Projects:** TBD as/if assigned by CEO, not to conflict with primary duties.
  - o  Staffing Business Model Support: Candidate screening & interviews, broker deals.
  - o  Other?



**SAFETY GROUP**

Page 3 of 5

**Location:** Position based, and officed, in metropolitan Atlanta, Georgia.

**Travel:** Some travel may be required to support business development in both current SMART geographic, and developing Geographic Areas.

**Reports To:** CEO of of Smart Profitability Solutions, LLC dba Smart Safety Gulf Coast.

**Starting Date:** To be mutually agreed upon, but preferably on or before October 1, 2014.

**Compensation:**

Annual Salary: $110,000.00 (Exempt position)

- Eligible for consideration of merit-based increase on one year anniversary.

Commissions Plan: The objective is for this position to generate a positive return on investment for the company, based on mutually developed targets set no less than annually. The commission schedule is listed below, and is separate from any and all prior commission plans between you and the Company:

| Commissionable Sales | | Split of Total Commission | | | |
|---|---|---|---|---|---|
| **1. Safety Program Annual (New) Contracts** | | **For Lead Only** | | **For Propose/Close** | |
| Monthly Program Fee Amount (New Prog): | Total Commission $'s | Sales | Safety Acct Mgr | Sales | Safety Acct Mgr |
| $1,500 to $2,500 | $750 | 33% | 67% | 67% | 33% |
| $2,501 to $5,000 | $1,000 | 33% | 67% | 67% | 33% |
| $5,000+ | $1,500 | 33% | 67% | 67% | 33% |
| | Paid On: | | | | |
| **2. Staffing (Jobsite Temporary Safety Staffing** | Gross Mrg. $'s | 7.5% | Gross margin $'s per W.I.P. Report. * | | |
| **3. Training** | Rev. $'s | 5% | | | |
| **4. Misc. Revenue (OSHA claims, projects, etc.)** | Rev. $'s | 5% | | | |
| **5. Renewals of Annual Programs** | Rev. $'s | 1% | | | |
| * Staffing must achieve minimum 12% gross margin to be bonusable. | | | | | |
| **Timing of Commission Payments** | | | | | |
| Payable in full, within 15 days after the quarter in which it was earned. | | | | | |



**SAFETY GROUP**

Page 4 of 5

**Long-term Incentives:**

- <u>ESOP participation of parent company</u>. (Plan Summary Attached)
  - ○ ESOP enrollment is governed by very specific law which the Company cannot alter. Enrollment following 1 year of service can commence either in January or July of each year. In this example, with an October 2014 employment date, one year would be met October of 2015, and enrollment would be effective July of 2016.
  - ○ We will provide written details of the program.
  - ○ Since the ESOP is essentially a retirement plan type vehicle, the company does not have a separate pension plan.

**Vehicle Options:** (Employees option, 1 or 2 below)

Note: <u>Company will initially provide the Vehicle Allowance option for a few months, and is willing to switch to the company provided vehicle option if the employee elects to do so.</u> (Probably by the end of 2014, maybe sooner.)

1. Company provided vehicle, insurance, and fuel card.

2. Vehicle Allowance $185 per week ($9,620 per annum) Per Company's Attached Vehicle Allowance Policy

- Fuel card for company business including transportation to and from work.
- You must have an acceptable driving record to operate a company vehicle, and an acceptable vehicle as defined in policy.
- You are responsible for providing specified levels of insurance.

**Mobile Phone:** Company provided iPhone, or a $75.00 per month taxable allowance if employee elects to keep his own cell phone.

**Benefits Summary:** (See more detailed Benefits Summary)

- The company will reimbursement you for applicable cost of COBRA or other alternative health insurance, up to $1,250 per month, during the 60 day waiting period until you are eligible for company medical insurance.



**SAFETY GROUP**

Page 5 of 5

- Employees are eligible for 401k participation after 6 months service. Since this is in addition to or outside the ESOP, there is no matching contribution.
- We cannot offer tax advice, you may wish to seek advice to determine if you could contribute savings to some type of individual retirement account (IRA) in the period before ESOP participation commences.
- 

**Vacation:** 3 weeks (Grandfathered in at this level).

**Sick Leave:** 1 week (3.33 hours per month)

**Holidays:** See benefits summary.

## Employment Conditions:

- Subject to Smart's Standard Confidentiality, Non-Solicitation, and Non-Compete Agreement.
- You will be required, as a condition to your employment, to sign all company policies, procedures including drug testing, and documents involved in the hiring process. You will also be required to meet all other pre-hire requirements. This letter and any attachments contain all of the terms of your employment and supersede any prior understandings or agreements, whether oral or written.

Sincerely,

*Robert L. Turner, III* RLT 9/5/14

**Robert L. Turner, III**
President & CEO
Smart Profitability Solutions, LLC
Email: bturner@smartsafetygulfcoast.com
Phone: 770-490-9092

Enclosures (4): Vehicle Allowance Policy, Benefits Summary, Confidentiality Agreement, ESOP Plan Summary
I acknowledge and accept this employment offer:

John C. Marsha, II            Date            9/5/14

# Exhibit C

# John Marsha

President at Double Check Risk Solutions, LLC

## Summary

## Experience

**President at Double Check Risk Solutions, LLC**
January 2018  -  Present

**Director of Business Development**
September 2014  -  January 2018 (3 years 5 months)

   Managing referral channel partners, industry association relationships and new business efforts.  Engagement Manager for customer servicing and site audits. OSHA 30 hour certified.  AGC of GA Safety Committee member.

**Senior Business Development Officer at Federal National**
December 2013  -  September 2014 (10 months)

   Asset Based Lending and Factoring lines of credit from $50,000 to $6,000,000 based upon accounts receivable, inventory, and machinery & equipment. Federal National helps businesses across the country achieve their full growth potential. Businesses under-served by the banking community or ill-served by other providers obtain from us the financing they need, delivered with service, value and trust.

   Bethesda, Maryland-based Federal National provides all of its financing using its own strong balance sheet and serves its customers' financing needs with its own back office and management.

   Specialties: We are particularly comfortable with high-tech service providers and staffing firms. We also maintain a strong expertise providing financing to government contractors.

**Director, International Business Development, Credit Protection, Factoring, Trade Credit**
November 2005  -  May 2010 (4 years 7 months)

**Vice President at Marsh and McLennan**
2002  -  2005 (4 years)

   Also, worked for Marsh from 1994-1995

**Vice President at Aon Risk Services**
November 1995  -  September 2001 (5 years 11 months)

## Education

**University at Buffalo**
Economics, Chinese, 1990 - 1992

**Canisius College**
undergrad, Pre-Medicine/Pre-Medical Studies, 1988 - 1990

---

# John Marsha

President at Double Check Risk Solutions, LLC

---



Contact John on LinkedIn

# Exhibit D

   Search      🏠 👥 💼 💬 🔔 👤      Free Upgrade to Premium

Be a compliance expert - Get certified at CUNA Regulatory Compliance Certification Schools!   Ad



## Double Check Risk Solutions, LLC

Professional Training & Coaching • Atlanta, GA • 1 follower

1 employee on LinkedIn

[ Follow ]    See jobs

## About us

Double Check Risk Solutions, LLC is a company that manages customized programs for auto dealers, manufacturers, and distribution companies. Although the firm provides a wide range of services to a diversified client base, it has expertise in verifying regulatory compliance. The firm is headquartered in Atlanta.

We are committed to growing our distinctive culture and holding to our core values which always place our clients' interests first. These values are reflected by our integrity, commitment to excellence, innovation, and communication.

Our culture reflects much more than a structure. Instead, it is the values that have been woven into the fabric of our character through many years of valuable experience.

## Company details

**Website**
http://www.doublecheckrisksolutions.com

**Headquarters**
Atlanta, GA

**Year founded**
2017

**Company type**
Partnership

**Company size**
2-10 employees

**Specialties**
safety, OSHA, automotive, manufacturing, and distribution

See less ⌃

## Get exclusive insights on 450,000+ public & private companies

Upgrade to

📈   See company growth and functional trends

⭐   Check out notable leadership changes

## Recent updates

 **Double Check Risk Solutions, LLC**
3w

https://lnkd.in/eZBpYjM

U.S. federal safety regulators proposed penalizing an Alabama dealership $152,099 following an investigation into a flash fire that killed thr ...see more

👍 Like    💬 Comment    ↪ Share



**https://lnkd.in/e8WfYwW**

U.S. Department of Labor Imposes Maximum Fines on Motion Picture Compa...

osha.gov

U.S. Department of Labor Imposes Maximum Fines on Motion Picture Company for Failing to Adequately P...

Like    Comment    Share

1   Messaging

# Exhibit E

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT (the "Agreement") dated this _____ day of _____, _____**

**BETWEEN:**

Russell Landscaping, Inc. of 4300 Woodward Way, Sugar Hill, Georgia, 30518
(the "Client")

**- AND -**

Double Check Risk Solutions, LLC of 38 Old Ivy Road, Suite 250, Atlanta, Georgia, 30342
(the "Consultant").

**BACKGROUND:**

A. The Client is of the opinion that the Consultant has the necessary qualifications, experience and abilities to provide consulting services to the Client.

B. The Consultant is agreeable to providing such consulting services to the Client on the terms and conditions set out in this Agreement.

**IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the Client and the Consultant (individually the "Party" and collectively the "Parties" to this Agreement) agree as follows:

### Services Provided

1. The Client hereby agrees to engage the Consultant to provide the Client with the following consulting services (the "Services"):
   - Consultant shall provide services, training and advice relating to safety, risk and health..

2. The Services will also include any other consulting tasks which the Parties may agree on. The Consultant hereby agrees to provide such Services to the Client.

### Term of Agreement.

3. The term of this Agreement (the "Term") will begin on the date of this Agreement and will remain in full force and effect indefinitely until terminated as provided in this Agreement.

4. In the event that either Party wishes to terminate this Agreement, that Party will be required to provide 30 days' written notice to the other Party.

5. In the event that either Party breaches a material provision under this Agreement, the non-defaulting Party may terminate this Agreement immediately and require the defaulting Party to indemnify the non-defaulting Party against all reasonable damages.

6. This Agreement may be terminated at any time by mutual agreement of the Parties.

7. Except as otherwise provided in this Agreement, the obligations of the Consultant will end upon the termination of this Agreement.

**<u>Performance</u>**

8. The Parties agree to do everything necessary to ensure that the terms of this Agreement take effect.

**<u>Currency</u>**

9. Except as otherwise provided in this Agreement, all monetary amounts referred to in this Agreement are in USD (US Dollars)

**<u>Compensation</u>**

10. The Consultant will charge the Client for the Services as follows (the "Compensation"):
    - $1,500 for three fire prevention training sessions at three facilities.

11. Invoices submitted by the Consultant to the Client are due within 15 days of receipt.

12. In the event that this Agreement is terminated by the Client prior to completion of the Services but where the Services have been partially performed, the Consultant will be entitled to pro rata payment of the Compensation to the date of termination provided that there has been no breach of contract on the part of the Consultant.

**<u>Penalties for Late Payment</u>**

13. Any late payments will trigger a fee of 1.00% per month on the amount still owing.

**<u>Confidentiality</u>**

14. Confidential information (the "Confidential Information") refers to any data or information relating to the business of the Client which would reasonably be considered to be proprietary to the Client including, but not limited to, accounting records, business processes, and client records and that is not generally known in the industry of the Client and where the release of that Confidential Information could reasonably be expected to cause harm to the Client.

15. The Consultant agrees that they will not disclose, divulge, reveal, report or use, for any purpose, any Confidential Information which the Consultant has obtained, except as authorized by the Client or as required by law. The obligations of confidentiality will apply during the term of this Agreement and will survive indefinitely upon termination of this Agreement.

16. All written and oral information and material disclosed or provided by the Client to the Consultant under this Agreement is Confidential Information regardless of whether it was provided before or after the date of this Agreement or how it was provided to the Consultant.

**Ownership of Intellectual Property**

17. All intellectual property and related material (the "Intellectual Property") that is developed or produced under this Agreement, will be the property of the Consultant. The Client is granted a non-exclusive limited-use license of this Intellectual Property.

18. Title, copyright, intellectual property rights and distribution rights of the Intellectual Property remain exclusively with the Consultant.

**Return of Property**

19. Upon the expiry or termination of this Agreement, the Consultant will return to the Client any property, documentation, records, or Confidential Information which is the property of the Client.

**Capacity/Independent Contractor**

20. In providing the Services under this Agreement it is expressly agreed that the Consultant is acting as an independent contractor and not as an employee. The Consultant and the Client acknowledge that this Agreement does not create a partnership or joint venture between them, and is exclusively a contract for service.  The Client is not required to pay, or make any contributions to, any social security, local, state or federal tax, unemployment compensation, workers' compensation, insurance premium, profit-sharing, pension or any other employee benefit for the Consultant during the Term.  The Consultant is responsible for paying, and

complying with reporting requirements for, all local, state and federal taxes related to payments made to the Consultant under this Agreement.

### Notice

21. All notices, requests, demands or other communications required or permitted by the terms of this Agreement will be given in writing and delivered to the Parties at the following addresses:

    a. Russell Landscaping, Inc.
       4300 Woodward Way, Sugar Hill, Georgia, 30518

    b. Double Check Risk Solutions, LLC
       38 Old Ivy Road, Suite 250, Atlanta, Georgia, 30342

    or to such other address as either Party may from time to time notify the other, and will be deemed to be properly delivered (a) immediately upon being served personally, (b) two days after being deposited with the postal service if served by registered mail, or (c) the following day after being deposited with an overnight courier.

### Indemnification

22. Except to the extent paid in settlement from any applicable insurance policies, and to the extent permitted by applicable law, each Party agrees to indemnify and hold harmless the other Party, and its respective directors, shareholders, affiliates, officers, agents, employees, and permitted successors and assigns against any and all claims, losses, damages, liabilities, penalties, punitive damages, expenses, reasonable legal fees and costs of any kind or amount whatsoever, which result from or arise out of any act or omission of the indemnifying party, its respective directors, shareholders, affiliates, officers, agents, employees, and permitted successors and assigns that occurs in connection with this Agreement. This indemnification will survive the termination of this Agreement.

### Modification of Agreement

23. Any amendment or modification of this Agreement or additional obligation assumed by either Party in connection with this Agreement will only be binding if evidenced in writing signed by each Party or an authorized representative of each Party.

### Entire Agreement

26. It is agreed that there is no representation, warranty, collateral agreement or condition affecting this Agreement except as expressly provided in this Agreement.

### Enurement

27. This Agreement will enure to the benefit of and be binding on the Parties and their respective heirs, executors, administrators and permitted successors and assigns.

### Titles/Headings

28. Headings are inserted for the convenience of the Parties only and are not to be considered when interpreting this Agreement.

### Gender

29. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

### Governing Law

30. This Agreement will be governed by and construed in accordance with the laws of the State of Georgia.

### Severability

31. In the event that any of the provisions of this Agreement are held to be invalid or unenforceable in whole or in part, all other provisions will nevertheless continue to be valid and enforceable with the invalid or unenforceable parts severed from the remainder of this Agreement.

### Waiver

32. The waiver by either Party of a breach, default, delay or omission of any of the provisions of this Agreement by the other Party will not be construed as a waiver of any subsequent breach of the same or other provisions.

**IN WITNESS WHEREOF** the Parties have duly affixed their signatures under hand and seal on this _____ day of _____, _____.

Russell Landscaping, Inc.

Name:_____

Title:_____


Double Check Risk Solutions, LLC

Name:_____

Title:_____

©2002-2017 LawDepot.com™

# Exhibit F



State of Georgia                                                                                        Rev. 133A2CD

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (this "Agreement") is made as of this 20th day of December 2017, (the "Effective Date") by and between **Double Check Risk Solutions, LLC**, a Georgia Limited Liability Company, located at 38 Old Ivy Road, Suite 250, Atlanta, GA 30342 ("Client") and **Marcial Marquez** located at ██████████████████████████ ("Independent Contractor"). Client and Independent Contractor may each be referred to in this Agreement as a "Party" and collectively as the "Parties."

1.   **Services.** Independent Contractor shall provide to Client the services as described in Exhibit A attached to this Agreement (the "Services"). In addition, Independent Contractor shall perform such other duties and tasks, or changes to the Services, as may be agreed upon by the Parties.

2.   **Compensation.** In consideration for Independent Contractor's performance of the Services, Client shall pay Independent Contractor as referenced in *Exhibit A* of this agreement. Independent Contractor will be paid within seven days after receiving Independent Contractor's invoice. Independent Contractor will submit invoices for payment on a weekly basis.

3.   **Expenses**. All costs and expenses incurred by Independent Contractor in connection with the performance of the Services shall be the sole responsibility of and paid by Independent Contractor.

4.   **Term and Termination.** Independent Contractor's engagement with Client under this Agreement shall commence on the Effective Date. The Parties agree and acknowledge that this Agreement and Independent Contractor's engagement with Client under this Agreement shall terminate upon the completion by Independent Contractor of the Services Engagement. In addition, this Agreement may be terminated by either the Independent Contractor or Client with 45 days prior written notice to the other party.  At the time of termination, Independent Contractor agrees to return all Client property used in performance of the Services, including but not limited to computers, cell phones, keys, reports and other equipment and documents. Independent Contractor shall reimburse Client for any Client property lost or damaged in an amount equal to the market price of such property.

5.   **Independent Contractor.** The Parties agree and acknowledge that Independent Contractor is an independent contractor and is not, for any purpose, an employee of Client.  Independent Contractor does not have any authority to enter into agreements or contracts on behalf of Client, and shall not represent that it possesses any such authority. Independent Contractor shall not be entitled to any of Client's benefits, including, but not limited to, coverage under medical, dental, retirement or other plans. Client shall not be obligated to pay worker's compensation insurance, unemployment compensation, social security tax, withholding tax or other taxes or withholdings for or on behalf of the Independent Contractor in connection with the performance of the Services under this Agreement. Nothing contained in this

Agreement shall be deemed or construed by the Parties to create the relationship of a partnership, a joint venture or any other fiduciary relationship.

6. **Confidentiality.**

a. **Confidential and Proprietary Information.**   In the course of performing the Services, Independent Contractor will be exposed to confidential and proprietary information of Client. "Confidential Information" shall mean any data or information that is competitively sensitive material and not generally known to the public, including, but not limited to, information relating to development and plans, marketing strategies, finance, operations, systems, proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, data, databases, inventions, know-how, trade secrets, customer lists, customer relationships, customer profiles, supplier lists, supplier relationships, supplier profiles, pricing, sales estimates, business plans and internal performance results relating to the past, present or future business activities, technical information, designs, processes, procedures, formulas or improvements, which Client considers confidential and proprietary. Independent Contractor acknowledges and agrees that the Confidential Information is valuable property of Client, developed over a long period of time at substantial expense and that it is worthy of protection.

b. **Confidentiality Obligations**.   Except as otherwise expressly permitted in this Agreement, Independent Contractor shall not disclose or use in any manner, directly or indirectly, any Confidential Information either during the term of this Agreement or at any time thereafter, except as required to perform the Services or with Client's prior written consent.

c. **Rights in Confidential Information**.   All Confidential Information disclosed to Independent Contractor by Client (i) is and shall remain the sole and exclusive property of Client, and (ii) is disclosed or permitted to be acquired by Independent Contractor solely in reliance on Independent Contractor's agreement to maintain the Confidential Information in confidence and not to use or disclose the Confidential Information to any other person. Except as expressly provided herein, this Agreement does not confer any right, license, ownership or other interest in or title to the Confidential Information to Independent Contractor.

d. **Irreparable Harm.**   Independent Contractor acknowledges that use or disclosure of any Confidential Information in a manner inconsistent with this Agreement will give rise to irreparable injury for which damages would not be an adequate remedy.   Accordingly, in addition to any other legal remedies which may be available at law or in equity, Client shall be entitled to equitable or injunctive relief against the unauthorized use or disclosure of Confidential Information. Client shall be entitled to pursue any other legally permissible remedy available as a result of such breach, including but not limited to, damages, both direct and consequential. In any action brought by Client under this Section, Client shall be entitled to recover its attorney's fees and costs from Independent Contractor.

7. **Ownership of Work Product.** The Parties agree that all work product, information or other materials created and developed by Independent Contractor in connection with the performance of the Services under this Agreement and any resulting intellectual property rights (collectively, the "Work Product") are the sole and exclusive property of Client. The Parties acknowledge that the Work Product shall, to the extent permitted by law, be considered a "work made for hire" within the definition of Section 101 of the Copyright Act of 1976, as amended, (the "Copyright Act") and that Client is deemed to be the author and is the owner of all copyright and all other rights therein. If the work product is not deemed to be a "work made for hire" under the Copyright Act, then Independent Contractor hereby assigns to Client all of Independent Contractor's rights, title and interest in and to the Work Product, including but not limited to

all copyrights, publishing rights and rights to use, reproduce and otherwise exploit the Work Product in any and all formats, media, or all channels, whether now known or hereafter created.

**8. Insurance.** Upon execution of this Agreement, and prior to the Independent Contractor commencing any work or providing any type of professional services, the Independent Contractor will secure and maintain specific insurance coverage as set forth below that names the client as an Additional Insured. Additional Insured coverage shall apply as primary insurance with respect to any other insurance afforded to the Client.  Coverage shall be afforded to the Additional Insureds whether or not a claim is in litigation. Independent Contractor agrees to maintain the above insurance for the benefit of Client for a period of five years, or the expiration of the Statute of Limitations, whichever is later.

In the Independent Contractor cannot provide required coverage the Client has the right to procure such coverage and deduct the premium from the contractor's invoice payments without dispute.

Each Certificate of Insurance shall provide that the insurer must give the Client at least 30 days' prior written notice of cancellation and termination of the Independent Contractor's coverage thereunder.  In the event any of these policies are terminated, Certificates of Insurance showing replacement coverage shall be provided to Client.  Additional, Independent Contractor agrees to carry insurance coverages referenced below and the coverages shall be no less than the following:

Workers' Compensation and Employers' Liability Insurance:  As required by law and affording thirty (30) days written notice to Contractor prior to cancellation or non-renewal.

Auto Liability Insurance:  Written in the amount of not less than $1,000,000 each accident.

9. **Non-Solicit.** Independent Contractor agrees and covenants that for a period of 24 months following the termination of this Agreement, Independent Contractor will not, directly or indirectly, solicit any officer, director or employee, or any customer, client, supplier or vendor of Client for the purpose of inducing such party to terminate its relationship with Client in favor of Independent Contractor or another business directly or indirectly in competition with Client.

10. **Mutual Representations and Warranties.**  Both Client and Independent Contractor represent and warrant that each Party has full power, authority and right to execute and deliver this Agreement, has full power and authority to perform its obligations under this Agreement, and has taken all necessary action to authorize the execution and delivery of this Agreement.  No other consents are necessary to enter into or perform this Agreement.

11. **Independent Contractor Representation and Warranties.** Independent Contractor represents and warrants that it has all the necessary licenses, permits and registrations, if any, required to perform the Services under this Agreement in accordance with applicable federal, state and local laws, rules and regulations and that it will perform the Services according to the Client's guidelines and specifications and with the standard of care prevailing in the industry.

12. **Indemnification.** The Independent Contractor shall indemnify and hold harmless Client from any damages, claims, liabilities, loss and expenses, including reasonable attorney's fees, arising out of any act or omission of Independent Contractor in performing the Services or the breach of any provision of this Agreement by Independent Contractor.

13. **Governing Law.**  The terms of this Agreement and the rights of the Parties hereto shall be governed exclusively by the laws of the State of Georgia, without regarding its conflicts of law provisions.

14. **Disputes.**  Any dispute arising from this Agreement shall be resolved in the courts of the State of Georgia.

15. **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

16. **Assignment.**  The interests of Independent Contractor are personal to Independent Contractor and cannot be assigned, transferred or sold without the prior written consent of Client.

17. **Entire Agreement.**  This Agreement constitutes the entire agreement between the Parties hereto with respect the subject matter hereof, and supersedes all prior negotiations, understandings and agreements of the Parties.

18. **Amendments.**  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by both of the Parties.

19. **Notices.**  Any notice or other communication given or made to either Party under this Agreement shall be in writing and delivered by hand with copy by email herein, and sent by overnight courier service or sent by certified or registered mail, return receipt requested, to the address stated above or to another address as that Party may subsequently designate by notice, and shall be deemed given on the date of delivery.

20. **Waiver.**  Neither Party shall be deemed to have waived any provision of this Agreement or the exercise of any rights held under this Agreement unless such waiver is made expressly and in writing. Waiver by either Party of a breach or violation of any provision of this Agreement shall not constitute a waiver of any subsequent or other breach or violation.

21. **Further Assurances.**  At the request of one Party, the other Party shall execute and deliver such other documents and take such other actions as may be reasonably necessary to effect the terms of this Agreement.

22. **Severability.**  If any provision of this Agreement is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable parts had not been included in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date first written above.

| | | |
|---|---|---|
| Double Check Risk Solutions, LLC | | Ben Newton, Treasurer |
| **Client** Full Name | **Client Representative** Signature | **Client Representative** Name and Title |

**Client Representative** Email Address

| | | |
|---|---|---|
| Marcial Marquez | | Marcial Marquez |
| **Independent Contractor** Full Name | **Independent Contractor** Signature | **Independent Contractor Representative** Name and Title |

**Independent Contractor** Email Address

**EXHIBIT A**

Double Check Risk Solutions, LLC will pay Marcial Marquez a service fee(s) generated from assigned service engagements as notified in writing by one of the following:

- Ben Newton, Treasurer,
- Keith Wood, Secretary.
- Authorized Manager as per Ben Newton or Keith Wood

The specific services fee contained in each service engagement will be disclosed in advance to Marcial Marquez prior to his commencing work.

Marcial Marquez will acknowledge receipt of the specific services fee notification and confirm his acceptance of the terms therein by email to an authorized manager of Double Check Risk Solutions, LLC prior to proceeding with his work as required by the service engagement.

# Exhibit G



BEARMAN, CALDWELL & BERKOWITZ, PC

MONARCH PLAZA
SUITE 1600
3414 PEACHTREE ROAD N.E.
ATLANTA, GEORGIA 30326

PHONE:   404.577.6000
FAX:        404.221.6501

www.bakerdonelson.com

KATHRYN J. HINTON
**Direct Dial**: 404.223.2216
**Direct Fax**: 404.238.9785
**E-Mail Address**: khinton@bakerdonelson.com

February 5, 2018

**<u>VIA FEDEX AND EMAIL</u>**

Mr. John Clark Marsha II
317 Senator's Ridge
Dallas, GA 30132
███████████████████

Double Check Risk Solutions, LLC
38 Old Ivy Road, Suite 250
Atlanta, GA 30342
████████████████████████████

      Re:     Smart Safety Group/Violation of Employment Agreement

Mr. Marsha,

      This law firm represents your former employer, SMART Profitability Solutions, LLC d/b/a SMART Safety Gulf Coast ("SSG" or "the Company").

      As you are aware, upon your resignation from SSG you represented that you were accepting a position with an entity that was not competitive with the business of SSG.  However, it has come to the Company's attention that you have in fact established your own company, Double Check Risk Solutions, LLC ("Double Check"), which is directly competitive with the business of SSG, and have been soliciting SSG customers for the purpose of providing services competitive with SSG. These acts constitute clear violations of the non-solicitation and non-compete covenants contained in the Confidentiality, Non-Solicitation and Non-Competition Agreement ("the Agreement") you signed at the commencement of your relationship with SSG. (Agreement, ¶¶ C-D). A copy of the Agreement is enclosed for your reference.  SSG also has reason to believe that you began engaging in competitive activities long before your departure from the Company.  If true, such conduct constitutes a breach of the fiduciary duty you owed to SSG, and SSG is entitled to all damages flowing from that breach.

      Moreover, by executing the Agreement you agreed not to use SSG's confidential or trade secret information for any purpose other than "in the faithful performance of [your] duties for

4822-1527-0236 v2
2904860-000002 02/05/2018

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MARYLAND • MISSISSIPPI • SOUTH CAROLINA • TENNESSEE • TEXAS • VIRGINIA • WASHINGTON, D.C.

**2** | P a g e

___

Smart." (Agreement, ¶ A). In light of the striking similarities between Double Check and SSG's business models, SSG strongly suspects that you are utilizing its information in the course of developing your new business. Please be aware that any such use of SSG's information constitutes not only a breach of the Agreement, but also a further breach of your fiduciary duty to SSG and a violation of the Georgia Trade Secrets Act.

At this time, SSG is conducting an investigation into the circumstances leading up to your departure from the Company and is evaluating its legal options. The Company is ready, willing and able to institute enforcement proceedings, and if it is forced to do so, it will seek all available monetary damages, injunctive relief, attorney's fees and expenses of litigation. **In the meantime, SSG expects you to immediately cease and desist in all competitive activity and the use of its confidential and/or trade secret information in violation of the Agreement and Georgia law, and to immediately return all information belonging to it currently in your possession, custody, or control.** Please coordinate the return of this information directly through me.

Further, both you and Double Check are hereby on notice of a potential lawsuit and should immediately implement a litigation hold to preserve all documents and communications related to this matter. These include any and all documents, records, written communications or audio or video recordings related to your SSG employment or departure, the creation and/or growth of Double Check, attempts to solicit or divert SSG employees, customers, potential customers, or business opportunities away from SSG, and related materials. "Written communications" include but are not limited to letters, memoranda, handwritten notes, emails, text messages, instant messages, social media postings, and similar forms of communication. Any destruction of evidence can have serious legal consequences.

Please be aware that SSG is closely monitoring this situation. Should you have any questions about this correspondence or your continuing obligations to SSG, please do not hesitate to contact me.

Sincerely,

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**

Kathryn J. Hinton, Esq.

KJH/slm
Enclosure

# SMART PROFITABILITY SOLUTIONS, LLC
## Confidentiality, Non-Solicitation and Non-Competition Agreement

In consideration of my employment or work as a Contractor/Consultant, or continued employment, by SMART PROFITABILITY SOLUTIONS, LLC ("Smart") and in further consideration of the compensation paid me and to be paid me, I, the undersigned employee, understand that I will obtain knowledge of, and have access to, Smart's Confidential Information. Therefore, I agree to the following:

**Definitions.**  As used in this Agreement:

"Confidential Information" means any and all trade secrets and other confidential information relating to the disclosing party's business or the business of its customers, suppliers, equipment manufacturers and/or consultants with whom it conducts business ("Clients") including, but not limited to, information concerning management, engineering, finances, human resources, information services, legal, manufacturing, marketing, project management, research and development, business forms, sales, products and product plans; computer software; processes; procedures; pricing; business costs; business plans; ideas, drawings and technical data; financial data and plans; identity of actual and potential customers; identity, capability, responsibilities, and/or compensation of its employees; recruiting plans; customer specifications and job requirements; and proposals and bidding information.

"Prohibited Term" shall mean during employment, and the two year period immediately following the termination of my employment with Smart (regardless of the reason for such termination).

"Prohibited Area" shall mean the United States of America.

"Smart's Business" shall mean providing products, services, training, and staffing relating to construction safety.

**A.**   **Confidential Information.**  I recognize that during my employment I will receive, develop, or otherwise acquire information which is of a secret or confidential nature, including Confidential Information regarding Smart and its Clients. Except as authorized by Smart, I will not disclose, directly or indirectly, any Confidential Information of Smart or its Clients to any third party including, without limitation, other customers or suppliers. Further, I will only use such Confidential Information in the faithful performance of my duties for Smart. The confidentiality provisions of this Agreement shall survive the termination of my employment at Smart. I also acknowledge that all files, records, documents, drawings, specifications, equipment, and similar items (regardless of media) relating to Smart's business, whether prepared by me or otherwise coming into my possession, shall remain the exclusive property of Smart. Upon the conclusion of my employment, I agree to return to or leave with Smart all of such written or other records and all copies thereof

**B.**   **Unlicensed Third Party Information.**  Smart understands that prior to my employment by Smart I may have had access to the Confidential Information of entities other than Smart. I understand that Smart does not permit employees to disclose or use the unlicensed Confidential Information of third parties and I represent and warrant that I will not disclose to Smart, receive, or use or incorporate into any work for or on behalf of Smart, any Confidential Information of third parties. Prior to signing this agreement and without breaching any obligation, I shall disclose to Smart below, any restrictions that may affect my ability to work on behalf of Smart, including any existing non-compete agreements, confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties.

**C.**   **Non-Solicitation.**

**1.**   **Non-Solicitation of Clients and Prospective Clients.**  I agree that, during the Prohibited Term and in the Prohibited Area, I will not, directly or indirectly, on behalf of myself or any other person or business, solicit, contact, call upon or do any transaction/business with (a) any client of Smart which was a Smart client at the time of the termination of my employment with Smart or at any time in the 12-month period immediately preceding the termination of my employment with Smart, or (b) any prospective Smart client known to me to be such during the course of my employment with Smart or contacted or solicited by me, either directly or indirectly, or by anyone under my supervision or direction, within the 12-month period prior to the termination of my employment with Smart.

**2.**   **Non-Solicitation of Employees.**  I agree that, during the Prohibited Term, I will not directly or indirectly, solicit, recruit or induce any Smart employee to leave employment with Smart or to work for any other person or business.

**D.**   **Non-Competition.**  I agree that during the Prohibited Term and in the Prohibited Area I will not provide services competitive with Smart's Business and I will not own, manage, control or operate, or act as an employee, representative, consultant or independent contractor for any business which is engaged in any line of business that is the same as, similar to or otherwise competitive with Smart's Business.  I further agree that I have carefully reviewed the Prohibited Term and the

1

Prohibited Area and agree that both (and this paragraph as a whole) are fair, reasonable and necessary to protect Smart's legitimate competitive business interests under the circumstances.

## E.   Enforcement of Agreement and Miscellaneous Provisions

**1.     Remedies for Breach.** I have carefully reviewed this Agreement and agree that its terms and restrictions are fair and reasonable. I also agree that Smart would be irreparably injured in its business and would not have an adequate remedy if I were to breach my obligations hereunder. Therefore, I agree that Smart's remedies in the event of any such breach by me would be cumulative and that Smart could seek money damages, specific performance, a temporary restraining order and preliminary and permanent injunctive relief, as appropriate. I also agree that if Smart must pursue any legal action to enforce this Agreement, and prevails in doing so, Smart is entitled to recover from me its actual attorney fees and costs of litigation.

**2.     Severability of Provisions.** If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable, to any extent, the remainder of the Agreement shall not be affected. Further, a court of competent jurisdiction may modify any provision of this Agreement deemed invalid or unenforceable to the extent necessary to render that provision valid and enforceable.

**3.     Modifications.** To be effective and binding upon Smart, any modification of this Agreement and any consent under it must be made in writing and signed by an officer of Smart.

**4.     Employment Relationship.** I acknowledge that this Agreement does not constitute a contract of employment for any definite period of time, that I am and remain employed at the will of Smart and that my employment may be terminated at any time with or without notice or cause.

**5.     Governing Law, Jurisdiction and Venue.** This Agreement is entered into in the State of Louisiana and shall be governed by, and construed and enforced in accordance with, the laws of Louisiana without regard to the conflicts of law provisions thereof. I agree that, should any litigation arise out of, in connection with, or relating to this Agreement, such litigation will be commenced in a state court situated in East Baton Rouge Parish, Louisiana, or in the United States District Court for the Eastern District of Louisiana. I specifically agree that either of these courts shall have personal jurisdiction over me and venue over any dispute arising under this Agreement.

**6.     Construction.** Although this Agreement was drafted by Smart, I agree that it accurately reflects our intent and understanding and should not be construed against Smart if there is any dispute over the meaning or intent of any provisions.

**7.     Successors and Assignment.** I understand that this is not a personal services agreement, and is fully assignable by Smart and this Agreement shall inure to the benefit of Smart and its successors or assigns.

**By my signature below, I acknowledge that (i) I have had sufficient opportunity to, and have, carefully read each provision of this Agreement, (ii) I have had the opportunity to review this Agreement with legal counsel of my own choice, (iii) I understand each provision, (iv) I am not under any duress, (v) I am not relying upon any representations or promises that are not set forth in this Agreement, and (vi) I am freely and voluntarily signing this Agreement and intend to be bound by it.**

| ☑ I have NO RESTRICTIONS that may affect my ability to work on behalf of Smart, including any existing non-compete or confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties. | ☐ YES, I have RESTRICTIONS that may affect my ability to work on behalf of Smart, including any existing non-compete agreements, confidentiality agreements, court orders, or pending or threatened litigation with prior employers, contractors or other third parties, as described in detail below: |
|---|---|
| Signature _John Marsh_ <br> Printed Name _John Marsh_ <br> Date: _5/30/14_ , 20 _14_ | |

# Exhibit H



BEARMAN, CALDWELL & BERKOWITZ, PC

MONARCH PLAZA
SUITE 1600
3414 PEACHTREE ROAD N.E.
ATLANTA, GEORGIA 30326

PHONE:   404.577.6000
FAX:       404.221.6501

www.bakerdonelson.com

KATHRYN J. HINTON
**Direct Dial**: 404.223.2216
**Direct Fax**: 404.238.9785
**E-Mail Address**: khinton@bakerdonelson.com

February 13, 2018

**<u>VIA FEDEX AND EMAIL</u>**

Mr. John Clark Marsha II
119 Foxdale Way
Dallas, GA 30132
<span style="background-color:black; color:black">████████████</span>

Double Check Risk Solutions, LLC
38 Old Ivy Road, Suite 250
Atlanta, GA 30342
<span style="background-color:black; color:black">████████████</span>

Double Check Risk Solutions, LLC
<u>ATTN</u>: Ben Newton, Registered Agent
2800 Century Parkway, Suite 300
Atlanta, GA 30345

Re:     **SECOND NOTICE**
        Smart Safety Gulf Coast/Violation of Employment Agreement

Mr. Marsha,

As you are aware, this law firm represents your former employer, SMART Profitability Solutions, LLC d/b/a SMART Safety Gulf Coast ("SSGC" or "the Company").

As outlined in my February 5, 2018 correspondence to you, SSGC learned that you established your own company, Double Check Risk Solutions, LLC ("Double Check"), which is directly competitive with the business of SSGC, and solicited at least one SSGC customer for the purpose of providing services competitive with SSGC.  I also advised that SSGC was investigating the circumstances surrounding your departure from the Company.

The initial results of SSGC's investigation confirm that you violated the non-solicitation and non-compete covenants contained in the Confidentiality, Non-Solicitation and Non-Competition Agreement ("the Agreement") you signed at the commencement of your relationship with SSGC. (Agreement, ¶¶ C-D). Moreover, you accessed and downloaded SSGC's

ALABAMA • FLORIDA • GEORGIA • LOUISIANA • MARYLAND • MISSISSIPPI • SOUTH CAROLINA • TENNESSEE • TEXAS • VIRGINIA • WASHINGTON, D.C.

confidential and trade secret information to use it on behalf of Double Check, which constitutes not only a breach of the non-disclosure provision of the Agreement, but also a flagrant breach of your fiduciary duty to SSGC and a violation of the Georgia Trade Secrets Act.  As you are using SSGC's trade secrets on behalf of your new company, Double Check has also violated the Georgia Trade Secrets Act, and is liable for conspiring with you to breach your fiduciary duty to SSGC.

Based upon these findings, I will be initiating legal proceedings against you and Double Check immediately. In the meantime, SSGC hereby reiterates its demand that you <u>immediately</u> return all SSGC documents, data, and information -- in electronic form, hard copy, or otherwise -- in your possession, custody, or control. Please coordinate the return of this information directly through me.  Additionally, SSGC demands that you immediately cease all communications with its customers, current employees and/or independent contractors. Failure to follow any of these directives will only result in the expansion of SSGC's damages and the corresponding relief it will seek from the court.

I remain available to discuss any alternatives to litigation before **Friday, February 16**.  If I do not hear from you by that date, I will presume that you intend to continue to violate your contractual obligations and Georgia law, and my client will proceed accordingly.

If you have retained counsel, please forward this correspondence to him/her immediately.


Sincerely,

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**

Kathryn J. Hinton, Esq.


KJH/mjh